UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

ROWE PLASTIC SURGERY OF NEW JERSEY,
L.L.C. and NORMAN MAURICE ROWE, M.D.,
M.H.A., L.L.C.,

                     Plaintiffs,

        v.

AETNA HEALTH AND LIFE INSURANCE
COMPANY,

                     Defendant.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
22-CV-4755 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Rowe Plastic Surgery of New Jersey, L.L.C. ("Rowe Plastic Surgery") and

Norman Maurice Rowe, M.D., M.H.A., L.L.C. ("Rowe MD") commenced the above-captioned

action on July 12, 2022, against Defendant Aetna Health and Life Insurance Company ("Aetna") in

the Supreme Court of the State of New York, Nassau County, asserting breach of contract,

promissory estoppel, and unjust enrichment claims and violation of New York's Prompt Pay Law,

N.Y. Ins. Law § 3224-a.  (Compl. ¶¶ 57–84, annexed to Notice of Removal as Ex. 1, Docket Entry

No. 1-1.)  Plaintiffs' claims arise out of Aetna's allegedly late, reduced, and unreasonable payment

for a bilateral breast reduction they performed on a patient, D.B. (the "Patient"), who Aetna

insured.  (*Id.* ¶¶ 3, 5, 31–56.)  On August 12, 2022, Aetna removed the case to the Eastern District

of New York, invoking diversity jurisdiction. [1]  (Notice of Removal ¶ 11, Docket Entry No. 1.)  On

---

      [1]  Aetna states in the Notice of Removal that the case was filed in and removed from the
Supreme Court of the State of New York, Queens County, (Notice of Removal ¶¶ 1, 14–15), and
provides a copy of the notice that it filed in state court indicating the case was being removed
from Supreme Court, Queens County, (Notice of Filing of Notice of Removal, annexed to Notice

November 9, 2022, Plaintiffs filed an Amended Complaint that added a claim for fraudulent inducement and expanded on the factual allegations.  (Am. Compl., Docket Entry No. 12.)  Aetna answered the Amended Complaint on November 22, 2022.  (Answer, Docket Entry No. 14.)

On May 16, 2025, Aetna moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the grounds that (1) the Amended Complaint fails to state a claim and (2) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.*, expressly preempts Plaintiffs' claims; Plaintiffs opposed the motion.[2]  For the reasons explained below, the Court grants Aetna's motion and dismisses Plaintiffs' Amended Complaint for failure to state a claim.

## I.    Background

Rowe Plastic Surgery is a limited liability company through which Lisa Schneider, M.D. ("Dr. Schneider") conducts business.[3]  (Am. Compl. ¶ 8.)  Rowe MD is a limited liability

---

of Removal as Ex. 3, Docket Entry No. 1-3).  The Nassau County Clerk's office received Aetna's notice of removal and processed the removal from Supreme Court, Nassau County.  *See* Confirmation Notice for Notice of Removal/Remand, *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Health & Life Ins. Co.*, No. 609088/2022 (N.Y. Sup. Ct. 2022).

[2]  (Aetna's Mot. for J. on the Pleadings ("Def.'s Mot."), Docket Entry No. 35; Decl. of Adam J. Petitt in Supp. of Def.'s Mot. ("Petitt Decl."), Docket Entry No. 35-1; Tr. of the Dec. 21, 2020 call from Veritext ("Dec. 21 Call Tr."), annexed to Petitt Decl. as Ex. A, Docket Entry 35-2; Tr. of the Feb. 25, 2021 call from Veritext ("Feb. 25 Call Tr."), annexed to Petitt Decl. as Ex. B, Docket Entry No. 35-3; Decl. of Elizabeth C. Petrozelli in Supp. of Def.'s Mot. ("Petrozelli Decl."), Docket Entry No. 35-4; Summary Plan Descriptions ("Plan Document"), annexed to Petrozelli Decl. as Ex. 1, Docket Entry No. 35-5; Aetna's Mem. in Supp. of Aetna's Mot. ("Def.'s Mem."), Docket Entry No. 35-6; Pls.' Opp'n to Aetna's Mot. ("Pls.' Opp'n"), Docket Entry No. 35-7; Decl. of Brendan J. Kearns in Opp'n to Def.'s Mot. ("Kearns Decl."), Docket Entry No. 35-8; ECF 1024 from *In re Aetna UCR Litig.* ("*Aetna UCR Litig.*"), annexed to Kearns Decl. as Ex. 1, Docket Entry No. 35-9; Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill*, N.Y. Times (Apr. 7, 2024) ("Times Article"), annexed to Kearns Decl. as Ex. 2, Docket Entry No. 35-10; Aetna's Reply in Supp. of Aetna's Mot. ("Def.'s Reply"), Docket Entry No. 35-11.)

[3]  The Court assumes the truth of the factual allegations in the Amended Complaint for

company through which Norman M. Rowe, M.D. ("Dr. Rowe") conducts business. (*Id.* ¶ 9.) Aetna is an insurance company licensed and authorized to do business in New York State. (*Id.* ¶¶ 6–7.) Aetna's health insurance plans "are the pairing of the health insurance coverage benefits under the product with a particular cost sharing structure, provider network, and service area." (*Id.* ¶ 11.) Aetna negotiates the terms of its network agreement with medical providers and its in-network rates are "not found within any discrete insurance product or plan Aetna sells and/or administ[ers]." (*Id.* ¶¶ 18–19.) Plaintiffs have "intentionally refused to join" Aetna's provider network and therefore are out-of-network providers for Aetna's insurance policies. (*Id.* ¶¶ 20–24.)

### a. Factual background

The Patient required a bilateral breast reduction and "went to see Plaintiff[s]" because Aetna did not have an in-network provider available. (*Id.* ¶¶ 3, 13, 38; *id.* ¶ 3 n.1.) As an out-of-network provider, Plaintiffs were "unwilling to risk" non-payment for the Patient's bilateral breast reduction and therefore communicated directly with Aetna before performing the Patient's procedure despite having no obligation to do so. (*See id.* ¶¶ 39–40, 109.)

### i. Plaintiffs' communications with Aetna

### 1. December 21, 2020 call with Aetna's employee, E.J.

On December 21, 2020, Plaintiffs' representative, Kiana, called Aetna and spoke with Aetna's employee, E.J., who provided reference number 5777163333 for the call.[4] (*Id.* ¶ 40;

---

the purpose of deciding Aetna's motion. *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024) (noting that "[w]hen a defendant moves under Rule 12(c) to dismiss a complaint for failure to state a claim," a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff]'s favor" (first citing *Lively v. WAFRA Inv. Advisory Grp.*, 6 F.4th 293, 301 (2d Cir. 2021); and then quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009))).

[4] Aetna submitted as an exhibit to its motion a certified transcript of the December 21, 2020 call, (*see* Dec. 21 Call Tr.), and as discussed in Section II.b.1 *infra*, the Court considers the transcript as integral to the Amended Complaint.

Dec. 21 Call Tr.)  During the call, after confirming that Kiana was calling on behalf of a provider

of services and the Patient's membership information, E.J. asked Kiana, "Now, let me know, are

you calling for benefits or claims?" and Kiana replied, "So I need outpatient surgery benefits

done in the hospital, billing as a concessional [sic], and I do have a CPT code."  (Dec. 21 Call Tr.

2:1–4:2.)  E.J. asked for procedure and diagnosis codes, and Kiana provided CPT Code 19318

and diagnosis code N-62.  (*Id.* at 4:4–25.)  E.J. checked the codes and stated that "the code is

valid and billable," "requires pre-certification," and "[Aetna has] a dedicated department . . . for

the pre-certification, all right?"  (*Id.* at 5:1–4.)  E.J. continued that the surgery "will be allowed

based on medical necessity, but also determinations are made when the claims are processed.

Additional code processing details can be found on the payment estimator and code editing tools

in our Availity."  (*Id.* at 5:5–8.)  E.J. "quot[ed]" the in-network benefits as "100 percent no

deductible" with an out-of-pocket maximum of $1,000 and noted that the Patient had already met

the deductible and out-of-pocket maximum.  (*Id.* at 5:13–6:14.)  E.J. then stated, "let me quote

you the out-of-network benefits for this plan," and explained that the benefits are $300

deductible with an out-of-network maximum of $1,000 and noted that the Patient had already

met the deductible for the out-of-network maximum as well.  (*Id.* at 6:15–7:24.)  E.J. continued

that "Aetna will cover 100% for that, um, the benefits, all right?  Because they already met the

out-of-packet max."  (*Id.* at 8:3–4.)  Kiana responded "Okay.  So it'll be 100%, not that 80%?" to

which E.J. replied, "Yes.  Uh, the-the 80% Aetna cover it, and, uh, remaining 20% is for the . . .

member's responsibility, all right?"  (*Id.* at 8:5–9.)  Kiana confirmed that the Patient had met the

out-of-pocket maximum for the in-network rates and next asked, "can you give me any

reimbursement rates?" to which E.J. responded, "[l]et me check my resources" and that "upon

seeing here, it's, uh, reasonable and customary 90 percentile, all right?"  (*Id.* at 8:10–9:1.)  Kiana

responded, "90%.  Perfect."  (*Id.* at 9:2–4.)  Kiana asked for a reference number and for the

Aetna representative's name, and the two ended the call.  (*Id.* at 9:6–23.)

Plaintiffs allege that during the December 21, 2020 call Aetna offered to reimburse the Patient's procedure at 90% of the usual, customary, and reasonable ("UCR") rate. (Am. Compl. ¶¶ 26, 40; *see id.* ¶ 96.)  The UCR is "the charge for a service in a geographic area based on what providers in the area usually charge for the same or similar medical services" and that insurers "[t]ypically . . . will disclose the total allowed amount as a percentage of [the] UCR."  (*Id.* ¶ 26.) "The 80th percentile of providers' charges in a geographic area for the same or similar service is a percentile threshold recognized in the healthcare industry as a reasonable value for that medical service."  (*Id.* ¶ 27.)

### 2.  January 29, 2021 call with Aetna's pre-surgical pre-approval department

Plaintiffs were "unwilling" to perform the surgery at the out-of-network rate E.J. offered during the December 21, 2020 call.  (*Id.* ¶¶ 40, 42.)  "Therefore, on or about January 29, 2021, [Plaintiffs'] employee contacted Aetna and spoke to an individual in Aetna's surgical pre-approval department or unit."  (*Id.* ¶ 43.)  Plaintiffs' employee identified Plaintiffs as out-of-network providers, stated that "bilateral breast reduction was indicated for [the Patient]," and that Plaintiffs were "willing to negotiate payment for their services."  (*Id.*)

### 3.  Plaintiffs' February 3, 2021 document submission to Aetna

In response to a request from Aetna, Plaintiffs submitted clinical information and certain medical records concerning the Patient's proposed surgery on February 3, 2021, including that the bilateral breast reduction "was indicated for [the Patient]," Dr. Rowe and Dr. Schneider would be performing the procedure, and "neither provider was willing to render the services unless they were reimbursed at a higher rate."  (*Id.* ¶¶ 44–46.)

### 4.    February 25, 2021 call with Aetna's employee, Rocky

Plaintiffs contend that on or about February 25, 2021, Aetna's employee Rocky "made a promise" and "orally offered reimbursement for a bilateral breast reduction rendered to [the Patient] as in-network" and provided reference number 5950576228 for the conversation.[5]  (*Id.* ¶¶ 47, 96–97, 118; *see id.* ¶ 4.)  Aetna intentionally represented to Plaintiffs that it would reimburse bilateral breast reduction as "in-network" to induce them to perform the Patient's surgery.  (*Id.* ¶¶ 5, 62, 106, 128.)

### 5.    Aetna grants Plaintiffs a network exception

Upon information and belief, Aetna notified the Patient that it "had received [Plaintiffs'] request for a network exception" and granted the request based on Plaintiffs' submissions.  (*Id.* ¶ 48.)  Rather than pre-authorizations, which establish coverage for service, "network exceptions . . . are agreements between an insurer and an out-of-network provider to render medical service in exchange for payment."[6]  (*Id.* ¶¶ 30, 34.)  Aetna issues a network exception "only when it does not have a medical provider with the capacity to render the services the consumer needs within its network or within the consumer's geographical vicinity" and the network exceptions are valid for a limited period.  (*Id.* ¶¶ 33, 35.)  Aetna has a business procedure for issuing network exceptions and authorized its employees and agents to disclose the rate it pays to out-of-network providers via telephone, email, or facsimile.  (*Id.* ¶ 36.)  Aetna's network exception process "foster[ed] a false sense of security in the requesting provider that Aetna was 'on-notice'

---

[5]  Aetna submitted as an exhibit to its motion a certified transcript of the February 25, 2021 call, (*see* Feb. 25 Call Tr.), but as discussed in Section II.b.1 *infra*, the Court does not consider the transcript because Plaintiffs dispute its accuracy.

[6]  *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621 (2d Cir. 2008) (explaining that an "in-network exception" is "an exception to regular UCR rates that applies only if . . . no in-network provider is available to perform it").

that the out-of-network provider had rejected the offer of out-of-network reimbursement and would receive a higher payment mount." (*Id.* ¶ 61.)  When Aetna granted Plaintiffs' network exception, it "never intended to pay anything more than a fraction of the reasonable value of the services rendered." (*Id.* ¶ 62.)  Plaintiffs allege that Aetna induced them "to believe the in-network rate to be an amount negotiated by fellow medical providers in the same field in the same geographical area" and that "far exceeded the out-of-network reimbursement or was at least equal to UCR." (*Id.* ¶ 64.)

### ii. Plaintiffs perform the surgery, bill Aetna, and receive payment from Aetna

On March 10, 2021, Plaintiffs contend that they accepted Aetna's offer by performing the bilateral breast reduction surgery. (*Id.* ¶¶ 49, 98.)  Plaintiffs performed the surgery in reliance on Aetna's promise to pay a higher, in-network rate and "forbore from collecting payment in full from [the Patient] prior to" the surgical procedure. (*Id.* ¶¶ 51, 112, 114, 132.)  Aetna's network exception and offer and promise to pay at the network level and Plaintiffs' acceptance allowed the Patient to receive the bilateral breast reduction "for the same out-of-pocket costs" as with an in-network provider, (*id.* ¶ 113); "facilitated [the Patient] receiving bilateral breast reduction from [Plaintiffs] when Aetna did not have a provider in its network with the same capacity," a service that "[the Patient] was not otherwise entitled to receive," (*id.* ¶ 114); and Aetna to receive "good will" that "has a value to Aetna" from "the esteem and the expectancy of [the Patient's] continued customer patronage," (*id.*).

Pursuant to their agreement with Aetna, and within 120 days of performing the Patient's surgery, Plaintiffs billed Aetna a total of $300,000 using industry standard billing codes. (*Id.* ¶¶ 50–51, 98, 123.)  Rowe Plastic Surgery attested to the accuracy of the claims for Dr. Schneider's services, and Rowe MD attested to the accuracy of the claims for Dr. Rowe's services, with each

billing Aetna $150,000.  (*Id.* ¶¶ 54–55.)  Aetna adjudicated Plaintiffs' claims, determined they

were for services covered under the Patient's policy, and reimbursed Plaintiffs $90,844.28,

despite its obligation to pay Plaintiffs $150,000 each or a total of $300,000.  (*Id.* ¶¶ 51–55, 91,

126.)

Plaintiffs contend that the $90,844.28 paid to them is not a reasonable value because it is

inconsistent with the UCR for bilateral breast reduction.  (*Id.* ¶¶ 26, 91.)  They also contend that

Aetna did not properly apply industry coding standards for determining any recognized

limitations, incorrectly calculated its payment to Plaintiffs, and "knew or should have known that

[Plaintiffs] expected to be reasonably compensated . . . according to usual and customary

prevailing rates for bilateral breast reduction, the services rendered to [the Patient]."  (*Id.* ¶¶ 94,

107.)  Aetna failed to pay at the level it promised to induce Plaintiffs to perform the Patient's

procedure and "counted [the money] directly to profits."  (*Id.* ¶¶ 69, 75–76.)

### iii.    Aetna's allegedly broader scheme to underpay out-of-network providers

Plaintiffs contend that Aetna's underpayment to Plaintiffs is one of a series of "fraudulent

inducement" schemes in which Aetna uses network exceptions to fraudulently induce medical

providers who have refused to join their provider network, to render services to Aetna's insured,

(*id.* ¶ 58), and then intentionally underpays out-of-network services "to artificially reduce gross

costs for medical services, increase profits, and to wage economic war on out-of-network

providers who render treatment to their consumers," (*id.* ¶ 68; *see also id.* ¶¶ 56–58, 60–61, 64,

67, 72–73, 106, 120).  The network exceptions benefit Aetna because medical providers who

receive the network exception agree as a condition of receipt not to "balance bill" patients for

any difference between Aetna's payment and the provider's charges.  (*Id.* ¶ 59.)

Between 2018 and 2022, "the rate at which Aetna made improper reimbursements to

8

[Plaintiffs], after issuing a network exception, and the degree to which Aetna made reimbursements were inconsistent." (*Id.* ¶ 73.)  Plaintiffs allege that Aetna often mistakenly reimburses Plaintiffs as out-of-network, despite well documented negotiations, (*id.* ¶ 66), and its "automated claims adjudication process . . . ensure[s] that claims for payment received by Aetna for all services rendered by out-of-network providers are intentionally underpaid," (*id.* ¶¶ 65). This is one of "numerous lawsuits" that Plaintiffs have filed against Aetna to recover balances owed for procedures performed on patients.  (*Id.* ¶ 67.)

### b.  Procedural background

On November 9, 2022, Plaintiffs filed an Amended Complaint following Aetna's removal of this action from Supreme Court, Queens County and Aetna answered on November 22, 2022, asserting nineteen affirmative defenses, including failure to state a claim upon which relief can be granted and ERISA preemption.  (Notice of Removal; Am. Compl.; Answer.)  On January 29, 2024, then-Magistrate Judge Sanket J. Bulsara ordered a stay on discovery pending the Second Circuit's decision in *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Insurance Co.*, an appeal of a Southern District of New York district court's dismissal of the common law claims by Rowe Plastic Surgery and Dr. Rowe against Aetna arising out of Aetna's alleged underpayment for medical services they rendered to a patient.  (Order dated Jan. 29, 2024.)  *See Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* (*Rowe I*), 705 F. Supp. 3d 194, 202–05 (S.D.N.Y. 2023), *aff'd*, No. 23-8083, 2024 WL 4315128 (2d Cir. Sept. 27, 2024); Notice of Appeal, *Rowe I*, No. 23-CV-8521 (S.D.N.Y. Oct. 18, 2024), Docket Entry No. 33.  On September 27, 2024, the Second Circuit issued a summary order affirming dismissal of the claims.  *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* (*Rowe II*), No. 23-8083, 2024 WL 4315128 (2d Cir. Sept. 27, 2024).

On September 27, 2024, Judge Bulsara directed the parties to explain "the effect, if any,

of the Second Circuit's decision" on this action.  (Order dated Sept. 27, 2024.)  Aetna responded

that the decision "made abundantly clear that the transcripts of . . . verification of benefits calls

do not create an offer or promise to pay" and therefore "[i]f Plaintiffs will not agree to dismiss

their [Amended Complaint] with prejudice, then discovery should be stayed while the parties

engage in expedited motion practice to determine whether, consistent with the Second Circuit's

recent decision, the verification of benefits calls at issue were offers of payment to Plaintiffs."

(Ltr. dated Oct. 11, 2024 from Aetna in Response to the Court's Sept. 27, 2024 Order 1–2,

Docket Entry No. 25.)

On October 11, 2024, Plaintiffs responded that the Second Circuit's decision "do[es] not

have precedential effect," "did not find that Plaintiffs have no claim[s], but merely that Plaintiffs'

allegations fall short of stating a claim," and Plaintiffs could have amended their complaint "to

sufficiently state actionable claim(s) against [Aetna]" in *Rowe II* "had transcripts of *all* the calls

between the parties been available."  (Pls.' Status Ltr. 1–2, Docket Entry No. 26.)  Plaintiffs

therefore "request[ed] leave to conduct targeted discovery to aid in drafting an Amended

Complaint in this action."  (*Id.* at 2.)

On October 29, 2024, Plaintiffs requested leave to amend the Amend Complaint to allege

that (1) "the 'reasonable and customary' fee schedule offered by Aetna to induce performance of

the surgery was not contained in the relevant patient's health plan and was, therefore, an offer

independent of Aetna's obligations in the relevant patient's health plan"; (2) "it was a lie for

Aetna to offer reimbursement using the 'reasonable and customary' fee schedule to induce

performance of the surgery[] [b]ecause Aetna does not use that fee schedule"; and (3) "*all* the

communications between the parties, and their sum and substance, leading up to Plaintiffs

rendering the surgery at issue" to provide the Court "a complete narrative of the parties'

agreement."  (Ltr. Request for Permission to File Second Am. Compl. 1–2, Docket No. 29.)

Judge Bulsara adopted the parties' proposed briefing schedule for Plaintiffs' motion to amend the Amended Complaint on November 14, 2024.  (Order dated Nov. 5, 2024; Ltr. to Magistrate Judge Bulsara Regarding Briefing Schedule for Mot. to Amend, Docket Entry No. 30; Order dated Nov. 14, 2024.)

On December 20, 2024, Magistrate Judge James R. Cho ordered the parties to file a joint status report.[7]  (Status Report Order dated Dec. 20, 2024.)  On January 3, 2025, the parties reported that Plaintiffs would not be filing a second amended complaint because "the Amended Complaint . . . includes the additional facts [they] believe alleges a unilateral offer wherein [Aetna] agreed to treat the Plaintiffs as if they were in-network providers even though they are out-of-network providers because [Aetna] did not have surgeons available to provide the surgery" and "this unilateral offer is enforceable and was accepted by full performance."  (Status Report on Behalf of Both Parties 1, Docket Entry No. 31.)  Plaintiffs asserted that the "matter should proceed with discovery."  (*Id.*)  Aetna reiterated its position that "this case should be dismissed" based on the Second Circuit's decision in *Rowe II* and stated its intent to move forward with a premotion conference request.  (*Id.* at 1–2.)

On January 24, 2025, Aetna filed its premotion conference request and sought a stay of discovery during the pendency of its anticipated motion for judgment on the pleadings.  (Def.'s PMC Request, Docket Entry No. 32.)  On January 27, 2025, Plaintiffs opposed Aetna's motion for judgment on the pleadings and initially objected to the requested stay but subsequently took no position on the motion to stay during a hearing held before Judge Cho on March 7, 2025. (Pls.' PMC Request, Docket Entry No. 32; Min. Entry for Mot. Hr'g Held on Mar. 7, 2025

---

[7]  The case was reassigned from Judge Bulsara to Judge Cho on December 18, 2024. (Case Reassignment Notification, dated Dec. 18, 2024.)

before Magistrate Judge James Cho.)  During the hearing, Judge Cho ordered a stay of discovery

pending a ruling on Aetna's motion.  (Min. Entry for Mot. Hr'g Held on Mar. 7, 2025.)

Aetna has now moved for judgment on the pleadings on the basis that the Amended

Complaint fails to state a claim and ERISA expressly preempts Plaintiffs' claims.

## II.    Discussion

### a.    Standard of review

"For a complaint to withstand judgment on the pleadings, it 'must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face,' which is the

same standard that governs a motion to dismiss under Rule 12(b)(6)."  *Beck v. Manhattan Coll.*,

136 F.4th 19, 22 (2d Cir. 2025) (citation omitted); *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir.

2024) (noting that "[w]hen a defendant moves under Rule 12(c) to dismiss a complaint for

failure to state a claim, the standard for granting the motion 'is identical to that for granting a

Rule 12(b)(6) motion,'" and a court must "accept all factual allegations in the complaint as true

and draw all reasonable inferences in [the plaintiff]'s favor" (first quoting *Lively v. WAFRA Inv.

Advisory Grp.*, 6 F.4th 293, 301 (2d Cir. 2021); and then quoting *Johnson v. Rowley*, 569 F.3d

40, 43 (2d Cir. 2009))); *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) ("The standard for

reviewing a motion for judgment on the pleadings is the same as that for a motion to dismiss. . . .

, accepting the material facts alleged in the complaint as true and drawing all reasonable

inferences in favor of the plaintiff." (first citing *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521

(2d Cir. 2006); and then citing *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 178 (2d Cir.

2013))); *Velazquez v. Home Controls, Inc.*, No. 22-CV-3921, 2023 WL 4622597, at *2

(S.D.N.Y. July 19, 2023) ("A Rule 12(c) motion for judgment on the pleadings based upon a

lack of subject matter jurisdiction is treated as a Rule 12(b)(1) motion to dismiss the complaint."

(alteration omitted) (quoting *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F.

Supp. 2d 443, 448–49 (S.D.N.Y. 2001))). "In reviewing a motion made pursuant to Rule 12(c), a court 'may consider all documents that qualify as part of the non-movant's pleading, including (1) the complaint or answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice.'" *Beck*, 136 F.4th at 22 (quoting *Lively*, 6 F.4th at 306); *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (quoting same).

   **b.    Documents relied on by Aetna**

   Aetna submitted as exhibits to its motion a certified transcript of the December 21, 2020 and February 25, 2021 calls and a copy of the summary plan for the Patient's insurance policy ("Plan Document"). Aetna argues that the transcripts are "plainly integral" because the Amended Complaint "relies upon the 'terms and effect' of the phone calls" and "presupposes the existence of a relationship between [the claims administrator] and [the Patient] through a health insurance plan." (Def.'s Mem. 13–14 (citations omitted).) Aetna argues that the Court can consider the Plan Document because (1) it is permissible under binding authority from the Second Circuit and the Supreme Court, (Def.'s Reply 6–8); (2) "the ERISA plan Aetna administered for Plaintiffs' patient is key to the Amended Complaint" and Plaintiffs' argument that it is not because they "never quote, cite, or rely on the plan in their Amended Complaint . . . 'is, frankly, frivolous – as Rowe and his counsel ought to know,'" (*id.* at 8 (quoting *Norman Maurice Rowe, M.D., M.H.A., LLC v. Aetna Life Ins. Co.*, No. 23-CV-6238, 2025 WL 692051, at *1 (S.D.N.Y. Mar. 4, 2025), *appeal withdrawn sub nom. Rowe Plastic Surgery of N.J., L.L.C. v. Blue Cross Blue Shield of N.C.*, No. 25-539, 2025 WL 1625510 (2d Cir. Apr. 23, 2025), *and* No. 25-537, 2025 WL 1603002 (2d Cir. Apr. 28, 2025))); (3) "Plaintiffs' argument that the [Plan Document] should be barred as hearsay" is "meritless" as "the plan is being used as a verbal act — for its legal effect — not for the truth of the matter asserted," (*id.* at 8); (4) "Plaintiffs'

argument that maybe the ERISA plan was no longer in effect . . . is impermissible speculation,"
(*id.* at 9); and (5) "Plaintiffs' argument that Aetna cannot rely on the [Plan Document] without
converting" to "a motion for summary judgment is belied by [*Park Avenue Podiatric Care,
P.L.L.C. v. Cigna Health and Life Insurance Co.*, No. 23-1134, 2024 WL 2813721 (2d Cir. June
3, 2024)], where the Second Circuit affirmed dismissal based on the plan document at the motion
to dismiss stage," (*id.* at 9).

Plaintiffs argue that the Court cannot consider the February 25, 2021 call transcript
because "[t]he recording itself reveals vocal inflections, pauses, and tonal patterns that the
transcript fails to capture, creating multiple reasonable inferences about what was
communicated." (Pls.' Opp'n 14.) Plaintiffs' counsel submitted a sworn declaration that "[t]he
transcript inserts definitive punctuation — specifically, question marks and pauses — that
suggest a meaning different from the one conveyed by the actual recording" and "[w]hen the
conversation is listened to rather than merely read, the tone, vocal inflection, and cadence of
[Rocky] contradict the impression created by the transcript's punctuation" and pointed to a
specific example. (Kearns Decl. ¶¶ 6–10.) Plaintiffs argue that Aetna cannot rely on the Plan
Document because (1) Aetna has failed to establish the business records or any other hearsay
exception as its sponsoring affidavit does not state "[w]ho created the Plan [D]ocument" or
"claim personal knowledge of the facts" nor does Aetna "submit[] a proper custodian
certification," (*id.* at 15–16); (2) "a defendant's unilateral production of a document [does not]
make it subject to judicial notice," (*id.* at 15); (3) Plaintiffs "never quote, cite, or rely on the
[Plan Document] in their Amended Complaint," "[do not] sue to enforce it," and "[do not] even
say [they have] seen it," (*id.* at 15, 17–18); (4) "Aetna's promise — not the plan — is the basis of
the lawsuit" and "the Plan Document establishes that Aetna's employees were not relying on the
Plan Document when it relayed the payment information," (*id.* at 18); and (5) the Court must

treat the motion as one for summary judgment with a chance to oppose on a full record if it

considers the Plan Document due to "factual disputes" for which the Plaintiffs "[have not] had

discovery," including whether "the purported plan was it in effect at the time of the call," "the

purported plan applied to this [P]atient," and anything "establishes the reimbursement standard

the plan uses,"[8] (*id.* at 19).

"In considering a [Rule 12(b)(6)] motion to dismiss for failure to state a claim, 'the

district court is normally required to look only to the allegations on the face of the complaint,'"

but "may consider documents that 'are attached to the complaint,' 'incorporated in it by

reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v.*

*Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.

2007)); *see Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025) ("Generally, in determining

whether a complaint states a claim, the court is required to make the assessment based solely on

the allegations in the complaint, without considering extraneous facts and materials" but "[a]

plaintiff may incorporate allegations in the complaint by reference to another document, and

"where the complaint relies heavily upon its terms and effect," the "document is integral to the

complaint." (first citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and

---

[8] Plaintiffs' remaining arguments challenge whether the Patient's insurance plan is
regulated by ERISA. These arguments are (1) "there is . . . an issue of fact regarding ERISA
regulation of the [P]atient's plan" because "the Plan Document itself says '[t]his Certificate is
governed by the laws of New York State,'" (Pls.' Opp'n 14 (quoting Plan Document 2)); (2)
Aetna fails under the standard set in *Grimo v. Blue Cross/Blue Shield*, 34 F.3d 148 (2d Cir.
1994), to offer "actual facts" to "prove the plan is governed by ERISA, and the plan was
'established or maintained' by an employer — not just purchased or referenced," (*id.* at 16–17);
and (3) Aetna has failed to show that the plan does not fall in the regulatory safe harbor
exception for ERISA plans that "applies where the employer [does not] contribute, the employee
participation is voluntary, the employer does nothing more than pass along information, and the
employer gets no benefit beyond admin cost reimbursement," (*id.* at 17). Because the Court does
not reach Aetna's preemption defense, *see infra* note 9, the Court does not consider these
arguments.

then quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016))). "If, however, there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016); *see also Oberlander v. Coinbase Glob. Inc.*, No. 23-184, 2024 WL 1478773, at *4 (2d Cir. Apr. 5, 2024) (emphasizing that "even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document" (alteration in original) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting same); *United States v. Persad*, 607 F. App'x 83, 84 (2d Cir. 2015) ("'A court should not' take judicial notice of a fact 'that is an essential part of a party's case unless the fact is clearly beyond dispute.'" (quoting *Pina v. Henderson*, 752 F.2d 47, 50 (2d Cir. 1985))). The "no dispute" requirement "has been interpreted strictly: even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible." *Santiago v. City of Rome*, No. 24-CV-704, 2025 WL 553347, at *3 (N.D.N.Y. Feb. 19, 2025) (quoting *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, No. 14-CV-2495, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016)); *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, No. 22-CV-10185, 2023 WL 9102400, at *8 (S.D.N.Y. Dec. 29, 2023) (quoting *Savides v. United Healthcare Servs., Inc.*, No. 18-CV-4621, 2019 WL 1173008, at *2 (S.D.N.Y. Mar. 13, 2019)) (same); *Fabi v. Prudential Ins. Co. of Am.*, No. 21-CV-4944, 2022 WL 5429520, at *3 (E.D.N.Y. Aug. 29, 2022) (quoting *Grant v. Abbott House*, No. 14-CV-8703, 2016 WL 796864, at *2 (S.D.N.Y. Feb. 22, 2016)); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221–22 (N.D.N.Y. 2014) (collecting cases).

The Court considers the December 21, 2020 call transcript but not the February 25, 2021

call transcript and summary plan document.

### 1. Call transcripts

Both transcripts are integral to the Amended Complaint because Plaintiffs reference the calls in the Amended Complaint. (*See, e.g.*, Am. Compl. ¶ 40.) Plaintiffs also cite to the transcripts in their opposition to Aetna's motion. (*See* Pls.' Opp'n 20–23, 25.) Therefore, the Court considers the December 21, 2020 transcript. However, because Plaintiffs challenge the accuracy of the February 25, 2021 call transcript versus the call recording, including whether the transcript correctly punctuates Rocky's statements as affirmative statements versus questions, the Court does not consider the February 25, 2021 call transcript. Neither party submitted a copy of the call recording to the Court. Therefore, the Court does not consider the February 25, 2021 transcript nor any arguments in support of or opposition to Aetna's motion that rely on direct quotes from the transcript. *See Rowe II*, 2024 WL 4315128, at *2 & n .2 (finding no error in district court's consideration of transcript that was "integral to the [a]mended [c]omplaint" as the plaintiff's counsel conceded and noting that the plaintiff's counsel "[did] not contest either the accuracy or the authenticity of the call transcript"); *Muniz v. New Horizon Counseling Ctr., Inc.*, No. 20-CV-4794, 2022 WL 426157, at *3–4 (E.D.N.Y. Feb. 11, 2022) (declining to consider nonpublic filing of recording and transcript of a "conversation [that was] critical to [the p]laintiff's claims" and partially quoted in the amended complaint as "the parties' opposing interpretation of the conversation makes such consideration improper in this motion to dismiss").

### 2. Plan Document

As to the Plan Document, although a close call, the Court does not consider it in deciding Aetna's motion. The Court agrees that the Plan Document is "integral" to the Amended Complaint, *Strock*, 982 F.3d at 63, as the allegations "presuppose[] the existence of a relationship" between the Patient and Aetna, *Park Ave.*, 2024 WL 2813721, at *3, under which

Aetna "arrange[d] for and manage[d] the costs of [the Patient's] medical treatment," (Am. Compl. ¶ 14), and "whether . . . out-of-network provider[s] like [Plaintiffs were] the recipient of any duty . . . rely on the terms of the plan and are necessary to resolve in order to advance [Plaintiffs'] challenge to the merits stage," *Park Ave.*, 2024 WL 2813721, at *3 (affirming district court's consideration of insurance plan documents as integral to the complaint "[b]ecause the plan terms and effects were relied upon in [the] complaint, and integral to its adjudication" and finding that the plans were regulated by ERISA); *Rowe, M.D.*, 2025 WL 692051, at *1 (dismissing Rowe MD and East Coast Plastic Surgery, P.C.'s argument that the court should not consider the plan documents submitted by insurers "because they were not attached to the complaint" as "too ridiculous to warrant serious consideration" because "the plans provide[d] the insurance coverage for the patients and so are integral to the complaint that seeks to recover for surgeries performed on them").  Although Plaintiffs contest that the Plan Document "was . . . in effect at the time of the call," "applied to [Patient]," and "establishes the reimbursement standard the [Plan Document] uses," Plaintiffs quote from the Plan Document and refer to it as "governing Plan [Document]" in their opposition brief, (Pls.' Opp'n 6, 19), effectively undermining their own arguments against consideration of the document," (*id.* at 19).  *But see Santiago*, 2025 WL 553347, at *3 (explaining that the no dispute requirement is "interpreted strictly" even in the face of "contradictory[] or implausible objections" to a document's authenticity or accuracy).

The Court nevertheless declines to consider the Plan Document because there is no permissible basis to conclude that the Patient was covered under the Plan Document, either as a participant or beneficiary, and the document appears to be inconsistent with the exhibits attached to the Amended Complaint.  (*See* Plan Document 1, 5–6, 65–66, 112; Health Ins. Claim Forms, annexed to Am. Compl. as Ex. 1, Docket Entry No. 12-1.)  In *Park Avenue*, where an out-of-network provider sued an insurance company to recover payment for surgeries that the insurer

allegedly reimbursed at a lower rate than promised, the Second Circuit affirmed in a summary order a district court's consideration of the plan documents the insurer submitted with its motion to dismiss on ERISA preemption grounds.  2024 WL 2813721, at *1, *3.  The district court considered the documents after first determining that the plan was employer-sponsored to provide medical benefits for its employees, and therefore governed by ERISA, and that the patient was a beneficiary.  *Park Ave. Podiatric Care, P.L.L.C. v. Cigna Health & Life Ins. Co.*, No. 22-CV-10312, 2023 WL 2478642, at *2 (S.D.N.Y. Mar. 13, 2023), *reconsideration denied*, 2023 WL 4866045 (S.D.N.Y. July 31, 2023), *aff'd*, 2024 WL 2813721; *see also Norman Maurice Rowe, M.D., M.H.A., L.L.C. v. UnitedHealthcare Serv., LLC*, No. 23-CV-516, 2024 WL 4252045, at *4 (E.D.N.Y. Sept. 20, 2024) (finding on a motion to dismiss that the patient was a beneficiary of the ERISA plan attached to the motion because the policy group number on the cover page of the ERISA plan summary documents attached to the complaint matched the policy group number on a complaint exhibit).  The Second Circuit concluded that the district court did not err "[b]ecause the plan terms and effects were relied upon in [the plaintiff's] complaint, and integral to its adjudication."  *Park Ave.*, 2024 WL 2813721, at *3.

Aetna provides a sworn declaration from a senior paralegal at its parent corporation attesting that "[i]n 2020-2021, based on Aetna's business records, [the Patient] was enrolled in a health benefits plan sponsored and funded by Intesa Sanpaolo, and noted in Aetna's business records as being governed by" ERISA.  (Petrozelli Decl. ¶ 2.)  The Plan Document states that the policy is a welfare plan providing health care services under a group policy, Intesa Sanpaolo is the policyholder and plan administrator, and Aetna is the policy underwriter and claims processor.  (Plan Document 1, 5–6, 65–66, 112.)  The Plan Document, however, does not mention the Patient and the only information before the Court linking the Patient to the policy is Aetna's declaration.  Plaintiffs attach to the Amended Complaint health insurance claim forms

they submitted to Aetna for the Patient's surgery, but the fields pertaining to the Patient's insurance policy, such as the policy group number, are blank.  (*See* Health Ins. Claim Forms.) The first field on the form requires selection of one of several plan types, with "group health plan" as an option.  The option selected on both forms is "Other," which appears to be inconsistent with the Plan Document that appears to indicate it is a group health plan.  (*See, e.g.*, Plan Document 3, 112.)  Thus, unlike in *Park Avenue*, there are no complaint exhibits that the Court can match to the Plan Document and the Court declines to reconcile any apparent inconsistencies on a motion for judgment on the pleadings.  Moreover, Plaintiffs do not allege any relationship between the Patient and Intesa Sanpaolo in the Amended Complaint such that the Court could find that the Patient was, for example, Intesa Sanpaolo's employee and therefore a participant in the Plan.

Accordingly, the only extrinsic document the Court considers is the transcript of the December 21, 2020 call, the authenticity and accuracy of which Plaintiffs do not challenge.[9]

### c.  Plaintiffs' common law claims

Aetna argues that Plaintiffs' claims for breach of contract, promissory estoppel, unjust enrichment, fraudulent inducement, and violation of New York's Prompt Pay Law should be dismissed because "the legal theory underpinning Plaintiffs' Amended Complaint" — "that,

---

[9]  Without consideration of the Plan Document, the Court does not reach Aetna's preemption defense because whether the Patient's health insurance plan with Aetna is governed by ERISA and therefore subject to express preemption "is [not] evident from the face of the [Amended Complaint]."  *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 300 (2d Cir. 2022) ("Although preemption is an affirmative defense, this doctrine 'can still support a motion to dismiss if the [relevant preemption] statute's barrier to suit is evident from the face of the complaint.'" (quoting *Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 28 (2d Cir. 2015))); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* (*Rowe I*), 705 F. Supp. 3d 194, 202 (S.D.N.Y. 2023) (determining that it would be "premature for the [c]ourt to engage in a preemption analysis" because "there [was] no proper evidence before the Court that [the patient's] plan [was] governed by ERISA"), *aff'd on other grounds*, No. 23-8083, 2024 WL 4315128 (2d Cir. Sept. 27, 2024).

during a pre-surgery call to verify benefits and preauthorize coverage under a patient's plan, Aetna made legally binding contracts or promises to pay Plaintiffs a particular rate for those surgeries rather than what the terms and conditions of the [P]atient's plan permits" — "remains as defective" as similar actions with "substantively identical claims" that the "Second Circuit and multiple District Courts have dismissed." (Def.'s Mem. 1, 14, 6–12.) They contend that the call transcripts "conclusively refute" Plaintiffs' "assertion that, during the December 21, 2020 verification of benefits call and subsequent February 25, 2021 preauthorization call, Aetna 'offered' to pay Plaintiffs for [the Patient's] surgery." (*Id.* at 13–14.)

Plaintiffs contend that "[e]ach claim is legally cognizable and adequately pled under federal and New York pleading standards" and that the "pre-service call transcripts provide the actual operative promises." (Pls.' Opp'n 19–20.) They argue that "[t]his case presents distinct allegations regarding a specific patient, a different surgery, and a completely different reimbursement representation," which "entitle[s] [them] to discovery, not premature dismissal based on prior rulings involving other claims and procedures." (*Id.* at 27–28.)

The Court considers the adequacy of Plaintiffs' allegations for each common law claim.

### i.    Breach of contract claim

Aetna argues that Plaintiffs cannot plead the existence of a valid contract based on the communications in the Amended Complaint. In support, Aetna contends that (1) the December 21, 2020 "call transcript conclusively refutes" that "Aetna offered or promised to pay Plaintiffs '90 percent of reasonable and customary' for [the Patient's] surgery" as the call had "no negotiation and . . . no offer for Plaintiffs to reject" and courts deciding other *Rowe* cases "have held as much, addressing materially identical call transcripts in companion cases with these same

Plaintiffs" and determining that the transcripts reflected benefits verification calls,[10] (Def.'s Mem. 14–17; Def.'s Reply 3–5); (2) Plaintiffs' allegations that on January 29, 2021 "they communicated with Aetna's 'surgical pre-approval department' to pre-certify [the Patient's] coverage" and "were willing to negotiate payment for [the Patient's] surgery" and that their February 3, 2021 submission of "'clinical information and medical records' to Aetna so it could determine medical necessity for precertification . . . meant *they* wanted to be reimbursed at an unspecified 'higher rate'" are "completely irrelevant" because the allegations convey "Plaintiffs' subjective intent," (Def.'s Mem. 17–18); (3) Plaintiffs' "additional communications here are no different" than the communications alleged in other *Rowe* lawsuits as they "concern initiating a precertification request, providing clinical information and medical records for medical necessity review, and a request to add a co-surgeon to the authorization for [the Patient's] surgery" and Plaintiffs have failed to distinguish the communications in this action, (*id.* at 18–19; Def.'s Reply 5–6); and (4) "[p]reauthorization calls and faxes are not a contract or promise to pay" and "Plaintiffs' efforts to transform them into a contract run contrary to the purpose of the preauthorization process," (Def.'s Mem. 9); and (5) "[a]s a matter of law, neither the benefits verification call nor the preauthorization of coverage communications, alone or together, constitute a meeting of the minds, mutual assent, clear and definite promise, or agreement to pay Plaintiffs," (*id.* at 20–21).

   Plaintiffs contend Aetna's argument that "there [is] no enforceable contract because its

---

[10]   Aetna also argues that the February 25, 2021 call transcript "makes plain that Aetna's representative responded to Plaintiffs' employee's request to add a co-surgeon to an authorization, yet Plaintiffs jump to the unfounded legal conclusion that this was either an offer or a promise to pay Plaintiffs as 'in-network,'" (Def.'s Mem. 18), despite the call involving "no discussion of reimbursement for [the Patient's] surgery," (Def.'s Reply 5).  As discussed in above, *see* Section II.b.1, the Court does not consider the February 25, 2021 call transcript or related arguments.

[representative's] statements [were not] definite and there was no mutual assent" is "wrong" because "New York courts look at facts and circumstances — not what they [did not] say or do" and "recognize contracts formed through context, course of dealing, and trade practice." (Pls.' Opp'n 22.) They argue that "[t]his was a textbook unilateral contract" as "Aetna provided information during [the December 21, 2020] call[] indicating that in-network services would be reimbursed at 100% with no deductible," "Aetna confirmed that the GAP request was approved for the services in question" during the February 25, 2021 call, "Plaintiffs rendered the services based on these communications," and "Aetna failed to pay as represented." (*Id.* at 22–23 (citations omitted).) Plaintiffs contend that the Third Circuit's decision in *Plastic Surgery Center, P.A. v. Aetna Life Insurance Co.*, 967 F.3d 218, 230 (3d Cir. 2020), "supports enforceability of . . . insurer representations" that Aetna made to it, and that "[c]ourts around the country have rejected the idea that verbal reimbursement statements are legally meaningless" and have "found these types of calls can absolutely create enforceable obligations." (*Id.* at 23–24 (citations omitted).) Plaintiffs also argue that "[t]his case centers on Aetna's affirmative pre-service promises that a network GAP exception had been approved, and that services would be processed at in-network reimbursement rates" and that "[u]nlike the generic verification calls at issue in prior *Rowe* decisions, the communications here involved specific approval language and no disclaimer or reservation of rights by Aetna." (*Id.* at 25 (citations omitted).)

Under New York law, a plaintiff alleging breach of contract must show "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Up State Tower Co., LLC v. Town of Cheektowaga*, No. 24-165, 2025 WL 444207, at *1 (2d Cir. Feb. 10, 2025) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)); *Creaven v. Erickson*, No. 22-874, 2023 WL 4247213, at *3 (2d Cir. June 29, 2023) (listing the elements of breach of contract under New York law as "(1) an

agreement, (2) performance by the plaintiff, (3) breach [by the defendant], and (4) damages"

(citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996))); *Edwards v. Sequoia Fund, Inc.*,

938 F.3d 8, 12 (2d Cir. 2019) (quoting *Orlander v. Staples, Inc*., 802 F.3d 289, 294 (2d Cir.

2015)) (similar); *Frye v. Lagerstrom*, No. 20-3134, 2021 WL 4022695, at *4 (2d Cir. Sept. 3,

2021) (quoting *Segui*, 91 F.3d at 348) (same).  A valid contract exists if there is "an offer and

acceptance, consideration, mutual assent, and an intent to be bound."  *Rowe II*, 2024 WL

4315128, at *2 (quoting *Register.com v. Verio*, 356 F.3d 393, 427 (2d Cir. 2004)); *Jun v. Bank of

Am.*, No. 23-7903, 2024 WL 5135381, at *2 (2d Cir. 2024) ("To establish the existence of an

enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration,

mutual assent, and an intent to be bound." (brackets and citation omitted)).  Moreover, "to

sufficiently plead the existence of a contract," a plaintiff must allege details regarding "the

formation of the contract, the date it took place, and the contract's major terms."  *Lim v. Radish

Media Inc.*, No. 22-1610, 2023 WL 2440160, at *2 (2d Cir. Mar. 10, 2023); *see Negotius Corp.

v. Viola, Inc.*, No. 24-CV-243, 2025 WL 416021, at *4 (S.D.N.Y. Feb. 6, 2025) ("[A] complaint

fails to sufficiently plead the existence of a contract if it does not provide factual allegations

regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major

terms."  (alteration in original) (quoting *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338,

347 (S.D.N.Y. 2020), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022)); *Thorpe v.

Delta Air Lines, Inc.*, No. 24-CV-1089, 2024 WL 5007423, at *5 (E.D.N.Y. Dec. 6, 2024)

("Critically, a complaint fails to sufficiently plead the existence of a contract if it does not

provide factual allegations regarding, *inter alia*, the formation of the contract, the date it took

place, and the contract's major terms." (quoting *Ebomwonyi*, 473 F. Supp. 3d at 347)); *N.Y. Grp.

for Plastic Surgery LLP v. Anthem Blue Cross*, No. 20-CV-4234, 2021 WL 310943, at *2

(S.D.N.Y. Jan. 29, 2021) (stating that to plead the existence of a contract, the complaint must

24

specify information regarding "the formation of the contract, the date it took place, and the contract's major terms" (quoting *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16-CV-1099, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017))); *Goldblatt v. N.Y. Inst. of Tech.*, No. 18-CV-265, 2020 WL 5027150, at *7 (E.D.N.Y. Aug. 25, 2020) (quoting *Childers v. N. Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014)) (same).

"To create a binding contract under New York law, the parties must provide a 'manifestation of mutual assent sufficiently definite to assure that they are truly in agreement with respect to all material terms.'" *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 199 (2d Cir. 2019) (brackets omitted) (quoting *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016)); *see also Trs. of N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 596 n.6 (2d Cir. 2024) ("An agreement is a manifestation of mutual assent on the part of two or more persons." (quoting Restatement (Second) of Contracts § 3 (1981))); *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102 (2d Cir. 2022) ("It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" (citation omitted)); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (same); *People v. Rodriguez*, 33 N.Y3d 956, 965 (2019) (explaining that New York courts "look to see if there exists the proverbial 'meeting of the minds'" (quoting *Stonehill Cap. Mgmt.*, 28 N.Y.3d at 448)). Further, "[t]he mere expectation that a contract will be entered into does not constitute a contract." *NRP Holdings LLC*, 916 F.3d at 201 (quoting *Papa v. N.Y. Tel. Co.*, 72 N.Y.2d 879, 881 (1988)); *Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc.*, No. 21-CV-5749, 2023 WL 7222736, at *7 (E.D.N.Y. Nov. 2, 2023) (same). "[W]hether a binding contract exists can be answered only by looking to 'the objective manifestations of the intent of the parties,'" *Turner v. Temptu Inc.*, 586 F. App'x 718, 721 (2d Cir. 2014) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp. (Brown Bros.)*,

41 N.Y. 2d 397, 393 (1977)), which is "gathered by their expressed words and deeds," *Zheng v. City of New York*, 19 N.Y.3d 556, 572 (2012) (quoting *Brown Bros.*, 41 N.Y.2d at 399); *Schoninger v. Green*, 763 F. App'x 1, 4–5 (2d Cir. 2019) ("[U]nder well-settled New York law, 'the existence of a binding contract is not dependent on the subjective intent of either [party],'" but "[r]ather, it depends upon 'the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" (quoting *Brown Bros.*, 41 N.Y.2d at 397)).  Courts determine the objective manifestations of the parties' intent by first examining "the communications between the parties," *Kolchins v. Evolution Markets, Inc.*, 8 N.Y.S.3d 1, 9 (App. Div. 2015), and "look to the basic elements of the offer and acceptance to determine if there was an objective meeting of the minds sufficient to create a binding and enforceable contract," *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 136 (2d Cir. 2022) (citing *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999))).

An offer must be "sufficiently definite . . . such that its unequivocal acceptance will give rise to an enforceable contract." *Express Indus.*, 93 N.Y.2d at 589 (citing *Martin Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)); *Rowe II*, 2024 WL 4315128, at *2 (quoting *Kolchins*, 31 N.Y.3d at 106) (same).  "[D]efiniteness as to material matters is of the very essence of contract law [and] [i]mpenetrable vagueness and uncertainty will not do." *Express Indus.*, 93 N.Y.2d at 589 (citing *Martin Delicatessen*, 93 N.Y.2d at 109); *Lipsett v. Pop. Bank*, No. 22-3193, 2024 WL 111247, at *1 (2d Cir. Jan. 10, 2024) (quoting *Martin Delicatessen*, 52 N.Y.2d at 109).  In addition, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Nwoye v. Obama*, No. 23-1178, 2024 WL 911753, at *2 (2d Cir. Mar. 4, 2024) (quoting *Express Indus.*, 93 N.Y.2d at 589), *cert. denied*, 145 S. Ct. 159 (2024); *Est. of Airday v. City of New York*, No. 22-1081, 2023 WL 4571967, at *2 (2d Cir. July 18, 2023) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power*

*Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007)) (similar); *Rodriguez*, 33 N.Y.3d at 965 (same); *Carione v. Hickey*, 20 N.Y.S.3d 157, 158 (App. Div. 2015) (same).  This manifestation of assent "may be by word, act, or conduct which *evinces the intention of the parties to contract.*" *Register.com*, 356 F.3d at 427 (quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (App. Div. 1998)); *Schoninger*, 763 F. App'x at 4 ("Assent need not be written and 'may be by word, act, or conduct which evinces the intention of the parties to contract.'" (quoting *Register.com*, 356 F.3d at 427)).  In general, "[u]nder New York [l]aw, an acceptance must comply with the terms of the offer and be clear, unambiguous, and unequivocal." *United States v. Darrah*, 132 F.4th 643, 650 (2d Cir. 2025) (quoting *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998)); *Kolchins*, 8 N.Y.S.3d at 9 (explaining that "for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal" (quoting *King v. King*, 617 N.Y.S.2d 593, 594 (App. Div. 1994))).

Plaintiffs have failed to plausibly allege the existence of a contract between them and Aetna concerning the reimbursement rate for the Patient's surgery.  Plaintiffs allege that a contract arose from the following course of communications: (1) on December 21, 2020, Aetna's representative E.J. offered to reimburse the Patient's surgery at 90% of UCR, an offer which Plaintiffs were "unwilling" to accept, (Am. Compl. ¶¶ 40, 42; *see id.* ¶ 96); (2) because Plaintiffs did not want to accept Aetna's offer, on January 29, 2021, they informed Aetna's surgical pre-approval department that they were "willing to negotiate payment for their services," (*id.* ¶¶ 40–43); (3) on February 3, 2021, Plaintiffs submitted information that Aetna requested at an unspecified time concerning the Patient's surgery and indicated that Plaintiffs were not "willing to render the services unless they were reimbursed at a higher rate," (*id.* ¶¶ 44–46); (4) on February 25, 2021, Aetna offered to reimburse Plaintiffs as in-network, (*id.* ¶¶ 47, 96–97, 118; *see id.* ¶ 4); (5) "[u]pon information and belief," Aetna notified the Patient that it had granted

27

Aetna's network exception based on Plaintiffs' submissions, (*id.* ¶ 48); and (6) Aetna accepted Aetna's February 25, 2021 offer by performing the Patient's surgery, (*id.* ¶¶ 49, 98). These allegations fail to establish that Aetna made a definite offer to Plaintiffs or an agreement as to the reimbursement amount.

### 1.    December 21, 2020 call

Plaintiffs' allegation that Aetna offered to reimburse the Patient's procedure at 90% of the UCR is not supported by the call's transcript.[11] During the call, E.J. stated twice that he was quoting the Patient's benefits and informed Kiana that pre-certification is required, pre-certifications are handled by a "dedicated department," and that "determinations are made when the claims are processed." (Dec. 21 Call Tr. 2:1–4:2, 5:1–8.) Even drawing all reasonable inferences in Plaintiffs' favor, nothing in the call's transcript can be construed as an offer to reimburse Plaintiffs at a specific amount. At most, Aetna verified the Patient's benefits and coverage levels for outpatient surgery under the CPT code Kiana provided. *See Rowe I*, 705 F.

---

[11] Plaintiffs make a different argument about the December 21, 2020 call in their opposition to Aetna's motion than they allege in the Amended Complaint. Rather than arguing that Aetna offered to reimburse at 90% of the UCR as they allege in the Amended Complaint, Plaintiffs argue that Aetna indicated that in-network services would be reimbursed at 100% with no deductible. (Pls.' Opp'n 22–23.) The Court does not consider this alternative argument about the December 21, 2020 call nor any of Plaintiffs' related arguments because Plaintiffs may not amend the Amended Complaint through their motion papers. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021) ("A district court therefore 'errs when it . . . relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.'" (quoting *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000))); *United Specialty Ins. Co. v. LIC Contracting, Inc.*, No. 17-CV-5736, 2024 WL 2815977, at *5 (E.D.N.Y. June 2, 2024) ("Factual allegations contained in legal briefs or memoranda are . . . treated as matters outside the pleading for purposes of Rule 12(b)" and "[s]uch allegations 'cannot, as a matter of law, cure the deficiencies in [a complaint].'" (alterations in original) (first quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988); and then quoting *Concepcion v. City of New York*, No. 05-CV-8501, 2008 WL 2020363, at *10 (S.D.N.Y. May 7, 2008))); *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 19-CV-1861, 2021 WL 960394, at *11 (E.D.N.Y. Mar. 15, 2021) ("Plaintiff may not amend the [c]omplaint through its moving papers."), *aff'd*, No. 21-847, 2022 WL 480475 (2d Cir. Feb. 17, 2022).

Supp. 3d at 203 (stating that "within the medical insurance industry, an insurer's verification is not the same as a promise to pay" (quoting *TML Recovery, LLC v. Humana, Inc.*, No. 18-CV-462, 2019 WL 3208807, at *4 (C.D. Cal. Mar. 4, 2019))).

Indeed, the call is virtually identical in all material respects to the call that the Second Circuit affirmed was insufficient to constitute an offer in *Rowe II*, where the Second Circuit considered Plaintiffs' appeal of a district court's dismissal of their breach of contract, unjust enrichment, promissory estoppel, and fraudulent inducement claims that arose out of Aetna's alleged underpayment for medical services Plaintiffs rendered to insured patient ELS ("Patient ELS"). 2024 WL 4315128, at *3–5. All of Plaintiffs' claims were predicated on whether an Aetna employee offered or promised to pay 80% of the cost of Patient ELS's surgery during a phone call that Plaintiffs' representative had with an Aetna customer service employee before the surgery. *Id.* at *2. The district court concluded that "[i]t [was] . . . plain from the transcript of the call" attached to Aetna's motion to dismiss "that [Aetna's] employee was merely recounting [Patient] ELS's scope of coverage and benefit rates" and "[n]o reasonable person would understand that representation to be an offer or promise to pay a particular amount to [P]laintiffs." *Rowe I*, 705 F. Supp. 3d at 203. The Second Circuit affirmed, finding the transcript showed in relevant part "that the [Plaintiffs'] employee made the call to obtain the 'benefits for outpatient surgery'" and "then asked for the reimbursement rate, to which the Aetna employee replied, '80 percent reasonable and customary.'" 2024 WL 4315128, at *3. Viewing the allegations together with the transcript, the Second Circuit concluded that Plaintiffs "[fell] short of the definiteness typically required to create an offer, such as details of the specific service and the price or an explicit undertaking of a duty" and that "the lack of definiteness eliminates any uncertainty as to what a reasonable factfinder would conclude about whether this conversation created an actionable offer by Aetna." *Id.*

The district court in *Rowe I* summarized the call that Plaintiffs alleged included the offer

or promise to pay 80% of the UCR as follows:

> At the start of the call, [P]laintiffs' employee states that she "would like the benefits" for [Patient] ELS "for outpatient surgery done in a hospital and billing as professional." [Aetna's] employee then goes on to recount, in detail, [Patient] ELS's plan benefits: (1) "the outpatient surgery center for ambulatory" would "be covered at 100 percent" without a deductible or copay; (2) [Patient] ELS's "out-of-pocket for in-network" is "4500" (only $170.69 of which had been met); (3) "out-of-network coinsurance" is "70 percent" after [Patient] ELS's $3,000 deductible; and (4) [Patient] ELS's "out-of-pocket for out-of-network" is $6,000 (only $178.69 of which had been met). Only after receiving all of that information did [P]laintiffs' employee ask "what is the reimbursement rate? Reasonable on customary or Medicare?"; [Aetna's] employee checked and then responded, "for the reimbursement rate, it's going to be 80 percent reasonable and customary."

*Rowe I*, 705 F. Supp. 3d at 202–03 (citations omitted). Like the employee in *Rowe I*, Plaintiffs' employee Kiana started the December 21, 2020 call by stating that she "need[s] outpatient surgery benefits done in the hospital, billing as a concessional [sic]," (Dec. 21 Call Tr. 4:1–2), and E.J. recounts the Patient's plan benefits in even less detail than the call in *Rowe I* and *II*, sharing that the Patient's in-network and out-of-network benefits would be covered at "100 percent no deductible" because the Patient had met the out-of-network maximum, (*id.* at 5:19–6:14, 8:2–9). Immediately after Kiana confirms with E.J. that the Patient had met the out-of-pocket maximum for in-network rates, she asks, "can you give me any reimbursement rates?," to which E.J. responds, after checking, that it would be "reasonable and customary 90 percentile." (*Id.* at 8:10–9:4.) Thus, the scope of the December 21, 2020 call was E.J. telling Kiana the Patient's benefits and reimbursement rates just as Aetna's employee did with Plaintiffs' representative in the call at issue in *Rowe I* and *II*.

## 2. Remaining communications

Because Plaintiffs have failed to show that Aetna made an offer or promise to pay during the December 21, 2020 call, Plaintiffs' allegations that "[t]herefore" they informed Aetna on or

about January 29, 2021" that they were "willing to negotiate" and on February 3, 2021 that they would not perform the surgery unless Aetna "reimbursed at a higher rate" do not plausibly reflect an ongoing course of communications or negotiations between Aetna and Plaintiffs regarding the reimbursement rate for the Patient's surgery.  (Am. Compl. ¶¶ 43, 46.)  Regardless of Plaintiffs' subjective belief that they were responding to an offer from Aetna, there is no indication that Aetna made an offer, was mutually engaging in pricing negotiations for Plaintiffs' services, or had any intent to enter into an agreement.  *Schoninger*, 763 F. App'x at 4–5 ("[T]he existence of a binding contract is not dependent on the subjective intent of either [party]" but on "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" (quoting *Brown Bros.*, 41 N.Y.2d at 399)).

Plaintiffs' allegations that Aetna employee Rocky made an offer to reimburse them "as in-network" during the February 25, 2021 call that they then accepted by performing the Patient's surgery lack the definiteness and mutual assent necessary to show the formation of an oral contract.[12]  (Am. Compl. ¶¶ 47, 97; *see id.* ¶ 4.)  Plaintiffs have offered no allegations that Rocky offered a specific rate of reimbursement nor that Rocky and Kiana discussed any material terms, including that Plaintiffs performing the surgery would constitute acceptance of the alleged offer.  *Darrah*, 132 F.4th at 650 (noting that New York law requires an acceptance "comply with the terms of the offer and be clear, unambiguous, and unequivocal" (citation omitted)); *Kalaj v.*

---

[12]  Plaintiffs state a different account of the February 25, 2021 call in their brief in opposition to the motion from the allegations in the Amended Complaint.  Rather than argue that Aetna *offered* to reimburse them the same as an in-network provider, they contend that Aetna's representative, Rocky, "*confirmed* that the authorization for surgery was *approved* with a 'network GAP.'"  (Pls.' Opp'n 3–4 (emphasis added) (quoting Feb. 25 Call Tr. at 3)); *see also id.* at 12, 20.)  The Court does not consider this argument as it relies on quotes from the transcript of the February 25, 2021 call, the authenticity of which Plaintiffs challenge.  *See supra* Section II.b.1.  Moreover, Plaintiffs may not amend the Amended Complaint through their motion papers.  *See Foreman*, 19 F.4th at 107; *supra* note 11.

*Kay*, No. 21-CV-4395, 2023 WL 4564795, at *7–8 (E.D.N.Y. July 17, 2023) (dismissing breach of contract claim concerning an alleged consultancy contract where the pleadings lacked a consistent price term and any detail on the timing of payments), *appeal dismissed*, No. 23-1173 (Oct. 18, 2023). In fact, Plaintiffs do not allege in the Amended Complaint the specific in-network reimbursement rate Aetna promised for the Patient's surgery. Reviewing the transcript of the December 21, 2020 call, the only coverage reimbursement rate that E.J. quoted was 90% of UCR, which Plaintiffs twice state is lower than they were willing to accept, and therefore presumably was not the in-network rate that Plaintiffs believe Aetna was obligated to pay. Plaintiffs allege that Aetna induced them "to believe the in-network rate" would "far exceed[] the out-of-network reimbursement or was at least equal to UCR," (*id.* ¶ 64), but do not plead when or how Aetna induced them to believe that the actual rate would "far exceed" the out-of-network reimbursement or equal the UCR nor do they plead the UCR for the Patient's surgery. Plaintiffs allegation that Aetna negotiates the terms of its in-network agreements with medical providers and that the in-network rates are "not found within any discrete insurance product or plan Aetna sells and/or [administers]," (*id.* at ¶¶ 18–19), makes an allegation of the specific rate of reimbursement that Aetna disclosed even more critical since, based on the Amended Complaint, that information does not appear to otherwise be available to out-of-network providers like Plaintiffs.[13]   Similarly, even if the Court were to find that the allegations concerning the

---

[13]  Plaintiffs' reliance on out-of-circuit decisions is unavailing. (Pls.' Opp'n 22–23 (citing *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 223 (3d Cir. 2020); *Out of Network Substance Use Disorder Claims*, No. 19-CV-2075, 2020 WL 2114934 (C.D. Cal. Feb. 21, 2020); *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*, No. 19-CV-709, 2020 WL 2027955 (C.D. Cal. Jan. 6, 2020), *rev'd and remanded on other grounds*, 22 F.4th 1086 (9th Cir. 2022); *Cal. Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*, No. 18-CV-2867, 2018 WL 6074567 (C.D. Cal. June 28, 2018)).)  In *Plastic Surgery Center*, the Third Circuit considered whether ERISA preempted an out-of-network provider's breach of contract, promissory estoppel, and other state law claims against Aetna arising out of alleged

February 25, 2021 call were sufficient to constitute a legally sufficient offer, taking the

December 21, 2020 call transcript and Amended Complaint as a whole, Plaintiffs have not

---

underpayments for two surgeries the provider had performed on patients insured under Aetna plans.  967 F.3d at 223–24.  The preemption question turned on whether the provider plausibly alleged that it was seeking "to enforce obligations independent of the [patients'] plans rather than claims for benefits due under the plans or claims otherwise impermissibly tethered to the plans." *Id.* at 230.  The Third Circuit held that the breach of contract and promissory estoppel claims survived preemption because the provider was seeking to enforce agreements that Aetna and the provider made during pre-surgical phone calls under which the provider was to perform the surgeries in exchange for Aetna paying "a reasonable amount" for one patient's surgery and "at the highest in[-]network level" for the other patient's surgery.  *Id.* at 230–33 (alteration in original).  The Third Circuit cautioned that questions such as "[w]hether any agreement was reached with a provider" would "depend on the facts and circumstances of the given case."  *Id.* at 231 n.16.  Unlike in *Plastic Surgery Center*, the Court is not deciding whether Plaintiffs' claims are preempted but rather is considering whether Plaintiffs' have sufficiently pleaded breach of contract and other common law claims under New York law.  The Third Circuit did not explicitly consider whether the claims in *Plastic Surgery Center* were sufficiently pleaded under New Jersey law, the governing state law, *see id.* at 233 n.19, and even if the Third Circuit had, the analysis would not be relevant to Plaintiffs' claims because New York state law, including as applied by the Second Circuit, governs these claims.  Similarly, the three Central District of California decisions that Plaintiffs rely on apply California law, but the Court notes that the decisions underscore the pleading deficiencies in Plaintiffs' breach of contract claim.  In all three cases, the courts considered whether network providers sufficiently pleaded breach of contract claims against insurers they alleged paid them less than promised during pre-treatment calls.  They held that the out-of-network providers sufficiently pleaded the formation of oral contracts because they alleged the promised rate of reimbursement, among other specific details, about the pre-treatment calls and there were no call transcripts before the courts that refuted the allegations.  *See Out of Network Substance Use*, 2020 WL 2114934, at *8 (concluding the provider sufficiently alleged that the insurance companies "orally promised to pay [the provider] for the treatment" at "approximately 70% of [the p]laintiff's fully-billed charges (based on 30% co-insurance payable by the patients)" and "represented" that the services provided to [their] insureds would be reimbursed at the fully billed charges"); *Bristol SL Holdings*, 2020 WL 2027955, at 3 (finding the provider stated breach of oral and implied contracts because the provider alleged a "specific billing rate pegged to a percentage of the [UCR], and allege[d] a different rate depending on whether or not the patient had met his or her out-of-pocket maximum"); *Cal. Spine*, 2018 WL 6074567, at *4 (concluding the provider sufficiently pleaded formation of an oral contract by alleging "specific names and dates of the calls between [the provider and the insurer] regarding payment for [p]atient's services, what the services would be, what was said, and by whom — including that [the insurer] agreed to pay a specific price: 75% of the [UCR] until [the p]atient's [max out of pocket expense was met], and 100% of the UCR rate afterwards").  In contrast, the December 21, 2020 call transcript refutes Plaintiffs' allegations that Aetna offered to reimburse them 90% of UCR and Plaintiffs fail to allege a specific rate of reimbursement that Aetna offered or promised during the February 25, 2021 call.

established that they and Aetna had the mutual understanding of the reimbursement rate for

Plaintiffs' surgery necessary to indicate that a contract was formed. *Cf. Colon v. Pina*, No. 24-

CV-5381, 2025 WL 2207756, at *6 (S.D.N.Y. Aug. 4, 2025) (finding alleged conversations gave

rise to an oral contract because they "sufficiently detail[ed]" when the conversations took place

and their content, including "the promises exchanged, the consideration provided, and when [the

parties] entered into the . . . agreement"); *see Waziry v. Fnu*, No. 23-CV-6395, 2024 WL

2702205, at *6 (W.D.N.Y. May 24, 2024) (dismissing breach of contract claim because the court

could not ascertain "whether or how [d]efendant may have 'assented to the contract'" and the

allegation that the parties agreed to work together "lack[ed] the requisite specificity as to the

circumstances of such an agreement" (citation omitted)); *N. Shipping Funds I, LLC v. Icon Cap.

Corp.*, No. 12-CV-3584, 2014 WL 13110918, at *5 (S.D.N.Y. June 20, 2014) (denying leave to

amend breach of contract to assert the existence of an oral contract because proposed allegations

did not "identify when any conversations purportedly creating a contract took place, who

participated, . . . what the agreed terms were," or "some plausible basis for establishing

consideration, mutual assent, and the other required elements" of contract formation); *Fuji Photo

Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 416 (S.D.N.Y. 2009) (finding contractor's

allegations that a film company "agreed to pay for [its] services on an hourly basis," the

contractor "performed its services in conformance with the agreement," and "[the film company]

failed and refused to pay [it] for services rendered" did not state a breach of contract

counterclaim because there were no "facts surrounding the formation of the contract,"

"point[ing] to the specific terms of the contract," or showing the film company breached the

alleged contract).

        Because Plaintiffs' allegations fail to demonstrate that Plaintiffs and Aetna agreed to a

specific reimbursement rate for the Patient's surgery, Plaintiffs also cannot establish that Aetna's

approximately $91,000 payment to Plaintiffs breached any agreement to reimburse Plaintiffs at a higher amount. *Lim v. Radish Media Inc.*, No. 22-1610, 2023 WL 2440160, at *2 (2d Cir. Mar. 10, 2023) (concluding the plaintiff failed to plead the existence of a contract because the complaint lacked "factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms, including under what circumstances [the p]laintiff could demand payment"); *Silverman v. 3D Total Sols., Inc.*, No. 18-CV-10231, 2019 WL 4248040, at *17 (S.D.N.Y. Sept. 9, 2019) (dismissing breach of contract claim where "it [was] not even clear there ha[d] been a breach of the contract's terms" because the complaint failed to "allege any facts surrounding the formation of the contract" and "point to the specific terms of the contract" breached), *report and recommendation adopted*, 2020 WL 1285049 (S.D.N.Y. Mar. 18, 2020).

Plaintiffs' alleged communications are similar to the communications they proposed to allege in a different *Rowe* case that the district court determined would fall short of pleading a breach of contract claim against Aetna.[14] *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Insurance Co.*, No. 23-CV-6206, 2025 WL 2218097, at *1–3 (S.D.N.Y. Aug. 5, 2025). Relying

---

[14] Plaintiffs sought to add allegations that (1) "[o]n September 28, 2021, using industry standard terms and conditions, Aetna orally represented to [Plaintiffs] that the price it would be [*sic*] pay for services rendered to [the patient] by out-of-network providers would be the '80th percentile of Reasonable and Customary,'" (2) "Aetna knew [Plaintiffs] had contemplated Bilateral Reduction Mammaplasty for [the patient], knew that Bilateral Reduction Mammaplasty was indicated for [the patient], and knew which facility the Providers intended on rendering Bilateral Reduction Mammaplasty, and the date by which its offer to cover the surgery would expire," (3) "[o]n December 23, 2021, [Plaintiffs] received a call from an Aetna employee who orally informed [plaintiffs] that Aetna would cover the Bilateral Reduction Mammaplasty at the out-of-network (OON) level for services at Hudson Regional Hospital from December 23, 2021, to June 23, 2022," and (4) "[o]n February 9, 2022, Aetna employee Natalie orally informed [plaintiffs] that Aetna agreed to cover Bilateral Reduction Mammaplasty rendered to [the patient] by [plaintiffs'] surgeon employees for dates of service between December 23, 2021 and June 23, 2022, at Hudson Regional Hospital." *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-CV-6206, 2025 WL 2218097, at *2–3 (S.D.N.Y. Aug. 5, 2025).

35

on *Rowe II*, the court adopted, over Plaintiffs' objections, a magistrate judge's report and recommendation that their motion to amend be denied and held that Aetna's transcript of one of the calls to be alleged along with the proposed allegations of additional communications "f[e]ll short of the definiteness typically required to create an offer, such as details about the specific service and the price or an explicit undertaking of a duty" thus "eliminat[ing] any uncertainty as to what a reasonable factfinder would conclude about whether [these conversations] created an actionable offer by Aetna." *Id.* at *2–3 (quoting *Rowe II*, 2024 WL 4315128, at *3). Because Plaintiffs allegations failed to give rise to a definite offer, the court concluded that their "proposed amended complaint . . . fail[ed] to state a claim for breach of contract." *Id.* at *3. Similarly, another district court adopted a report and recommendation recommending Plaintiffs' breach of contract and other claims against Aetna be dismissed with prejudice after Plaintiffs failed to respond to an order to show cause as to why their case should not be dismissed in light of *Rowe II*. *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 22-CV-7900, 2025 WL 1603919, at *1–3 (S.D.N.Y. June 6, 2025). The court held that Plaintiffs' allegation that "Aetna 'represented that the total allowed amount for [the surgery] was based upon 85% of [the UCR] for covered services rendered to [the patient]'" lacked "concrete factual detail indicative of an offer" because Plaintiffs failed to "allege that the parties discussed the details of the surgery, the services to be rendered as part of the surgery, or specific prices for those services," and failed to "plead any facts to support an inference that Aetna explicitly undertook a duty to pay for the surgery at a specific rate or otherwise." *Id.* at *4 (alterations in original). The court determined that even though "Plaintiffs may have subjectively understood Aetna's generic recounting of the patient's benefits to constitute a unilateral offer to pay for the surgery, '[t]he parties' subjective intent is irrelevant'" and dismissed Plaintiffs' breach of contract claim against Aetna with prejudice because, "'[a]bsent an offer, there can be no contract' between the parties."

36

*Id.* (quoting *Rowe I*, 705 F. Supp. 3d at 202) (first alteration in original).

Plaintiffs' allegation that "[u]pon information and belief" Aetna granted Plaintiffs a network exception through a letter sent to the Patient, (Am. Compl. ¶ 48), does not cure the deficiencies in Plaintiffs' Amended Complaint because Plaintiffs do not establish that approval of the network exception obligated Aetna to reimburse Plaintiffs at a specific rate and if so, at what rate. Plaintiffs define network exceptions as "agreements between an insurer and an out-of-network provider to render medical service in exchange for payment" and allege that Aetna has a "business procedure" for issuing network exceptions and authorizes its employees and agents to disclose the rate it pays to out-of-network providers via telephone, email, or facsimile. (*Id.* ¶¶ 34, 36.) Plaintiffs do not attach a copy of the letter and do not otherwise provide any supporting detail such as the date Plaintiffs requested the network exception, the date Aetna granted the exception, and any promised reimbursement rate. Thus, on these facts, there is nothing to support Plaintiffs' claim that Aetna and Plaintiffs formed any agreement concerning reimbursement for the Patient's surgery based on the granting of a network exception.[15] *See Ne.*

---

[15] The Court is also unclear how Aetna sending a letter to the Patient approving a network exception would support that Aetna made a promise to Plaintiffs to pay a certain amount since the letter was sent to the Patient. To the extent Plaintiffs are alleging that the network exception was an acceptance of a request that Plaintiffs made for a network exception, thus creating an agreement, Aetna's acceptance would need to be communicated to Plaintiffs. *See Agric. Ins. Co. v. Matthews*, 749 N.Y.S.2d 533, 535 (App. Div. 2002) ("[I]t is essential in any bilateral contract that the fact of acceptance be communicated to the offeror."); *see also Bocci v. Nationstar Mortg. LLC*, No. 23-CV-1780, 2024 WL 4326932, at *10 (S.D.N.Y. Sept. 27, 2024) (explaining that "it is essential . . . that the fact of acceptance be communicated to the offeror" (quoting *Agric. Ins.*, 749 N.Y.S.2d at 535)); *Norman Maurice Rowe, M.D., M.H.A., L.L.C. v. Oxford Health Ins. Co., Inc.*, 182 N.Y.S.3d 551, 555 (Sup. Ct. 2022) (rejecting Rowe MD's argument that a letter the defendant insurer sent to a patient approving a network exception for Rowe MD to perform a surgery constituted a contract to reimburse at the in-network rate because assuming the letter created a contract, it was between the patient and the insurer and "[t]here can be no breach of contract claim" when "there is no allegation that [Rowe MD] . . . was an intended beneficiary of the said contract").

*Plastic Surgery PLLC v. BlueCross BlueShield of Ill.*, No. 24-CV-9148, 2025 WL 1194446, at *2 (S.D.N.Y. Apr. 22, 2025) (concluding that an insurer's letter granting a network exception to an out-of-network provider for a surgery "contain[ed] no promise to pay any amount, let alone a promise to pay [the provider's] bills in full" and "at most, suggest[ed] that [the insurer] was prepared to pay something for [the patient's] surgeries"); *Manalapan Surgery Ctr., P.A. v. 1199 SEIU Nat'l Benefit Fund*, No. 23-CV-3525, 2025 WL 813610, at *10 (E.D.N.Y. Mar. 12, 2025) (finding that the "allegation that an unidentified employee communicated with an unidentified customer service representative of [the d]efendant and "confirmed that [the defendant] would indeed share the costs of the surgery to be performed on the relevant patient and that the service the relevant [c]enter was going to render was eligible for reimbursement," failed to "plausibly allege a clear and unambiguous' promise" because they were "at most, a promise that [the d]efendant would make *some* payment related to the costs of the surgical procedure to be performed").

Accordingly, the Court dismisses Plaintiffs' breach of contract claim for failure to state a claim.

### ii. Promissory estoppel claim

Aetna argues that Plaintiffs' promissory estoppel claim fails for the same reasons as the breach of contract claim.

Plaintiffs argue that they satisfy each element for promissory estoppel and that the Third Circuit's decision in *Plastic Surgery Center*, 967 F.3d at 230, "confirms that providers may state promissory estoppel claims based on pre-service insurer representations exactly like the representations made in this case." (Pls.' Opp'n 24.) In support, Plaintiffs argue that they sufficiently pleaded (1) a "clear promise" in that Aetna's representative stated that in-network services were covered at 100% with no deductible during the December 21, 2020 call and acknowledged the GAP exception had been approved in the February 25, 2021 call; (2) reasonable

reliance in alleging that Plaintiffs as "experienced providers, reasonably relied on these statements and omissions when deciding to proceed" and "Aetna's post services payment demonstrates the Providers['] reliance was justified," and (3) an injury in that "Plaintiffs suffered substantial economic loss when reimbursement failed to match in-network expectations."  (*Id.* at 23–24.)

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made[;] and an injury sustained by the party asserting the estoppel by reason of the reliance."  *Annabi v. N.Y, Univ.*, No. 24-2601, 2025 WL 1066083, at *2 (2d Cir. Apr. 9, 2025) (alteration in original) (quoting *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995)); *NRP Holdings LLC*, 916 F.3d at 202 ("To establish a claim of promissory estoppel, a plaintiff 'must demonstrate that the [defendant] made a clear and unambiguous promise, upon which the [plaintiff] reasonably relied, to its detriment.'" (quoting *Wilson v. Dantas*, 58 N.Y.S.3d 286 (2017) (alterations in original))); *ED Cap., LLC v. Bloomfield Inv. Res. Corp.*, 757 F. App'x 26, 30 (2d Cir. 2018) ("Under New York law, promissory estoppel requires '(1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance.'" (citation omitted)); *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000) (listing the same three elements for a promissory estoppel claim).  "A promise is not 'clear and unambiguous' where the allegations are premised on an ambiguity or where the alleged promise is conditional upon further agreements or negotiations."  *Rowe II*, 2024 WL 4315128, at *4 (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996)).  "[A] promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract."  *Doe v. Rochester Inst. of Tech.*, No. 21-CV-6761, 2024 WL 1051953, at *9 (W.D.N.Y. Mar. 11, 2024)

(quoting *Annabi v. N.Y. Univ.*, No. 22-CV-3795, 2023 WL 6393422, at *12 (S.D.N.Y. Sept. 29, 2023)); *Benefitvision Inc. v. Gentiva Health Servs., Inc.*, No. 09-CV-473, 2014 WL 298406, at *9 (E.D.N.Y. Jan. 28, 2014) (quoting *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, No. 09-CV-8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010)) (same); *Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 158 (2d Cir. 2012) (recognizing that a court may reject a promissory estoppel claim because "a breach of contract claim may not give rise to tort liability unless a legal duty independent of the contract . . . has been violated" (quoting *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577–78 (App. Div. 2011))); *That's What She Said, Inc. v. Gutter Games Ltd.*, No. 22-CV-4230, 2024 WL 3678473, at *10 (S.D.N.Y. Aug. 5, 2024) ("[A] claim sounding in promissory estoppel is precluded 'in the absence of a legal duty independent of the contract.'" (quoting *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 199–200 (S.D.N.Y. 2021), *aff'd*, 88 F.4th 204 (2d Cir. 2023))), *appeal dismissed sub nom. That's What She Said, Inc. v. Perch UK 1 LTD*, No. 24-2106, 2024 WL 4762973 (2d Cir. Sept. 9, 2024); *Goldberg*, 535 F. Supp. 3d at 200 ("[A] promissory estoppel claim [is] precluded where it relied on the 'exact same policies at issue' in contract claim." (citing *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 372 (S.D.N.Y. 2016))); *see also Behler v. Tao*, 43 N.Y.3d 343, 351 (2025) (noting that under New York law the plaintiff's promissory estoppel claim "would have to be dismissed as 'duplicative of the breach of contract claim'" (quoting *Kim v Francis*, 125 N.Y.S.3d 411, 414 (App. Div. 2020))).

 Plaintiffs' promissory estoppel claim fails because Plaintiffs have not sufficiently alleged "a clear and unambiguous promise" by Aetna. *ED Cap*, 757 F. App'x at 29. Plaintiffs allege that Aetna "promise[d] to pay for bilateral breast reduction at in-network benefit level rate if it was rendered to [the Patient]," that Aetna made the promise on February 25, 2021, and that Aetna "should have expected that [Plaintiffs] would rely upon that promise" because "among

other reasons, Aetna issued numerous payments to [Plaintiffs] after issuing a network exception

for the same healthcare services rendered by [Plaintiffs] at higher percentage of the billed

amount under the same or similar circumstances," including "[b]etween 2019 and 2021" when

"Aetna paid [Plaintiffs] on average . . . [92.7%] of the billed amount in [twenty] instances after

Aetna had issued a GAP exception agreeing to pay the in-network rate for the same service."

(Am. Compl. ¶¶ 117–20.)  Rocky's promise to pay Aetna at the "in-network benefit level rate"

on the February 25, 2021 call is insufficient because the allegations do not indicate that Rocky

specified a reimbursement rate.  *Rowe Plastic Surgery*, 2025 WL 1603919, at *1, *4 (dismissing

Plaintiffs' promissory estoppel claim because the complaint as a whole was "devoid of any

allegations that Aetna 'promised to pay a particular amount' for the surgery or any particular

services, let alone all of the services that could have been rendered as part of the surgery"); *see*

*Rowe II*, 2024 WL 4315128, at *4 (dismissing Plaintiffs' promissory estoppel claim because "the

[call's] transcript d[id] not show any representation by Aetna that it would reimburse

[Plaintiffs']" and was "ambiguous as to its scope and vague as to the terms").

Accordingly, the Court dismisses Plaintiffs' promissory estoppel claim for failure to state

a claim.

### iii.  Unjust enrichment claim

Aetna argues that Plaintiffs' unjust enrichment claim fails because (1) Plaintiffs'

allegation that "Aetna benefitted because they rendered surgery to [the Patient]" is insufficient to

establish a "specific and direct" benefit under New York law, (Def.'s Mem. 21); and (2)

Plaintiffs cannot allege that Aetna requested that they perform the surgery as "the Amended

Complaint recognizes that Plaintiffs *requested* verification of benefits and coverage preapproval

*from* Aetna."  (*Id.* at 22).  Aetna contends that the prior *Rowe* "decisions are dispositive" and that

the "Amended Complaint fails to remedy either defect the Second Circuit identified and relies on

41

a defunct legal theory." (*Id.* at 21–22.)

Plaintiffs argue that "Aetna clearly benefitted" as "Aetna fulfilled its obligations to its insured using the Provider's services — without paying the promised amount" and contends "[t]hat's exactly what unjust enrichment is meant to address." (Pls.' Opp'n 24.) Plaintiffs contend that "unjust enrichment can be pled in the alternative when the existence or scope of a contract is in dispute." (*Id.* at 24–25.)

"To recover under a theory of unjust enrichment under New York law, a litigant must show 'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 198 (2d Cir. 2023) (quoting *Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253, 275 (2022)); *Cable First Constr., Inc. v. Lepetiuk Engr. Corp.*, No. 24-871-CV, 2025 WL 2016277, at *2 (2d Cir. July 18, 2025) (same); *Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33, 36 (2d Cir. 2021) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." (quoting *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006))); *Myun-Uk Choi v. Tower Res. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (listing the same three requirements for an unjust enrichment claim). "[T]he plaintiff's allegations must show that the defendant 'received some benefit' from the plaintiff' that is 'specific and direct'"; "'some indirect benefit' will not be enough to support an unjust enrichment claim." *Rowe II*, 2024 WL 4315128, at *3 (quoting *Kaye*, 202 F.3d at 616); *Hudson Neurosurgery, PLLC v. UMR, Inc.*, No. 20-CV-9642, 2023 WL 6311218, at *6 (S.D.N.Y. Sept. 28, 2023) ("To prove a defendant was enriched, 'a plaintiff must show that the defendant actually received a benefit' that is both 'specific and direct.'" (quoting *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 124 (S.D.N.Y.

2023))).  An unjust enrichment claim "may be premised on deceptive conduct."  *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 208 (W.D.N.Y. 2020); *see also Leboeuf v. Edgewell Pers. Care Co.*, No. 22-CV-642, 2023 WL 5432265, at *16 (N.D.N.Y. Aug. 23, 2023) (same); *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (App. Div. 2004) ("[The] [p]laintiffs' allegations that [the defendant's] deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment.").  However, "unjust enrichment is not a catchall cause of action to be used when others fail [and an] unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Mancuso*, 454 F. Supp. 3d at 208 (alteration in original) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)); *see also Ham v. Lenovo (U.S.) Inc.*, 664 F. Supp. 3d 562, 584 (S.D.N.Y. 2023) ("Where an 'unjust enrichment claim is premised on the same factual allegations as those supporting [a plaintiff's] other claims, and [a plaintiff] ha[s] not alleged distinct damages with respect to this claim,' then a plaintiff's unjust enrichment claim will be dismissed." (quoting *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021))).  "Two claims are duplicative of one another if they 'arise from the same facts . . . and do not allege distinct damages.'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (App. Div. 2008)); *see also In re Colum. Coll. Rankings*, No. 22-CV-5945, 2024 WL 1312511, at *18 (S.D.N.Y. Mar. 26, 2024) (same); *Turk v. Rubbermaid Inc.*, No. 21-CV-270, 2022 WL 836894, at *14 (S.D.N.Y. Mar. 21, 2022) (explaining that "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim" and "[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages'" (alterations in original) (first quoting *Corsello*, 18 N.Y.3d at 790; and then quoting *NetJets Aviation, Inc.*, 537 F.3d at 175)); *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 246 (S.D.N.Y. 2022) (similar);

*Grossman v. Simply Nourish Pet Food Co.*, 516 F. Supp. 3d 261, 285 (E.D.N.Y. 2021) ("[U]njust enrichment claims should be dismissed 'where the violative conduct alleged is conterminous with a conventional tort or contract claim, regardless of whether the tort or contract claim is dismissed.'" (quoting *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 877 (E.D.N.Y. 2018))); *see also Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 392 (E.D.N.Y. 2017) (dismissing unjust enrichment claim because it was duplicative of the plaintiff's other dismissed claims).

 "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" and the remedy is "available when, 'though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.'" *Residential Fences Corp. v. Rhino Blades, Inc.*, No. 24-897, 2025 WL 583323, at *2 (2d Cir. Feb. 24, 2025) (first quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); and then quoting *Corsello*, 18 N.Y.3d at 790). Unjust enrichment claims may stand "where the pleadings . . . indicate a relationship between the parties that could have caused reliance or inducement." *Mandarin Trading Ltd.*, 16 N.Y.3d at 182; *Ga. Malone & Co., Inc. v. Ralph Rieder*, 926 N.Y.S.2d 494, 497 (App. Div. 2011) ("[A]lthough privity is not required for an unjust enrichment claim, a claim will not be supported unless there is a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part." (first quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007); and then quoting *Mandarin Trading*, 16 N.Y.3d at 182)), *aff'd sub nom. Ga. Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511 (2012); *see also Leidel v. Annicelli*, 980 N.Y.S.2d 431, 432 (App. Div. 2014) (dismissing unjust enrichment claim where the relationship between the parties "as alleged, [was] not one that 'could have caused reliance or inducement'" and therefore "[was] inadequate

to sustain a claim of unjust enrichment" (citations omitted)).  "[T]he requirement of a connection

between plaintiff and defendant is a modest one" and "a claim will not be supported if the

connection between the parties is too attenuated."  *Myun-Uk Choi*, 890 F.3d at 69 (quoting

*Mandarin Trading*, 16 N.Y.3d at 182).  Generally, "to recover under a theory of unjust

enrichment, the plaintiff must show that the services were performed '*for the defendant*,' and not

at the 'behest of someone other than the defendant'" and "where services are provided at the

'behest of someone other than the defendant, the plaintiff must look to that person for

recovery.'"  *Rowe II*, 2024 WL 4315128, at *4 (quoting *Kagan v. K-Tel Ent., Inc.*, 568 N.Y.S.2d

756, 757 (App. Div. 1991)); *Caro Cap.*, 653 F. Supp. 3d at 122 (explaining that "a plaintiff need

not be in privity with the defendant to state a claim for unjust enrichment," however, "[t]he

relationship between plaintiff and defendant . . . cannot be 'too attenuated'" and "[s]o long as

'the services were performed at the defendant's behest, New York courts have found that

defendants can be indirectly liable in unjust enrichment'" (first quoting *Sperry*, 8 N.Y.3d at 215;

then quoting *Rieder*, 19 N.Y.3d at 511; and then quoting *Ga. Malone & Co.*, 926 N.Y.S.2d at

497)); *TransformaCon, Inc. v. Vista Eq. Partners, Inc.*, No. 15-CV-3371, 2015 WL 4461769, at

*6 n.83 (S.D.N.Y. July 21, 2015) ("[A] plaintiff must demonstrate that services were performed

for the defendant resulting in its unjust enrichment.  It is not enough that the defendant received a

benefit from the activities of the plaintiff; if the services were performed at the behest of

someone other than the defendant, the plaintiff must look to that person for recovery." (citing

*Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 338

(S.D.N.Y. 1998), *aff'd*, 173 F.3d 845 (2d Cir.1999))); *see Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466

F. Supp. 2d 533, 543 (S.D.N.Y. 2006) (explaining that "applying the broad discretion contained

in the third element [of an unjust enrichment claim], courts have imposed various additional

requirements such as: services must have been performed for the defendant; services must have

been performed at defendant's behest, or defendant must have assumed an obligation to pay plaintiff for services it received" (collecting appellate division cases)); *see also Zunzurovski v. Finger*, No. 23-CV-4883, 2024 WL 836481, at *4 (S.D.N.Y. Feb. 28, 2024) (similiar).

### 1. Plaintiffs' allegations fail to show that Aetna induced them to perform the Patient's surgery

Plaintiffs' theory of this claim is that Aetna induced them to perform the Patient's surgery and therefore it would be unjust for Aetna to retain the remainder of the payment that Plaintiffs believe they are owed.[16]  Plaintiffs' theory fails, however, because as discussed under both the breach of contract and promissory estoppel claims, Plaintiffs have not sufficiently alleged that Aetna offered or promised to pay them a specific rate of reimbursement.  Without any discernible offer or promise to pay, it is implausible that Aetna induced Plaintiffs to perform the Patient's surgery.  *Winston & Strawn LLP v. Mid-A. Arena, LLC*, No. 18-CV-11430, 2021 WL 3037478, at *8 (S.D.N.Y. July 19, 2021) (dismissing unjust enrichment claim where the plaintiff failed to plead "any allegations that plausibly suggest it was 'induced' to confer a benefit on [the defendant] and that it would be unjust to deny [the plaintiff] relief"); *Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.*, No. 10-CV-683, 2011 WL 5884209, at *4–5 (E.D.N.Y. Nov. 23, 2011) (finding relationship between plaintiff and defendant "[was] too attenuated to support a cause of action for unjust enrichment" where the "complaint d[id] not allege that [the defendant] requested, approved, supervised, agreed to pay for, or assumed any other obligations with respect to the [construction project]" for which the plaintiff alleged the defendant failed to pay him).

---

[16]  Plaintiffs allege that Aetna induced them to perform the Patient's surgery by offering to reimburse them as in-network providers and that "[r]elying on Aetna's offer of payment at the in-network benefit level rate, [Plaintiffs] forbore from collecting payment in full from [the Patient] prior to rendering bilateral breast reduction" and "conferred a benefit upon Aetna" such that "[u]nder the circumstances, it would be unfair to permit Aetna to retain the benefits conferred upon it without Aetna paying a reasonable value to [Plaintiffs]."  (Am. Compl. ¶¶ 106–07, 112, 115.)

Moreover, Plaintiffs allege that they "intentionally refused to join" Aetna's provider network and "had no obligation to seek Aetna's approval" before performing the Patient's surgery, (Am. Compl. ¶¶ 20, 109), demonstrating that Plaintiffs and Aetna did not have a "special connection or relationship" that could have reasonably induced Plaintiffs to perform the Patient's surgery or make it "against equity and good conscience to permit [Aetna] to retain what [Plaintiffs seek] to . . . recover[]." *Rynasko*, 63 F.4th at 198; *Clark v. Hemphill Artworks, LLC*, No. 22-CV-7537, 2024 WL 1157170, at *15 (S.D.N.Y. Mar. 16, 2024) (dismissing unjust enrichment claim where the plaintiff did not "allege that she entered into any agreement or transactions with [the defendants]" and the limited contacts pleaded between plaintiff and the defendants were "not sufficient to plausibly allege a relationship that 'could have caused reliance or inducement' on [the p]laintiff's part" (quoting *Mandarin Trading*, 16 N.Y.3d at 182)), *appeal withdrawn*, No. 24-2078, 2024 WL 4753658 (2d Cir. Nov. 4, 2024), *aff'd in part, vacated in part, and remanded on other grounds*, No. 24-2078, 2025 WL 2394935 (2d Cir. Aug. 19, 2025).

In the absence of plausible allegations of inducement or reliance, the Amended Complaint supports only that Plaintiffs performed the surgery at the Patient's "behest." *Kagan*, 568 N.Y.S.2d at 757. Plaintiffs allege that the Patient sought them out to perform her surgery because Aetna did not have an available provider, (*see* Am. Compl. ¶ 38), and that they only engaged Aetna directly because they were "unwilling to risk non-payment" for the Patient's surgery and had no obligation to do so, (*id.* ¶¶ 39, 109). Thus, Plaintiffs, as out-of-network providers, are seeking to recover payment from an insurer for medical services they rendered at the request of a patient who is a member of the insurer's health plan, a type of unjust enrichment claim that New York courts dismiss. *Da Silva Plastic & Reconstructive Surgery, P.C. v. UnitedHealthcare Ins. Co. of N.Y., Inc.*, 226 N.Y.S.3d 294, 296 (App. Div. 2025) (finding that out-of-network providers' unjust enrichment claim against insurer for failure to pay thirty-eight

claims submitted for patients that were members of the insurer's health plan was subject to dismissal "because the medical services at issue were rendered at the behest of the subject members" (first citing *Pekler v. Health Ins. Plan of Greater N.Y.*, 888 N.Y.S.2d 196, 198 (2009); and then citing *Kirell v. Vytra Health Plans Long Is., Inc.*, 815 N.Y.S.2d 185, 186–87 (2006))); *see Brain & Spine Surgeons of New York, P.C. v. Triple-s Salud Inc.*, No. 22-CV-8951, 2024 WL 4150103, at *7 (S.D.N.Y. Sept. 11, 2024) (dismissing providers' unjust enrichment claim against insurer because "there [was] no allegation a service was provided to [the d]efendant at [the d]efendant's request, as is required under New York law"); *Josephson v. United Healthcare Corp.*, No. 11-CV-3665, 2012 WL 4511365, at *5 (E.D.N.Y. Sept. 28, 2012) (finding medical providers' theory that they were unjustly enriched failed "to state a basis for recovery because [the providers'] services were performed at the behest of [their] patients, not [the insurance company]"), *on reconsideration in part on other grounds*, 2013 WL 3863921 (E.D.N.Y. July 24, 2013); *see also Laine v. Empire HealthChoice Assurance, Inc.*, 226 N.Y.S.3d 258, 261 (App. Div. 2025) (dismissing out-of-network provider's quantum merit claim against insurer "as the complaint allege[d] that chiropractic services were performed by the plaintiff at the behest of his patients" and therefore "no claim in quantum meruit [could] be asserted against the defendant").

Consistent with other New York courts that have rejected out-of-network providers' efforts to recover insurer reimbursements under unjust enrichment claims, the Second Circuit in *Rowe II* and other district courts have dismissed Rowe Plastic Surgery and/or Rowe MD unjust enrichment claims against Aetna because they performed the underlying medical services at a patient's behest. *Rowe II*, 2024 WL 4315128, at *4 (finding Rowe Plastic Surgery and Rowe MD could not recover under unjust enrichment theory because they "ma[d]e no allegations that Aetna requested their services" and explaining that "[b]ecause the surgery was completed at the patient's request, [Rowe Plastic Surgery and Rowe MD] must recover from the patient, not

Aetna"); *see, e.g.*, *Rowe Plastic Surgery*, 2025 WL 2218097, at *3 (denying Rowe Plastic

Surgery and Rowe MD leave to amend their unjust enrichment claim because it was "not

plausible for [them] to suggest that the operations were somehow performed at the behest of

Aetna" as "there [was] no allegation that the medical services at issue in this case were

performed for Aetna" and "the proposed amended complaint allege[d] that it was [Rowe Plastic

Surgery and Rowe MD] themselves who reached out to Aetna on the patient's behalf regarding

the surgeries"); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-CV-3636,

2025 WL 1907005, at *9 (E.D.N.Y. July 10, 2025) (denying leave to amend unjust enrichment

claim where proposed allegations showed that Rowe Plastic Surgery and one other plaintiff

"provided benefits to the patient, not to Aetna"); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna

Life Ins. Co.*, No. 23-CV-8529, 2024 WL 382143, at *2 (S.D.N.Y. Feb. 1, 2024) (dismissing

Rowe Plastic Surgery and another plaintiff's unjust enrichment claim against Aetna because

there was "no allegation that a benefit was conferred upon [Aetna] or that a service was provided

to [Aetna] at the defendant's request"); *see also Rowe Plastic Surgery of Long Island, P.C. v.

United Health Care*, No. 23-CV-4541, 2025 WL 1715445, at *11–12 (E.D.N.Y. May 6, 2025)

(denying Rowe Plastic Surgery, Rowe MD, and one other plaintiff leave to amend unjust

enrichment claim as futile because the proposed amended complaint "fail[ed] to show that [the

defendant] requested the medical surgeries" and "[the p]laintiffs' conclusion that the partial

payment and preauthorization of the surgeries was [the defendant insurers'] implicit request" had

"no merit"); *Rowe Plastic Surgery of N.J., L.L.C. v. United Healthcare*, No. 23-CV-4352, 2024

WL 4309230, at *8 (E.D.N.Y. Sept. 26, 2024) (finding Rowe Plastic Surgery and another

plaintiff failed to state an unjust enrichment claim against insurance companies where they did

"not allege that they operated on [the patient] 'at [the insurers'] request, as is required under New

York law" (quoting *Rowe I*, 705 F. Supp. 3d at 204)).

### 2. Plaintiffs fail to sufficiently plead that they conferred a direct benefit on Aetna

Plaintiffs fail to plead a direct benefit that they conferred on Aetna by performing the Patient's surgery. Construing the Amended Complaint liberally, Plaintiffs allege Aetna received four benefits from them performing the Patient's surgery: (1) the "benefit of its bargain" from pre-surgery communications with Plaintiffs," (Am. Compl. ¶ 108); (2) profit from underpaying Plaintiffs, (*id.* ¶¶ 68–69); (3) ability "for Aetna to fulfill its contractual obligation to manage [the Patient's] costs for medically necessary services," (*id.* ¶ 111); and (4) valuable "good will" from "the esteem and the expectancy of [the Patient's] continued customer patronage" after Aetna facilitated the Patient's receipt of a service that she "was not entitled to receive" since Aetna did not have the "same capacity" in-network, (*id.* ¶¶ 113–15). None of these alleged benefits are sufficient to sustain an unjust enrichment claim because the direct benefit from Plaintiffs performing the bilateral reduction was a benefit conferred on the Patient not her insurance company. Patient "was indicated" for the surgery and received the medical benefits of it. *See Manalapan Surgery*, 2025 WL 813610, at *10 (dismissing the providers' unjust enrichment claim against alleged health insurance company because the providers rendered elective medical services on the covered patients, the benefits of which "runs to the patient and not the insurer"); *see also Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-CV-3632, 2025 WL 1940325, at *9 (E.D.N.Y. July 15, 2025) ("It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured — which hardly can be called a benefit." (quoting *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001))).

In addition to the fact that the direct benefit of Plaintiffs' medical services inured to the

Patient, the entire Amended Complaint undermines the plausibility of the four benefits that Plaintiffs allege they conferred on Aetna.  First, Plaintiffs performing the Patient's surgery could not have given Aetna the "benefit of [any] bargain" from its pre-surgery communications with Plaintiffs, (Am. Compl. ¶ 108), because the alleged communications do not support that Plaintiffs bargained or negotiated with Aetna concerning the Patient's surgery.  Second, Aetna could not have profited from paying Plaintiffs less than Plaintiffs believed they were owed, (*id.* ¶¶ 68–69), because as discussed under Plaintiffs' breach of contract and promissory estoppel claims, Aetna made no promise or offer to pay Plaintiffs a specific amount and therefore could not have profited from holding money it had no obligation to pay.  *See Winston & Strawn*, 2021 WL 3037478, at *8 (dismissing unjust enrichment claim where the plaintiff failed to plead "any allegations that plausibly suggest[ed] it was 'induced' to confer a benefit on [the defendant] and that it would be unjust to deny [the plaintiff] relief"); *La Barte v. Seneca Res. Corp.*, 728 N.Y.S.2d 618, 621–22 (App. Div. 2001) (concluding the plaintiffs could not recover damages based upon a theory of quasi contract and unjust enrichment against the defendants as there was no evidence that the defendants assumed any obligation to pay the plaintiffs).

Plaintiffs' final two alleged benefits — fulfillment of "[Aetna's] contractual obligation to manage [the Patient's] costs for medically necessary services," (*id.* ¶ 111), and the "good will" Aetna received from facilitating the Patient's receipt of a service that she was "not entitled to receive," (*id.* ¶¶ 113–15) — are insufficient because, to the extent they are benefits that Aetna received, they are at most incidental to Plaintiffs performing the Patient's surgery, which as discussed above, was a benefit conferred at the Patient's behest not Aetna's request.  *See Kaye*, 202 F.3d at 616 (dismissing unjust enrichment claim against wife whose husband received a loan because the wife's alleged receipt of an "indirect benefit from the loan" did "not establish the specific and direct benefit necessary to support an unjust enrichment claim").

The Court notes that Plaintiffs first two alleged benefits conferred on Aetna echo Plaintiffs' allegations in *Rowe I* and *II* that were legally insufficient to support their unjust enrichment claim.  Plaintiffs alleged that "Aetna's failure to pay amounts due unjustly enriched them because every dollar that Aetna didn't pay that it was obligated to pay was a dollar in Aetna's pocket as pure profit" and "[t]he benefit conferred upon Aetna was the benefit of its bargain, bilateral breast reduction and other medical services rendered to [Patient ELS]."  Am. Compl. ¶¶ 67, 70, *Rowe I*, No. 23-CV-8521 (S.D.N.Y. Aug. 24, 2023), Docket Entry No. 13. The district court noted that "the only benefit allegedly conferred on [Aetna was] the surgery [P]laintiffs performed on [Patient] ELS" and found "that [was] not a benefit that inured to [Aetna]" but rather was "solely a benefit conferred on [Patient ELS], which is legally insufficient to allege an unjust enrichment claim."  *Rowe I*, 705 F. Supp. 3d at 204–05.  The Second Circuit affirmed in its summary order that "Plaintiffs' allegations do not show how Aetna benefitted from their services" and added that Plaintiffs' allegations of Aetna profiting from withholding the amount it was obligated to pay constituted "allegations of an abstract and attenuated indirect benefit Aetna received" that are "insufficient."  *Rowe II*, 2024 WL 4315128, at *3.  Other courts deciding unjust enrichment claims that Rowe Plastic Surgery and/or Rowe MD have brought against Aetna and other insurance companies for allegedly underpaying them for surgeries at lower rates than promised have also rejected the same alleged benefits as legally insufficient to support the unjust enrichment claims.  *See, e.g.*, *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Ins. Co.*, No. 23-CV-8514, 2025 WL 1797219, at *6 (S.D.N.Y. June 26, 2025) (dismissing unjust enrichment claim predicated on allegations that "[t]he benefit conferred upon Aetna was the benefit of . . . medical services rendered to [the patient]" and "Aetna's failure to pay amounts due enriched them because every dollar that Aetna did not pay that it was otherwise obligated to pay was a dollar in Aetna's pockets as profits"); *Rowe Plastic Surgery*, 2024 WL 4309230, at *8

(rejecting Rowe Plastic Surgery and another plaintiff's argument that "'[t]he benefit conferred upon [the insurers] was the benefit of its bargain, bilateral breast reduction, and other medical services rendered to [the patient]' because there was no benefit to the . . . insurers" as "the plaintiffs conferred a benefit 'solely' 'on the patient'" (citations omitted)); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-CV-8140, 2025 WL 1786416, at *2 (S.D.N.Y. June 27, 2025) (concluding "as in the other[]" *Rowe* cases "with analogous facts and a nearly identical procedural posture" that the plaintiffs failed to sufficiently plead an unjust enrichment claim because they "rel[ied] solely on allegations of an abstract and attenuated indirect benefit Aetna received" and "ma[d]e no allegations that Aetna requested their services" (citations omitted)); *Rowe Plastic Surgery*, 2024 WL 382143, at *2 (dismissing Rowe Plastic Surgery and one other plaintiff's unjust enrichment claim for failing to allege that "a benefit was conferred upon the defendant or that a service was provided to [Aetna] at [Aetna's] request" and denying leave to amend because allegations of a "misstatement of the plan rate on a benefits verification call would not have created an offer or a valid agreement" and "would not have conferred a benefit on [Aetna]").

Accordingly, the Court dismisses Plaintiffs' unjust enrichment claim for failure to state a claim.

### iv. Fraudulent inducement claim

Aetna argues that Plaintiffs' fraudulent inducement claim is barred because (1) "the Second Circuit's holding in [*Rowe II*] that Plaintiffs cannot allege the same facts as both breach of contract and fraud remains dispositive," (Def.'s Mem. 24); (2) "the 'lie' [Plaintiffs] allege as fraudulent inducement — that Aetna would pay Plaintiffs 'in-network' for the surgery . . . is the very term they allege Aetna breached in their purported contract," such that "Plaintiffs have not alleged a misrepresentation 'collateral to the contract it induced'" as required under New York

law, (*id.*); and (3) Plaintiffs cannot meet the heightened pleading standard for fraud as they "cannot plausibly explain how Aetna's statement" that "it was reimbursing bilateral breast reduction as 'in-network'" was fraudulent since Aetna "did not promise to pay the plaintiffs' in the first place" nor that they "justifiably relied" on Aetna's statement as being an offer or promise to pay when, as a matter of law, it was neither," (*id.* at 25 (citations omitted)).

Plaintiffs argue that they plead each fraudulent inducement claim element with particularity and that their allegations "identify[ing] the 'who, what, when, where, and how' . . . suffices at the pleading stage" because Rule 9(b) of the Federal Rules of Civil Procedure "requires particularity in pleading fraud." (Pls.' Opp'n 20, 22.) In support, they contend that for (1) "material misrepresentation or omission" they allege that "Aetna's representative stated that for in-network services, the plan provided 100% coverage with no deductible" and that "[d]uring the February 25 call, Aetna's representative acknowledged that GAP had been approved," and that Aetna "[s]tating that a specified reimbursement formula would be used, while planning to and actually a far lower, manipulated rate, constitutes . . . a collateral misrepresentation," (*id.* at 20–22); (2) as to knowledge and intent they allege "that Aetna had no intention of honoring this rate and instead knew that its system was unable to process claims using that rate," (*id.* at 21); (3) with regard to inducement and reliance they allege that "Plaintiffs relied on Aetna's omission and statements in proceeding to render surgical services," (*id.*); and (4) as to damages they allege that Aetna paid "substantially less than [the] promised in-network reimbursement" and "Aetna's argument that this is merely a contract while at the same time arguing there is not a contract misses the point" as "[f]raudulent inducement lies in the misrepresentation made before any contract was formed and is actionable as a tort under New York law," (*id.* at 21).

Under New York law, the elements for fraudulent inducement are "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable

reliance on the misrepresentation by appellants; and (iv) resulting damages." *Rowe II*, 2024 WL 4315128, at *4 (quoting *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012)); *NRW, Inc. v. Bindra*, 775 F. App'x 22, 24 (2d Cir. 2019) (listing the elements for fraudulent inducement as "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006))); *see also Ipcon Collections*, 698 F.3d at 62 (stating the elements of fraudulent inducement). A party must plead "specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Johnson*, 660 F.3d at 143 (first citing Fed. R. Civ. P. 9(b); and then citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 51 (2d Cir. 1995)); *see State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 352 (S.D.N.Y. 2020) (quoting *Johnson*, 660 F.3d at 143) (same); *see also Compass-Charlotte 1031, LLC v. Prime Cap. Ventures, LLC*, No. 24-CV-55, 2024 WL 3163238, at *6 (N.D.N.Y. June 24, 2024) (quoting *State St. Glob. Advisors Tr. Co.*, 431 F. Supp. 3d at 352) (same).

Under New York law, "allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud claim]." *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, No. 22-1113, 2023 WL 3477157, at *1 (2d Cir. May 16, 2023) (alterations in original) (quoting *Wall*, 471 F.3d at 416); *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018) ("Where a plaintiff alleges . . . that the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract." (citing *Wall*, 471 F.3d at 416)). In addition, an allegation of fraudulent inducement "may not be used as a means of restating what is, in substance, a claim for breach of contract." *Keystone Foods*, 2023 WL

3477157, at *1 (quoting *Wall*, 471 F.3d at 416).  This is because "New York law does not recognize breach of contract claims that . . . masquerad[e] as claims" of fraud in the inducement. *State St. Glob. Advisors Tr. Co.*, 431 F. Supp. 3d at 355 (citation omitted); *Wall*, 471 F.3d at 416 (explaining that "[o]ne reason for this rule is to prevent parties from avoiding the Statute of Frauds by recharacterizing their contract claims as torts" (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir. 1986))).  In order to establish fraudulent inducement based "upon an insincere promise of future performance," the allegedly false promise must be "collateral to the contract" and cannot "concern[ ] the performance of the contract itself."  *Fairway Prime Estate Mgmt., LLC v. First Am. Int'l Bank*, 952 N.Y.S.2d 524, 527 (App. Div. 2012) (quoting *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 74 (App. Div. 2012)); *E. Effects, Inc. v. 3911 Lemmon Ave. Assocs., LLC*, 202 N.Y.S.3d 105, 105 (App. Div. 2024) ("A fraudulent inducement cause of action is duplicative of a breach of contract claim where it is based on the same facts, seeks the same damages, and fails to allege a breach of an independent duty outside of the contract" and "is subject to dismissal when it is duplicative of a contract claim, such as where there is an insincere promise of future performance of the contract itself." (citations omitted)); *see also Rowe II*, 2024 WL 4315128, at *5 ("To adequately plead the first element of a fraudulent inducement claim, the material misrepresentation must be 'collateral to the contract it induced.'" (quoting *Wall*, 471 F.3d at 416)); *Spinelli*, 903 F.3d at 209 ("Misrepresentations made to induce a party to enter a contract are not actionable as fraud, however, unless they are 'collateral' to the contract induced." (citation omitted)); *Wall*, 471 F.3d at 416 (noting that fraudulent inducement may be based on a promise "not contained in the written agreement," which was made with an intention not to perform (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986))).  Because a fraudulent inducement claim cannot simply restate a breach of contract claim, to state a claim for fraudulent inducement, a

party must allege: "(i) . . . a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *State St. Glob. Advisors Tr. Co.*, 431 F. Supp. 3d at 352 (quoting *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996)) (other citations omitted); *Compass-Charlotte 1031*, 2024 WL 3163238, at *6 (quoting *State St. Glob. Advisors Tr. Co.*, 431 F. Supp. 3d at 352) (similar); *see also Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-6717, 2017 WL 6335905, at *5 (S.D.N.Y. Dec. 7, 2017) (explaining that while a fraud claim cannot stand when the only fraud charged relates to breach of a contract, fraud and breach of contract claims can coexist if the plaintiff alleges a separate legal duty, collateral fraudulent misrepresentation, or special damages).

Plaintiffs' fraudulent inducement claim fails as a matter of law because the allegations repackage the breach of contract claim.  Plaintiffs allege that (1) "Aetna intentionally represented to [them] that it would reimburse bilateral breast reduction as 'in-network' to induce [Plaintiffs] to render that service to [the Patient]" while knowing that "there was no in-network rate . . . because Aetna does not have an in-network rate for service provided by out-of-network providers"; and (2) they "justifiably relied on Aetna['s] statements that it would reimburse the bilateral breast reduction as in-network, and as a result rendered bilateral breast reduction to Aetna," entitling them to punitive and treble damages.  (Am. Compl. ¶¶ 128–34.)  Plaintiffs in essence allege that Aetna offered to reimburse them as in-network providers — the same offer that Plaintiffs allege Aetna made, they accepted, and Aetna breached under their breach of contract claim — with no intent to actually perform by paying the associated rate, a generally impermissible

application of a fraudulent inducement claim under New York law.[17]   (*See* Pls.' Opp'n 21

(arguing that Plaintiffs have sufficiently pleaded "knowledge and intent" by alleging "that Aetna

had no intention of honoring [the promised] rate and instead knew that its system was unable to

process claims using that rate"); *Keystone Foods*, 2023 WL 3477157, at *1 ("[A]llegations that

[a] defendant entered into a contract while lacking the intent to perform it are insufficient to

support [a fraud claim]." (second and third alterations in original)); *Spinelli*, 903 F.3d at 209

("Where a plaintiff alleges . . . that the defendant simply misrepresented its intent to perform

under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an

action for breach of contract."); *see also Pate v. BNY Mellon-Alcentra Mezzanine III, LP*, 81

---

[17]   Plaintiffs' reliance on *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58
(2d Cir. 2012), to argue that its allegation that Aetna "never intended to pay as promised"
constitutes a "quintessential example of [fraud in the inducement]" is misplaced.  (Pls.' Opp'n 21
(citation omitted).)  In *Ipcon Collections*, the Second Circuit addressed the justiciability of
contracts containing arbitration clauses that are challenged on the basis of fraud in the
inducement.  The plaintiff, an assignee of the rights of a retailer, brought various common law
claims arising out of the defendant's alleged failure to fulfill its contractual obligations to sell the
retailer's products.  No. 10-CV-9012, 2011 WL 3806255, at *1–2 (S.D.N.Y. Aug. 24, 2011),
*aff'd*, 698 F.3d 58 (2d Cir. 2012).  The defendant moved to dismiss the action as barred under the
Federal Arbitration Act ("FAA") because of contractual arbitration clauses and the plaintiff
cross-moved to stay arbitration on the basis that there was fraud in the inducement of the
contracts that rendered them unenforceable.  *Id.*  Relying on Supreme Court precedent that the
FAA "does not permit the federal court to consider claims of fraud in the inducement of the
contract generally" and "a challenge to the validity of the contract as a whole . . . must go to the
arbitrator," *id.* at *3 (first quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395,
403–04 (1967); and then quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449
(2006)), the district court dismissed the claims, *inter alia*, because "the crux" of the plaintiff's
allegations was that the defendant did not intend to fulfill its obligations and thus alleged fraud in
the inducement and should be decided by an arbitrator.  *Id.* at *4.  The Second Circuit affirmed
and in addressing plaintiff's "meritless" argument that the allegations constituted a different type
of fraud claim that rendered the contracts void *ab initio* and thus appropriately tried before a
district court rather than an arbitrator, the Second Circuit concluded that the plaintiff's
"allegation that [the defendant] 'never intended to honor' its contract is a quintessential
example" of fraud in the inducement and thus "dismissal was required in order to effectuate the
contracts' arbitration clauses."  *Id.* at 62.  Neither the Second Circuit nor the district court
reached the merits of the fraud in the inducement claim, including whether it was permissible
under New York law, because the arbitration clauses precluded judicial review.

N.Y.S.3d 29, 30 (App. Div. 2018) (affirming dismissal of fraudulent inducement claim as duplicative of dismissed breach of contract claim because "it [was] predicated on an alleged expression of a future expectation or intent to perform, rather than on a misrepresentation of present fact").

Moreover, Plaintiffs do not plead any of the three exceptions — a separate legal duty, collateral fraudulent misrepresentation, or special damages — that permit a fraudulent claim that relates to a breach of contract to proceed under New York law.  Plaintiffs allege in the fraudulent inducement claim that Aetna's promise or offer to pay that forms the basis of their alleged breach of contract claim was an intentional misrepresentation.[18]  This alleged misrepresentation is not collateral to the contract — it is the very promise upon which the breach of contract claim relies.  Plaintiffs also do not plead that Aetna had a legal duty separate from the alleged contract nor special damages that are unrecoverable as contract damages.  *State St. Glob. Advisors Tr. Co.*, 431 F. Supp. 3d at 352; *Mohegan*, 2017 WL 6335905, at *5 (explaining that while a fraud claim cannot stand when the only fraud charged relates to breach of a contract, fraud and breach of contract claims can coexist if the plaintiff alleges a separate legal duty, collateral fraudulent misrepresentation, or special damages); *see also Magnacoustics, Inc. v. Integrated Comput. Sols., Inc.*, No. 17-CV-4967, 2020 WL 4041310, at *6 (E.D.N.Y. July 17, 2020) (explaining that "punitive damages are, by definition, not 'caused by' fraud and therefore do not count as 'special damages' that would differentiate the fraud claim from the breach of contract claim" (quoting *MBIA Ins. Corp. v. Credit*

---

[18]  Plaintiffs allege that Aetna "intentionally represented" that "it would reimburse [the Patient's] bilateral breast reduction as 'in-network' to induce [them] to render that service to [the Patient]" despite knowing that "its product could not provide the medical services indicated for [the Patient]," Plaintiffs "had already rejected the out-of-network reimbursement to render bilateral breast reduction to [the Patient] offered by Aetna," and that it "[did] not have an in-network rate for service provided by out-of-network providers."  (Am. Compl. ¶¶ 128–32.)

*Suisse Sec. (USA) LLC*, 58 N.Y.S.3d 874, 874 (Sup. Ct. 2017) (unpublished table decision))).

Plaintiffs' argument that Aetna made a "collateral misrepresentation" of a "present fact — separate from the contract terms" that "a specified reimbursement formula would be used, while planning to and actually applying a far lower, manipulated rate," (Pls.' Opp'n 21–22), is unavailing. Plaintiffs' have not alleged a "present fact" that Aetna misrepresented to them separate from the "contract terms"; rather, Plaintiffs simply reallege the offer or promise pleaded under their breach of contract claim — that Aetna would pay them "in-network" for performing the Patient's surgery — with three vague or unsupported allegations that appear to be intended to show why Aetna's promise to pay was a misrepresentation. First, Plaintiffs allege that Aetna offered to pay them as in-network despite knowing that Plaintiffs "had already rejected the out-of-network reimbursement to render bilateral breast reduction to [the Patient] offered by Aetna," (Am. Compl. ¶ 130), but as discussed under the breach of contract claim, *see supra* Section II.c.i, Plaintiffs' allegations along with the transcript of the December 21, 2020 call do not support that Aetna made an initial offer that Plaintiffs then rejected. Second, Plaintiffs allege that Aetna offered to pay them as in-network despite knowing "its product could not provide the medical services indicated for [the Patient]." (Am. Compl. ¶ 129.) However, it is unclear how this allegation supports that Aetna made a misrepresentation to Plaintiffs, particularly because other allegations in the Amended Complaint demonstrate that Plaintiffs were engaged to perform the Patient's surgery because Aetna did not have capacity in-network.[19] Finally, Plaintiffs allege

---

[19] (*See, e.g.*, Am. Compl. ¶ 3 ("[Aetna] did not have sufficient capacity in its network to render bilateral breast reduction to [the Patient] so [the Patient] went to see Plaintiff[s]."), ¶¶ 35, 48 ("Aetna will issue a network exception only when it does not have a medical provider with the capacity to render the services the consumer needs within in its network or within the consumer's geographical vicinity" and "[u]pon information and belief, Aetna notified the [P]atient that it had received [Plaintiffs'] request for a network exception and based on information provided by [Plaintiffs] it had granted [Plaintiffs'] request.").)

that Aetna offered to pay them as in-network despite knowing that Aetna "[did] not have an in-network rate for service provided by out-of-network providers" but it is unclear how this makes Aetna's offer to reimburse Plaintiffs' in-network — *i.e.*, apply the in-network rate, whatever the rate may be, as the rate of reimbursement — a misrepresentation that is collateral to the contract Aetna allegedly induced Plaintiffs to enter. Moreover, the allegation is similar to alleged misrepresentations that courts deciding other *Rowe* cases have found were not collateral to the contract at issue in Rowe Plastic Surgery and/or Rowe MD's breach of contract claim claims against Aetna.[20] *See Rowe II*, 2024 WL 4315128, at *5 (finding allegations that "Aetna 'intentionally told' [Plaintiffs'] that its 'reimbursement was based upon "80% Reasonable Customary"' when it 'knew its claims processing system did not allow for payment using 80% Reasonable and Customary"' was "insufficient to allege a misrepresentation 'collateral to' the allegations supporting their breach of contract claim"); *Rowe Plastic Surgery*, 2025 WL 2218097, at *4 (concluding, based on *Rowe II*, the proposed allegation that "[i]t was a lie to say that Aetna's price was the '80th percentile of Reasonable and Customary' because Aetna was not using Reasonable and Customary to determine [out-of-network] prices at that time and had ceased using

---

[20]   Plaintiffs also argue that "Aetna's later use of a repricing vendor known for reducing UCR-based payments" is evidence that Aetna never intended to pay as promised and that the Court should take judicial notice of an "opinion in [a] New Jersey Class Action" and a New York Times article that support their argument. (Pls.' Opp'n 21; *Aetna UCR Litig.*; Times Article.) The Court does not consider Plaintiffs' argument nor does it take judicial notice of the proffered supporting documentation because Plaintiffs have not alleged facts in the Amended Complaint concerning Aetna's purported use of a repricing vendor, and Plaintiffs may not amend the Amended Complaint through their opposition papers. *See supra* note 11; *see also Citibank, N.A. v. Aralpa Holdings Ltd. Partn.*, No. 22-CV-8842, 2023 WL 5971144, at *7 (S.D.N.Y. Sept. 14, 2023) (declining to take judicial notice of a news article and other materials that related to events not pleaded in the complaint and "agree[ing] with courts in [the Second Circuit] that have cautioned that judicial notice should not 'be interpreted as endorsement of a practice whereby rather than amending his or her complaint, a plaintiff seeks to "support" the complaint by submitting extraneous documents and seeking judicial notice of them'" (citations omitted)), *appeal dismissed*, No. 23-7451, 2024 WL 1714598 (2d Cir. Jan. 25, 2024).

Reasonable and Customary to price [out-of-network] services years before" was not a collateral misrepresentation (alterations in original)); *Rowe Plastic Surgery*, 2025 WL 1797219, at *7 (holding that Rowe MD and one other plaintiff's allegations that "an Aetna representative represented that reimbursements would be made at '80% reasonable and customary' when Aetna 'knew its claims processing system had no capacity to ensure the claims of [Plaintiffs] would be paid using [that rate]'" was "no different from Plaintiffs' breach-of-contract claim" and "fail[ed] to allege any misrepresentation 'collateral to' the allegations supporting their breach of contract claim" (alterations in original)); *Rowe Plastic Surgery*, 2025 WL 1603919, at *7 (finding Plaintiffs' allegation that "Aetna intentionally told [Plaintiffs] that its reimbursement rate was based upon [85 percent of the UCR]" when it "knew it was going to send [their] claim to its Pricing Vendor to suppress the reimbursement amount" failed to "make [a] showing" that Aetna's alleged material misrepresentation was collateral to the contract (alterations in original)).

Accordingly, the Court dismisses Plaintiffs' fraudulent inducement claim for failure to state a claim.

### d. New York's Prompt Pay Law

Aetna argues that Plaintiffs have failed to allege entitlement to relief under the Prompt Pay Law because they "fail to allege when or how the bills were submitted to Aetna, and no agreement exists between the parties and the prompt pay law applies to the processing of health law claims under agreements." (Def.'s Mem. 22–23; *id.* at 23.)

Plaintiffs did not respond to Aetna's arguments in support of its motion to dismiss Plaintiffs' claim under New York's Prompt Pay Law and the Court therefore deems the claim abandoned. *See Worley v. Simon Meyrowitz & Meyrowitz, P.C.*, No. 23-187, 2023 WL 8664375, at *3 (2d Cir. Dec. 15, 2023) ("Where a partial response to a motion is made — *i.e.*, referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when

appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." (quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 197–98 (2d Cir. 2014))); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("'[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider those arguments abandoned,' especially 'in the case of a counseled party' where 'a court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned'" (first quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004); and then quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014))); *see also Jackson*, 766 F.3d at 196 ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.").

## III.  Dismissal with or without prejudice

Aetna argues the "Court should dismiss the Amended Complaint with prejudice" because (1) "Plaintiffs were given every opportunity to develop their legal theory, with the benefit of many more decisions than the average litigant gets," (2) "it is clear any further request for leave to amend would be futile" as "Plaintiffs have confirmed to the Court that this is the end of the road" and "[m]ore facts will not change what the key call transcript says — it was a benefits verification call, nothing more," and (3) "any decision that delays the inevitable conclusion to Plaintiffs' litigation campaign would only prejudice Aetna."  (Def.'s Mem. 27–28.)

Plaintiffs do not respond to Aetna's arguments, nor do they request leave to amend.

The Court dismisses Plaintiffs' common law claims without prejudice.  *See Broidy Cap. Mgmt. v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend . . . ." (citation omitted)); *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (explaining that leave to amend should be

"freely give[n] . . . when justice so requires" but may be denied for good reason, including "instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party" (alteration in original) (first quoting Fed. R. Civ. P. 15(a)(2); and then quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008))). Although Plaintiffs previously declined to amend their Amended Complaint despite Judge Bulsara granting them leave to do so with an approved briefing schedule because "the Amended Complaint . . . include[d] the additional facts [Plaintiffs] believe[d] alleges a unilateral offer," (Status Report on Behalf of Both Parties 1), they make arguments in their opposition to Aetna's motion that are predicated on facts not alleged in the Amended Complaint. *See supra* notes 11, 12, and 20. Therefore, the Court dismisses Plaintiffs' common law claims without prejudice and Plaintiffs may file a second amended complaint within thirty days of this Memorandum and Order.

Because Plaintiffs abandoned the Prompt Pay Claim and failed to respond to Aetna's request to dismiss the claim with prejudice, the Court dismisses the Prompt Pay Claim with prejudice. *Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *2–3 (2d Cir. Apr. 4, 2023) (finding no abuse of discretion in district court's dismissal of abandoned state law claims with prejudice where plaintiff did not formally make a motion to amend, previously declined the opportunity to amend, and did not advise the court of any proposed revisions to the operative complaint); *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 205, 217 (E.D.N.Y. 2025) (explaining that "[b]y failing to address in his brief [the d]efendants' arguments for dismissal of [two of his Title VII] claims, [the plaintiff] ha[d] abandoned them" and that the "claim[s] are therefore dismissed with prejudice"); *Maroney v. Woodstream Corp.*, 695 F. Supp. 3d 448, 468–69, 469 n.5 (S.D.N.Y. 2023) (deeming plaintiffs' unjust enrichment and injunctive relief claims abandoned because the plaintiffs did not respond to the defendants'

arguments for dismissal and dismissing the claims with prejudice because they were abandoned); *see Greene v. Northwell Health Inc.*, No. 23-CV-4846, 2024 WL 4287875, at *9 (E.D.N.Y. Sept. 25, 2024) (dismissing abandoned claims with prejudice); *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20-CV-4650, 2024 WL 4008120, at *9, *17 (S.D.N.Y. Aug. 30, 2024) (same); *Verdi v. City of New York*, 306 F. Supp. 3d 532, 552 (S.D.N.Y. 2018) (same).

## IV.  Conclusion

For the foregoing reasons, the Court grants Aetna's motion to dismiss the Amended Complaint for failure to state a claim.  The Court dismisses without prejudice Plaintiffs' breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement claims and dismisses with prejudice Plaintiffs' abandoned Prompt Pay Law claim.  The Court grants Plaintiffs thirty days from the date of this Memorandum and Order to file a second amended complaint that repleads their breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement claims.  If Plaintiffs fail to timely file a second amended complaint, the Court will direct the Clerk of Court to enter judgment for Aetna and close this case.

Dated:  August 26, 2025
       Brooklyn, New York

SO ORDERED:


_____/s/MKB_____
MARGO K. BRODIE
United States District Judge