UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ROWE PLASTIC SURGERY OF NEW JERSEY,
L.L.C. and NORMAN MAURICE ROWE, M.D.,
M.H.A., L.L.C.,

                            Plaintiffs,

              v.

AETNA HEALTH AND LIFE INSURANCE
COMPANY,

                            Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
22-CV-4755 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiffs Rowe Plastic Surgery of New Jersey, L.L.C. ("Rowe Plastic Surgery") and

Norman Maurice Rowe, M.D., M.H.A., L.L.C. ("Rowe MD") commenced the above-captioned

action on July 12, 2022, against Defendant Aetna Health and Life Insurance Company ("Aetna") in

the Supreme Court of the State of New York, Nassau County, asserting breach of contract,

promissory estoppel, and unjust enrichment claims and violation of New York's Prompt Pay Law,

N.Y. Ins. Law § 3224-a.  (Compl. ¶¶ 57–84, annexed to Notice of Removal as Ex. 1, Docket Entry

No. 1-1.)  On August 12, 2022, Aetna removed the case to the Eastern District of New York,

invoking diversity jurisdiction. [1]  (Notice of Removal ¶ 11.)

---

[1]  Aetna states in the Notice of Removal that the case was filed in and removed from the
Supreme Court of the State of New York, Queens County, (Notice of Removal ¶¶ 1, 14–15,
Docket Entry No. 1), but the copy of the notice filed in state court provides that the Nassau
County Clerk received Aetna's notice of removal and processed the removal from Supreme
Court, Nassau County.  *See* Confirmation Notice for Notice of Removal/Remand, *Rowe Plastic
Surgery of N.J., L.L.C. v. Aetna Health & Life Ins. Co.*, No. 609088/2022 (N.Y. Sup. Ct. 2022),
Docket Entry No. 4.

On September 25, 2025, Plaintiffs filed a Second Amended Complaint ("SAC") alleging claims of (1) fraud, (2) fraud by omission, and (3) fraudulent inducement. (SAC ¶¶ 75–121, Docket Entry No. 37.) On January 14, 2026,[2] Aetna moved to dismiss the action pursuant to Rule 12(b) of the Federal Rules of Civil Procedure on the grounds that (1) Plaintiffs improperly add two new claims without seeking leave of court to do so; (2) all three fraud claims fail to state a claim; and (3) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, expressly preempts Plaintiffs' claims.[3] For the reason stated below, the Court grants Aetna's motion and dismisses Plaintiffs' SAC with prejudice.

---

[2] The parties were initially ordered to file a fully briefed motion by January 9, 2026. (*See* Order dated Nov. 3, 2025.) On January 8, 2026, Aetna filed a letter motion for extension of time to file a response/reply until January 14, 2026, and for leave to file excess pages, (Ltr. Mot. for Extension of Time, Docket Entry No. 42), which the Court granted on January 9, 2026, (Order dated Jan. 9, 2026).

[3] (Aetna's Not. of Mot. to Dismiss ("Def.'s Mot."), Docket Entry No. 43; Decl. of Adam J. Petitt in Supp. of Def.'s Mot. ("Petitt Decl."), appended to Def.'s Mot., Docket Entry No. 43-1; Tr. of the Dec. 21, 2020 call from Veritext ("Dec. 21 Call Tr."), annexed to Petitt Decl. as Ex. A, Docket Entry 43-2; Tr. of the Feb. 25, 2021 call from Veritext ("Feb. 25 Call Tr."), annexed to Petitt Decl. as Ex. B, Docket Entry No. 43-3; List of Cases involving Plaintiffs, annexed to Petitt Decl. as Ex. C, Docket Entry No. 43-4; Decl. of Elizabeth C. Petrozelli in Supp. of Def.'s Mot. ("Petrozelli Decl."), appended to Def.'s Mot., Docket Entry No. 43-5; Summary Plan Descriptions ("Plan Document"), annexed to Petrozelli Decl. as Ex. 1, Docket Entry No. 43-6; Explanation of Benefits ("EOBs"), annexed to Petrozelli Decl. as Ex. 2, Docket Entry No. 43-7; Aetna's Mem. in Supp. of Aetna's Mot. ("Def.'s Mem."), appended to Def.'s Mot., Docket Entry No. 43-8; Pls.' Opp'n to Aetna's Mot. ("Pls.' Opp'n"), appended to Def.'s Mot., Docket Entry No. 43-9; Decl. of Brendan J. Kearns in Opp'n to Def.'s Mot. ("Kearns Decl."), appended to Def.'s Mot., Docket Entry No. 43-10; ECF 1024 from *In re Aetna UCR Litig.* ("*Aetna UCR Litig.*"), annexed to Kearns Decl. as Ex. 2, Docket Entry No. 43-11; Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, N.Y. TIMES (Apr. 7, 2024) ("Times Article"), annexed to Kearns Decl. as Ex. 3, Docket Entry No. 43-12; Assurance of Discontinuance Pursuant to Exec. Law § 63(15) from 2009 Investigation by N.Y. State Office of the Attorney General, annexed to Kearns Decl. as Ex. 4, Docket Entry No. 43-13; Aetna's Reply in Supp. of Aetna's Mot. ("Def.'s Reply"), appended to Def.'s Mot., Docket Entry No. 43-14; Aetna's Proposed Order, appended to Def.'s Mot., Docket Entry No. 43-15; Aetna's Not. of Suppl. Authority in Supp. of Aetna's Mot. ("Def.'s Not. of Suppl. Authority"); Docket Entry No. 44; R&R, No. 22-CV-4870 (E.D.N.Y. Jan. 16, 2026), annexed to Def.'s Not. of Suppl. Authority as Ex. A, Docket Entry No. 44-1; R&R, No. 23-CV-2599 (E.D.N.Y. Feb. 3, 2026), annexed to Def.'s Not. of Suppl. Authority as Ex. B, Docket Entry No. 44-2.)

## I.    Background

Rowe Plastic Surgery and Rowe MD (the "Practice") are limited liability companies

through which Rowe MD conducts business.  (SAC ¶¶ 2–3.)  Aetna is an insurance company

licensed in Connecticut and authorized to do business in New York State.  (*Id.* ¶ 1.)

Plaintiffs' claims arise out of Aetna's allegedly late, reduced, and unreasonable payment

for a bilateral breast reduction they performed on March 1, 2021 on non-party patient, D.B. ("the

Patient"), who Aetna insured.  (*Id.* ¶ 4; *see generally id.*)

### a.    Factual background

In this case, the Patient required a bilateral breast reduction, and Plaintiffs performed the

surgery after they "sought and obtained a network exception from Aetna" under the Patient's in-

network benefits ("the Plan"), and "in reliance on, and consistent with, [a] representation of 90th

percentile of reasonable and customary reimbursement."  (SAC ¶¶ 4, 47, 53.)

#### i.    Plaintiffs' communications with Aetna

##### 1.    December 21, 2020 call with Aetna's employee, E.J., and the discussion of "90th percentile reasonable and customary"

On December 21, 2020, Plaintiffs' representative, Kiana, called Aetna and spoke with

Aetna's employee, E.J., who provided reference number 5777163333 for the call.[4]  (SAC ¶ 12;

Dec. 21 Call Tr.)  Plaintiffs allege the "purpose of the call was to obtain reimbursement

information in advance of surgery, so that the [Plaintiffs] could inform the [P]atient how much

Aetna would pay, determine the amount to collect from the patient beforehand, and whether to

proceed with scheduling," (SAC ¶ 14; *see id.* ¶¶ 24–25), because the Practice's policy is "not to

---

[4]  Aetna submitted as an exhibit to its motion a certified transcript of the December 21, 2020 call, (*see* Dec. 21 Call Tr.), and as discussed *infra* Section II.c.1, the Court considers the transcript as integral to the SAC.

schedule major surgeries without the insurer's confirmation of coverage and reimbursement terms," (*id.* ¶ 9; *see id.* ¶ 11).

During the call, after confirming that Kiana was calling on behalf of a provider of services and the Patient's membership information, E.J. asked Kiana, "Now, let me know, are you calling for benefits or claims?" and Kiana replied, "So I need outpatient surgery benefits done in the hospital, billing as a concessional [sic], and I do have a CPT code." (Dec. 21 Call Tr. 2:1–4:2.) E.J. asked for procedure and diagnosis codes, and Kiana provided CPT Code 19318 and diagnosis code N-62. (*Id.* at 4:4–25; SAC ¶ 13.) E.J. checked the codes and stated that "the code is valid and billable," "requires pre-certification," and "[Aetna has] a dedicated department . . . for the pre-certification, all right?" (*Id.* at 5:1–4.) E.J. continued that the surgery "will be allowed based on medical necessity, but also determinations are made when the claims are processed. Additional code processing details can be found on the payment estimator and code editing tools in our Availity." (*Id.* at 5:5–8.) E.J. "quot[ed]" the in-network benefits as "100 percent no deductible" with an out-of-pocket maximum of $1,000 and noted that the Patient had already met the deductible and out-of-pocket maximum. (*Id.* at 5:13–6:14.) E.J. then stated, "let me quote you the out-of-network benefits for this [P]lan," and explained that the benefits are $300 deductible with an out-of-pocket maximum of $1,000 and noted that the Patient had already met the deductible for the out-of-network maximum as well. (*Id.* at 6:15–7:24.) E.J. continued that "Aetna will cover 100% for that, um, the benefits, all right? Because they already met the out-of-packet max." (*Id.* at 8:3–4.) Kiana responded, "Okay. So it'll be 100%, not that 80%?" to which E.J. replied, "Yes. Uh, the-the 80% Aetna cover it, and, uh, remaining 20% is for the . . . member's responsibility, all right?" (*Id.* at 8:5–9.) Kiana confirmed that the Patient had met the out-of-pocket maximum for the in-network rates and next asked, "can you give me any reimbursement rates?" to which E.J. responded, "[l]et me check my resources" and that

4

"upon seeing here, it's, uh, reasonable and customary 90 percentile, all right?" (*Id.* at 8:10–9:1.) Kiana responded, "90%.  Perfect." (*Id.* at 9:2–4.)  Kiana asked for a reference number and for the Aetna representative's name, and the two ended the call.  (*Id.* at 9:6–10:4.)

Plaintiffs allege that during the December 21, 2020 call Aetna offered to reimburse the Patient's procedure at 90th percentile of the usual, customary, and reasonable ("UCR") rate and "did not qualify the statement by reference to plan documents, nor did they suggest that payment would depend on terms or limitations not disclosed during the call."  (SAC ¶¶ 15–16; *see id.* ¶ 61.)  The UCR, or "reasonable and customary," "refers to percentile-based benchmarks reflecting provider charges in a geographic area" for a particular medical procedure.  (*Id.* ¶ 61.)

### 2.   February 3, 2021 network exception

After the December 21, 2020 call, Plaintiffs sought a network exception on February 3, 2021 from Aetna for the Patient's bilateral breast reduction, which Plaintiffs sought "in reliance on, and consistent with, the December 21 representation of 90th percentile of reasonable and customary reimbursement."  (*Id.* ¶¶ 47–48.)  Aetna approved the network exception on February 10, 2021.  (*Id.* ¶ 49.)

Plaintiffs contend, first, that a network exception "means that Aetna agrees to treat an out-of-network provider as if they were in-network for a particular service or episode of treatment."  (*Id.* ¶ 35.)  Second, Aetna issues a network exception when its network "fails to include a provider with the requisite specialty, training, or availability to meet the patient's needs."[5]  (*Id.* ¶ 36.)  Third, Aetna's network exceptions are actually a "cost-control tactic necessitated by Aetna's own inability to meet its contractual promise of access to care" that

---

[5]  *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621 (2d Cir. 2008) (explaining that an "in-network exception" is "an exception to regular UCR rates that applies only if . . . no in-network provider is available to perform it").

functions as "a systemic inducement [and] an engineered reliance that exploits provider goodwill to make up for Aetna's own operational failures." (*Id.* ¶¶ 38–39.) Fourth, Plaintiff contends that a network exception reduces a patient's out-of-pocket burden, (*id.* ¶ 40), but allows Aetna to "create[] a reimbursement structure that mirrors Aetna's contractual obligations to its network providers," and therefore provide "the lesser of the charged price or the network price," (*id.* ¶ 41). Fifth, Plaintiffs also allege that because there was no contracted rate, Aetna created the expectation "that it would reimburse the lesser of the 90th percentile of FAIR Health[6] or [Plaintiffs'] charge." (*Id.* ¶ 42.) In support, Plaintiffs contend that Aetna did not "disclose that granting the exception would result in a materially lower payment," (*id.* ¶ 43; *see id.* ¶ 46), and if it had, Plaintiffs allege they would not have proceeded with the Patient's surgery, (*id.* ¶ 44). Plaintiffs contend that Aetna intentionally represented to Plaintiffs that it would reimburse bilateral breast reduction at "90th percentile reasonable and customary" and granted a network exception to induce them to perform the Patient's surgery. (*Id.* ¶¶ 45, 52, 81, 88, 112, 118.)

### 3. February 25, 2021 call with Aetna's employee, Rocky

Plaintiffs contend that on or about February 25, 2021, they called Aetna and spoke with Aetna's employee Rocky to add a surgeon employee as a co-surgeon and provided reference number 5950576228 for the conversation. (SAC ¶ 50.)

---

[6] FAIR Health is "an independent, non-profit entity created through state regulatory action and funded by health insurers, including Aetna," (SAC ¶ 64), which "collects and analyzes millions of actual claims from across the country and publishes percentile data that regulators, providers, and insurers can verify," (*id.* ¶ 65). *See AA Med., P.C. v. Iron Workers Loc. 40, 361 & 471 Health Fund*, No. 22-CV-1249, 2026 WL 836429, at *3 (E.D.N.Y. Mar. 26, 2026) (relying on the plaintiff's description of FAIR Health as "a third-party vendor that collects a database of claims to determine what providers charge and what insurers pay for healthcare, grouped by geographic area and percentiles"); *Rowe Plastic Surgery of N.J., L.L.C. v. Anthem Blue Cross Blue Shield of Colo.* ("*Rowe XXVII*"), No. 23-CV-4536, 2026 WL 540767, at *1 n.1 (E.D.N.Y. Feb. 26, 2026) (relying on the plaintiffs' description of FAIR Health as "a database used by insurers as a reliable source for provider pricing and for determining UCR" (internal quotation marks omitted)).

ii.    **Plaintiffs perform the surgery, bill Aetna, and received payment from Aetna**

On March 1, 2021, Drs. Lisa Schneider and Norman Rowe performed the bilateral breast reduction on the Patient "in reliance on Aetna's representation made during the December 21, 2020, call, and on the network exception subsequently issued by Aetna confirming payment for the procedure." (*Id.* ¶ 53.)  Using industry standard billing codes, Plaintiffs billed Aetna a per unit price of $75,000, and each surgery is done bilaterally involving 2 units for a cost of $150,000 per surgeon, $300,000 total.  (*Id.* ¶¶ 54, 57–59.)  Plaintiffs contend that this pricing is "consistent with or slightly below the 90th percentile of FAIRHealth for that code in the northern New Jersey geographic area."  (*Id.* ¶ 57.)

Aetna reimbursed Plaintiffs $90,844.28 total — $45,615.93 for Dr. Rowe and $45,228.35 for Dr. Schneider — which Plaintiffs contend is "far below 90th percentile of reasonable and customary, did not reflect the proper application of reductions on reimbursement an insurer is entitled to make because co-surgeons should be reimbursed the same amount, and directly contradicted the representation Aetna made on December 21, 2020."  (*Id.* ¶ 60.)  Plaintiffs allege that at no time during their communications with Aetna "did Aetna advise that reimbursement would be determined by a non-party, or by any methodology other than 90th percentile of reasonable and customary."  (*Id.* ¶ 56.)

iii.    **Plaintiffs' reliance based on prior dealings and industry standards**

Plaintiffs contend that "[a]lthough Aetna does not always disclose the 'allowed amount' in advance," Aetna's prior payment history, Aetna's express statement of 90th percentile reimbursement, and "the industry-standard meaning of 'reasonable and customary'" reinforced Plaintiffs' "reasonable expectation that reimbursement would track prior approvals."  (SAC ¶ 33.)  First, Plaintiffs allege that between 2019 and 2020, Aetna reimbursed Plaintiffs for a

7

bilateral breast reduction at an average of $42,769.93 per unit — Aetna's share after deducting a patient's cost-share obligation — and under "an 80/20 coinsurance split, like [the Patient's], the full allowed amount would correspond to approximately $53,462 per unit." (*Id.* ¶ 32.) As a result, Plaintiffs allege that Aetna's use of "90th percentile of reasonable and customary," during the December 21 call "was not merely descriptive," but "operated as a factual assertion, intended to induce reliance." (*Id.* ¶ 34.)

Second, Plaintiffs allege that "Aetna knew or should have known that based on its prior acts Plaintiffs were likely to believe that its representation was tied to the FAIRHealth rates" when Aetna stated "90th percentile of reasonable and customary." (*Id.* ¶¶ 80, 115–16.) Plaintiffs allege that the health care industry, including providers, patients, insurers, and regulators, can use a publicly available vendor called FAIR Health to determine reasonable and customary benchmark data regarding medical billing charges. (*Id.* ¶¶ 20, 62, 114.) Plaintiffs also contend that FAIR Health data shows that reimbursement at the 90th percentile per breast reduction surgery would be greater than or equal to $75,000, but Aetna only paid around $45,000 per unit. (*Id.* ¶¶ 21, 66.)

Plaintiffs further contend that Aetna's underpayment "evidences that Aetna or a non-party pricing vendor calculated Aetna's payment because it is not consistent with the industry recognized FAIR Health data." (*Id.* ¶ 63.) Instead of using the public FAIR Health database, Plaintiffs allege that Aetna either calculated the rates themselves or hired a private contractor pricing vendor "to reduce its payment obligations" to "unilaterally assign[] a much lower 'allowable' amount." (*Id.* ¶¶ 65, 67.) In addition, a pricing vendor "do[es] not make their data public" or "disclose their methodology" so the "numbers cannot be independently verified." (*Id.* ¶¶ 67–66.) Plaintiffs allege that the deviation from Aetna's December 21, 2020 representation and "industry benchmarks like FAIR Health's 80th or 90th percentile" "demonstrates that the

8

payment was not the result of a consistent reimbursement policy but an after the fact reduction" and an underpayment that exposed Plaintiffs to significant financial harm.[7]  (*Id.* ¶ 68.)  Plaintiffs allege they "relied on Aetna's express statement that reimbursement would be made at the 90th percentile . . . [which] was unambiguous and material to the [P]atient's and [Plaintiffs'] decision to proceed with scheduling and rendering surgical services."  (*Id.* ¶ 22; *see id.* ¶¶ 25, 71.)

### iv.  Plaintiffs' SAC claims

Plaintiffs assert three fraud-based claims — (1) fraud, (SAC ¶¶ 75– 92); (2) fraud by omission, (*id.* ¶¶ 93–108); and (3) fraudulent inducement, (*id.* ¶¶ 109–21) — alleging that: (a) Aetna intentionally used the term "'reasonable and customary' 90th percentile" during a December 21, 2020 phone call, (*id.* ¶¶ 76, 110); (b) Plaintiffs understood that to mean reimbursement based on FAIR Health benchmarks, (*id.* ¶¶ 80, 115); (c) Aetna failed to disclose, and had a duty to disclose, that it was using a private pricing vendor and not FAIR Health and that Plaintiffs would not be reimbursed at out-of-network rates once granted the in-network exception, (*id.* ¶¶ 82–85, 94, 96, 102–03); and (d) Aetna lied about its pricing, (*id.* ¶¶ 110–11, 116).  The three causes of action are largely repetitive and "repeat and reallege" all prior information, (*id.* ¶¶ 75, 93, 109).

---

[7]  Plaintiffs also allege that Aetna has a documented history of engaging in unfair practices against out-of-network providers where they were alleged to have intentionally utilized inaccurate databases to calculate reimbursement for services using terms such as "reasonable and customary," including a New York Attorney General investigation and a class action lawsuit in New Jersey.  (SAC ¶ 72.)  Plaintiffs allege that in a January of 2009 settlement agreement between the New York Attorney General and Aetna, Aetna agreed to use FAIR Health as "an independent database to ensure transparency and fairness in reimbursement calculations."  (*Id.* ¶¶ 72 n.2, 73.)  Plaintiffs contend that Aetna "cannot now claim that FAIR Health data is unreasonable or not reliable because Aetna agreed to rely on FAIRHealth data in the past, and never told anyone it stopped using FAIR Health."  (*Id.* ¶ 74.)

######  v.   *Rowe* companion cases

Plaintiffs have filed approximately thirty nearly identical lawsuits in the Southern and

Eastern Districts of New York alleging that Aetna breached an oral agreement to pay for a

surgery.[8]

---

[8] The following cases involve the same plaintiffs and similar defendants, and ruled in favor of defendants on either motions to amend or to dismiss: *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe I*"), 705 F. Supp. 3d 194 (S.D.N.Y. 2023), *aff'd*, No. 23-8083, 2024 WL 4315128 (2d Cir. Sep. 27, 2024) (summary order); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe II*"), No. 23-CV-8529, 2024 WL 382143 (S.D.N.Y. Feb. 1, 2024); *Rowe v. UnitedHealthcare Serv., LLC* ("*Rowe III*"), No. 23-CV-516, 2024 WL 4252045 (E.D.N.Y. Sep. 20, 2024); *Rowe Plastic Surgery of N.J., L.L.C. v. United Healthcare* ("*Rowe IV*"), No. 23-CV-4352, 2024 WL 4309230 (E.D.N.Y. Sep. 26, 2024); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe V*"), No. 23-8083, 2024 WL 4315128 (2d Cir. Sep. 27, 2024) (summary order) (affirming *Rowe I*); *Rowe v. Aetna Health & Life Ins. Co.* ("*Rowe VI*"), No. 22-CV-9427, 2025 WL 618556 (S.D.N.Y. Feb. 25, 2025), *appeal withdrawn*, No. 25-474, 2025 WL 1540330 (2d Cir. Apr. 21, 2025); *Rowe v. Aetna Life Ins. Co.* ("*Rowe VII*"), No. 23-CV-8527, 2025 WL 692051 (S.D.N.Y. Mar. 4, 2025), *appeal withdrawn sub nom. Rowe Plastic Surgery of N.J., L.L.C. v. Blue Cross Blue Shield of N.C.*, No. 25-539, 2025 WL 1625510 (2d Cir. Apr. 23, 2025), and *appeal withdrawn*, No. 25-537, 2025 WL 1603002 (2d Cir. Apr. 28, 2025); *Rowe Plastic Surgery of N.J., LLC v. Aetna Health & Life Ins. Co.* ("*Rowe VIII*"), No. 23-CV-8504, 2025 WL 1004730 (S.D.N.Y. Apr. 2, 2025); *Rowe Plastic Surgery of N.J., LLC v. Aetna Health & Life Ins. Co.* ("*Rowe IX*"), No. 22-CV-7900, 2025 WL 1000147 (S.D.N.Y. Apr. 3, 2025); *Rowe Plastic Surgery of Long Island, P.C. v. UnitedHealth Care Serv., Inc.* ("*Rowe X*"), No. 23-CV-4541, 2025 WL 1715445 (E.D.N.Y. May 6, 2025), *report and recommendation adopted*, 2025 WL 2306721 (E.D.N.Y. Aug. 11, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XI*"), No. 22-CV-7900, 2025 WL 1603919 (S.D.N.Y. June 6, 2025); *Rowe v. Aetna Life Ins. Co.* ("*Rowe XII*"), No. 22-CV-8713, 2025 WL 1603920 (S.D.N.Y. June 6, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Ins. Co.* ("*Rowe XIII*"), No. 23-CV-8514, 2025 WL 1797219 (S.D.N.Y. June 26, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Health & Life Ins. Co.* ("*Rowe XIV*"), No. 23-CV-8140, 2025 WL 1786416 (S.D.N.Y. June 27, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XV*"), No. 23-CV-3636, 2025 WL 1907005 (E.D.N.Y. July 10, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XVI*"), No. 23-CV-3632, 2025 WL 1940325 (E.D.N.Y. July 15, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XVII*"), No. 23-CV-6206, 2025 WL 2218097 (S.D.N.Y. Aug. 5, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XVIII*"), No. 23-CV-8509, 2025 WL 2242507 (S.D.N.Y. Aug. 6, 2025); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Health & Life Ins. Co.* ("*Rowe XIX*"), No. 22-CV-4755, 2025 WL 2452406 (E.D.N.Y. Aug. 26, 2025) ("August 2025 Decision"); *Rowe v. Aetna Life Ins. Co.* ("*Rowe XX*"), No. 23-CV-8297, 2025 WL 2644190 (S.D.N.Y. Sep. 15, 2025); *Rowe v. Aetna Life Ins. Co.* ("*Rowe XXI*"), No. 23-CV-8512, 2025 WL 2644203 (S.D.N.Y. Sep. 15, 2025); *E. Coast Plastic Surgery, P.C. v. Aetna Life Ins. Co.* ("*Rowe XXII*"), No. 25-CV-6136,

### b.   Procedural background

On November 9, 2022, Plaintiffs filed an Amended Complaint following Aetna's removal of this action from Supreme Court, Nassau County, adding a claim for fraudulent inducement and expanding on the factual allegations, and Aetna answered on November 22, 2022, asserting nineteen affirmative defenses, including failure to state a claim upon which relief can be granted and ERISA preemption.  (Notice of Removal; Am. Compl., Docket Entry No. 12; Answer, Docket Entry No. 14.)

### i.   Stay pending Second Circuit decision in *Rowe* companion case

On January 29, 2024, then-Magistrate Judge Sanket J. Bulsara ordered a stay on discovery pending the Second Circuit's decision in *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Insurance Co.*, an appeal of a Southern District of New York court's dismissal of the common law claims by Rowe Plastic Surgery and Dr. Rowe against Aetna arising out of Aetna's alleged underpayment for medical services they rendered to a patient.  (Order dated Jan. 29, 2024.)  *See Rowe I*, 705 F. Supp. 3d at 202–05; Notice of Appeal, *Rowe I*, No. 23-CV-8521 (S.D.N.Y. Dec. 21, 2023), Docket Entry No. 30.  On September 27, 2024, the Second Circuit issued a summary order affirming dismissal of the claims.  *Rowe V*, 2024 WL 4315128, at *1.

On September 27, 2024, Judge Bulsara directed the parties to explain "the effect, if any, of the Second Circuit's decision" on this action.  (Order dated Sep. 27, 2024.)  Aetna responded

---

2025 WL 3168172 (S.D.N.Y. Nov. 13, 2025); *Rowe Plastic Surgery of Long Island, P.C. v. Aetna Life Ins. Co.* ("*Rowe XXIII*"), No. 22-CV-9328, 2025 WL 3268083 (S.D.N.Y. Nov. 24, 2025); *Rowe v. Aetna Health & Life Ins. Co.* ("*Rowe XXIV*"), No. 22-CV-4870, 2026 WL 388609 (E.D.N.Y. Jan. 16, 2026) *report and recommendation adopted*, Order adopting Report and Recommendation (E.D.N.Y. Feb. 2, 2026); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XXV*"), No. 23-CV-7049, 2026 WL 158610 (S.D.N.Y. Jan. 20, 2026); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.* ("*Rowe XXVI*"), No. 23-CV-2599, 2026 WL 783837 (E.D.N.Y. Feb. 3, 2026) *report and recommendation adopted*, Order adopting Report and Recommendations (E.D.N.Y. Feb. 18, 2026); *Rowe XXVII*, 2026 WL 540767, at *1.

11

that the decision "made abundantly clear that the transcripts of . . . verification of benefits calls do not create an offer or promise to pay" and therefore "[i]f Plaintiffs will not agree to dismiss their [Amended Complaint] with prejudice, then discovery should be stayed while the parties engage in expedited motion practice to determine whether, consistent with the Second Circuit's recent decision, the verification of benefits calls at issue were offers of payment to Plaintiffs." (Aetna's Status Ltr. dated Oct. 11, 2024, 1–2, Docket Entry No. 25.)

On October 11, 2024, Plaintiffs responded that the Second Circuit's decision "do[es] not have precedential effect," "did not find that Plaintiffs have no claim[s], but merely that Plaintiffs' allegations fall short of stating a claim," and Plaintiffs could have amended their complaint "to sufficiently state actionable claim(s) against [Aetna]" in *Rowe V* "had transcripts of *all* the calls between the parties been available." (Pls.' Status Ltr. dated Oct. 11, 2024, 1–2, Docket Entry No. 26.) Plaintiffs therefore "request[ed] leave to conduct targeted discovery to aid in drafting a[] [Second] Amended Complaint in this action." (*Id.* at 2).[9]

### ii.   Plaintiffs declined to amend the Amended Complaint after *Rowe V*

On October 29, 2024, Plaintiffs requested leave to amend the Amended Complaint to allege that (1) "the 'reasonable and customary' fee schedule offered by Aetna to induce performance of the surgery was not contained in the relevant patient's health plan and was, therefore, an offer independent of Aetna's obligations in the relevant patient's health plan"; (2) "it was a lie for Aetna to offer reimbursement using the 'reasonable and customary' fee schedule to induce performance of the surgery[] [b]ecause Aetna does not use that fee schedule"; and (3) "*all* the communications between the parties, and their sum and substance, leading up to Plaintiffs rendering the surgery at issue" to provide the Court "a complete narrative of the

---

[9] As discussed *infra* Section I.b.ii, Plaintiffs declined to amend their Amended Complaint and did not pursue this targeted discovery request.

parties' agreement." (Pls.' Ltr. Request for Permission to File Second Am. Compl. 1–2, Docket No. 29.)  Judge Bulsara directed the parties' to "meet and confer and propose a briefing schedule for such a motion by [November 12, 2024]," (Order dated Nov. 5, 2024), and subsequently adopted the parties' proposed briefing schedule for Plaintiffs' motion to amend the Amended Complaint on November 14, 2024.  (Ltr. to Magistrate Judge Bulsara Regarding Briefing Schedule for Mot. to Amend, Docket Entry No. 30; Order dated Nov. 14, 2024.)

On December 20, 2024, Magistrate Judge James R. Cho ordered the parties to file a joint status report.[10]  (Status Report Order dated Dec. 20, 2024.)  On January 3, 2025, Plaintiffs reported that they would not be filing a second amended complaint because "the Amended Complaint . . . includes the additional facts [they] believe alleges a unilateral offer wherein [Aetna] agreed to treat the Plaintiffs as if they were in-network providers even though they are out-of-network providers because [Aetna] did not have surgeons available to provide the surgery" and "this unilateral offer is enforceable and was accepted by full performance."  (Status Report on Behalf of Both Parties 1, Docket Entry No. 31.)  Plaintiffs asserted that the "matter should proceed with discovery."  (*Id.*)  Aetna reiterated its position that "this case should be dismissed" based on the Second Circuit's decision in *Rowe V* and stated its intent to move forward with a pre-motion conference request.  (*Id.* at 1–2.)

On January 24, 2025, Aetna filed pre-motion conference request and sought a stay of discovery during the pendency of its anticipated motion for judgment on the pleadings.  (Def.'s Pre-Mot. Conf. Request, Docket Entry No. 32.)  On January 31, 2025, Plaintiffs opposed Aetna's motion for judgment on the pleadings and initially objected to the requested stay but

---

[10]  The case was reassigned from Judge Bulsara to Judge Cho on December 18, 2024. (Case Reassignment Notification, dated Dec. 18, 2024.)

subsequently took no position on the motion to stay during a hearing held before Judge Cho on March 7, 2025.  (Pls.' Pre-Mot. Conf. Request, Docket Entry No. 33; Min. Entry for March 7, 2025, Mot. Hr'g.)  During the hearing, Judge Cho ordered a stay of discovery pending a ruling on Aetna's motion.  (Min. Entry for March 7, 2025, Mot. Hr'g.)

### iii.  Aetna's motion for judgment on the pleadings

On May 16, 2025, Aetna moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the grounds that (1) the Amended Complaint failed to state a claim, and (2) ERISA expressly preempted Plaintiffs' claims; Plaintiffs opposed the motion.[11]  On August 26, 2025, the Court granted Aetna's motion and dismissed without prejudice Plaintiffs' breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement claims and dismissed with prejudice Plaintiffs' abandoned Prompt Pay Law claim for failure to state a claim.  (Mem. and Order dated Aug. 26, 2025 ("August 2025 Decision") 65, Docket Entry No. 36.)  The Court granted Plaintiffs thirty days from the date of August 2025 Decision to file a second amended complaint that repleaded their breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement claims.  (*Id.*)

On September 25, 2025, Plaintiffs filed a SAC asserting claims of (1) fraud, (2) fraud by omission, and (3) fraudulent inducement.  (SAC ¶¶ 75–121.)  Aetna moved to stay discovery on October 9, 2025, (Def.'s Second Pre-Mot. Conf. Request, Docket Entry No. 38), which Judge

---

[11]  (Aetna's Mot. for J. on the Pleadings ("Def.'s Mot. for J. on the Pleadings"), Docket Entry No. 35; Aetna's Mem. in Supp. of Aetna's Mot. for J. on the Pleadings ("Def.'s Mem. for J. on the Pleadings"), appended to Def.'s Mot. for J. on the Pleadings, Docket Entry No. 35-6; Pls.' Opp'n to Aetna's Mot. for J. on the Pleadings ("Pls.' Opp'n for J. on the Pleadings"), Def.'s Mot. for J. on the Pleadings, Docket Entry No. 35-7; Aetna's Reply in Supp. of Aetna's Mot. ("Def.'s Reply for J. on the Pleadings"), Def.'s Mot. for J. on the Pleadings, Docket Entry No. 35-11.)

Cho granted on October 28, 2025 after Plaintiffs consented to the stay, (Order dated Oct. 28, 2025).

Aetna has now moved to dismiss the SAC pursuant to Rule 12(b) of the Federal Rules of Civil Procedure on the basis that it improperly added two new claims; all three fraud claims fail to state a claim; and ERISA expressly preempts the SAC.  (*See generally* Def.'s Mem.)

## II.    Discussion

### a.    Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must 'construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor.'" *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (quoting *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) ("[The Second Circuit] review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002))).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Yerkyn v. Yakovlevich*, 164 F.4th 224, 231 (2d Cir. 2026) (quoting *id.*).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see Knapp v. Barclays PLC*, 171 F.4th 166, 170 (2d Cir. 2026) (quoting same); *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63); *see also Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024) ("[T]he

15

plaintiff's allegations must enable the court to reasonably infer that the defendant is liable for the alleged misconduct." (citing *Iqbal*, 556 U.S. at 678)), *cert. denied*, 146 S. Ct. 880 (2025); *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) ("[S]urviv[ing] a motion to dismiss . . . requires 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 678)).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

### b.    Plaintiffs' claims of fraud and fraud by omission

Aetna argues the Court should dismiss Plaintiffs' newly pled claims for fraud and fraud by omission because they were filed without leave of Court.  (Def.'s Mem. 1, 7–8.)  In support, Aetna argues that the Court granted Plaintiffs leave to replead only four specific causes of action in the August 2025 Decision — breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement — and instead Plaintiffs reasserted only the fraudulent inducement claim and impermissibly added two additional claims that exceed the scope of the Court's express grant of leave to amend.  (*Id.* at 7.)  In addition, Aetna argues that if Plaintiffs wished to seek further leave to amend, they must do so through formal motion practice and not by "stealth pleading."  (Def.'s Reply 2.)

Plaintiffs argue that that they repleaded fraudulent inducement and "boldly advance[] two related theories, common-law fraud and fraud by omission, each arising from the same operative facts."  (Pls.' Opp'n 15.)  In support, Plaintiffs argue that the Court authorized a repleading of fraudulent inducement, which is "a specific species of fraud" and the common law fraud and

16

fraud by omission claims are "legal variants of that same fraud-based misconduct." (*Id.*)  In the alternative, Plaintiffs contend that the two new claims "fall squarely within the spirit and purpose of [Federal Rule of Civil Procedure] 15(a)(2), which favors leave to amend when justice so requires." (*Id.*)  Plaintiffs therefore request that the Court either "construe[] [the added claims] as either compliant with the Court's order or as incorporating an implicit request for leave" because "the added claims are closely related, factually coterminous, and do not prejudice Aetna" since no additional discovery is required. (*Id.* at 15–16.)

Rule 15 of the Federal Rules of Civil Procedure provides that "[l]eave to amend should be 'freely give[n] . . . when justice so requires,' but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party.'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (second and third alterations in original) (first quoting Fed. R. Civ. P. 15(a)(2); and then quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)); *see MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) ("A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (citations and internal quotation marks omitted)); *see also Dalewitz v. Procter & Gamble Co.*, No. 22-CV-7323, 2025 WL 764023, at *2 (S.D.N.Y. Mar. 11, 2025) ("[A]bsent a showing of prejudice or bad faith, practice in this Circuit is to grant a motion to amend." (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993))).  "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Shasha v. Malkin*, No. 25-442, 2026 WL 320201, at *2 (2d Cir. Feb. 6, 2026) (summary order) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119

(2d Cir. 2012)); *see also Bus. Casual Holdings LLC v. YouTube, LLC*, No. 22-3007, 2023 WL 6842449, at *1 (2d Cir. Oct. 17, 2023) (summary order) ("Proposed amendments are futile if they would fail to cure prior deficiencies or state a claim." (quoting *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015))); *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("Amendment is futile if it fails 'to cure prior deficiencies.'" (quoting *Panther Partners Inc.*, 681 F.3d at 119)). "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW*, 783 F.3d at 389. "If the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Kong v. Lau*, No. 24-CV-3041, 2025 WL 3496383, at *7 (E.D.N.Y. Dec. 5, 2025) (quoting *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015)). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018)).

"Leave to amend . . . should generally be denied in instances of . . . bad faith." *Exelis*, 824 F.3d at 28 (internal quotation marks and citation omitted). Courts have declined to allow leave to amend due to bad faith where new and implausible allegations are provided in late stages of a litigation or where a party is seeking leave to amend to gain a tactical advantage. *See, e.g.*, *Third Ave. Commons LLC v. Gobrands, Inc.*, No. 25-CV-934, 2026 WL 533755, at *6 (E.D.N.Y. Feb. 26, 2026) ("[F]inding that a party is seeking leave to amend solely to gain a tactical advantage supports a finding that such an amendment is made in bad faith." (quoting *Feuer v. Cornerstone Hotels Corp.*, No. 14-CV-5388, 2017 WL 3841841, at *5 (E.D.N.Y. Aug. 4, 2017), *report and recommendation adopted*, 2017 WL 3842350 (E.D.N.Y. Aug. 31, 2017))); *Dalewitz*, 2025 WL 764023, at *3 (quoting *Franco v. Diaz*, 51 F. Supp. 3d 235, 245 (E.D.N.Y.

2014)) (same); *Optionality Consulting PTE. LTD. v. Edge Tech. Grp.*, No. 18-CV-5393, 2021 WL 310942, at *5 (S.D.N.Y. Jan. 29, 2021) ("[The p]laintiff's new allegations, squarely fitting within the statute of frauds, leads the [c]ourt to believe that they are not being [set] forth in good faith. [The p]laintiff's unexplained recollection of these critical facts . . . cannot be reconciled with the [o]riginal [c]omplaint.").

As Defendants argue, without leave to amend, Plaintiffs cannot bring their claims for fraud and fraud by omission. *See Buxbaum v. Webull Fin., LLC*, No. 24-CV-9784, 2025 WL 3949816, at *4 & n.7 (S.D.N.Y. Nov. 13, 2025) (treating the prior complaint as the operative pleading because "[the d]efendant did not consent to [the p]laintiff filing additional complaints and the [c]ourt did not grant leave to file further amended complaints"), *report and recommendation adopted*, 2025 WL 3560355 (S.D.N.Y. Dec. 12, 2025); *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2021 WL 4434935, at *37 (S.D.N.Y. Sep. 23, 2021) (granting the defendant's motion to dismiss the plaintiff's newly asserted claim added without leave of court because "[the p]laintiff exceeded the scope of the permission he was granted to replead his formerly dismissed claims"); *Cummings v. City of New York*, No. 19-CV-7723, 2021 WL 1163654, at *3 (S.D.N.Y. Mar. 26, 2021) (striking newly asserted allegations because they were beyond the scope of leave to amend granted by the court, and "[d]istrict courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted" (quoting *Miles v. City of New York*, No. 14-CV-9302, 2018 WL 3708657, at *5 (S.D.N.Y. Aug. 3, 2018))). While the SAC exceeds the scope of the leave to amend that the Court granted Plaintiffs in the August 2025 Decision by pleading two additional claims of fraud and fraud by omission, (*see* August 2025 Decision 63–64 (granting leave to replead breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement

19

claims)), Plaintiffs' additional claims do not prejudice Aetna because they are based on the same underlying facts as the fraudulent inducement claim, and therefore the Court considers Plaintiffs' claims of fraud and fraud by omission.

First, Plaintiffs' new claims exceed the Court's leave because in the August 2025 Decision, the Court dismissed Plaintiffs' claims of breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement without prejudice and allowed leave to replead because Plaintiffs made arguments in their opposition to Aetna's motion for judgment on the pleadings that were predicated on facts not alleged in the Amended Complaint. (*Id.* at 63–64 (citing 28 n.11, 30 n.12, 61 n.20).) Plaintiffs addressed one of the factual deficiencies in the SAC, as it relates to the claim for fraudulent inducement, by adding facts regarding Aetna's use of a pricing vendor that reduced UCR-based payments. (*See id.* at 61 n.20; *cf.* SAC ¶¶ 21, 65–67.) The Court did not permit additional claims, and thus Plaintiffs have abused the Court's leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave . . . ."); *Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 821 F.3d 349, 352 (2d Cir. 2016) (per curiam) (holding that it was not abuse of discretion to deny the plaintiffs' opportunity to amend the complaint where the plaintiffs "did not ask the district court for leave to amend"); *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted.") (affirming rejection of amended complaint and collecting cases); *Teman v. Zeldes Needle Cooper LLP*, No. 24-CV-9830, 2026 WL 880298, at *3 (S.D.N.Y. Mar. 31, 2026) (quoting *Palm Beach Strategic Income*, 457 F. App'x at 43) (same); *see also Kumaran v. Nat'l Futures Ass'n, LLC*, No. 20-CV-3668, 2022 WL 1805936, at *3 n.1 (S.D.N.Y. June 2, 2022) (dismissing the plaintiffs' claims

20

under other sections of the Commodity Exchange Act when the court had only provided leave to replead claims against the defendants under Section 22); *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 597 n.5 (S.D.N.Y. 2013) (dismissing causes of action that exceed the court's permission to replead).  Moreover, "[Plaintiffs] ha[ve] had multiple opportunities to amend [their] claims but did not submit the proposed amendment for review [to] the [ ] [C]ourt."  *See Rosendale v. Brusie*, 374 F. App'x 195, 198 (2d Cir. 2010) (citing *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999) (per curiam)).

The Court allowed Plaintiffs to replead four specific claims in its August 2025 Decision, but Plaintiffs also previously had an opportunity to amend the Amended Complaint, and they declined to do so.[12]  Plaintiffs declined because "the Amended Complaint . . . include[d] the additional facts [they] believe[d] alleged a unilateral offer wherein [Aetna] agreed to treat the Plaintiffs as if they were in-network providers even though they are out-of-network providers because [Aetna] did not have surgeons available to provide the surgery" and "this unilateral offer is enforceable and was accepted by full performance." (Status Report on Behalf of Both Parties 1.) *See Palm Beach Strategic Income*, 457 F. App'x at 43 (affirming district court's dismissal of the plaintiff's claims for exceeding the scope of leave).

However, New York law supports that claims of fraud, fraud by omission, and fraudulent inducement contain significant overlap and are often addressed together.[13]  Under New York law, common law fraud can either be premised on misrepresentation *or* omission: "To state a

---

[12]  As discussed *supra* Section I.b.ii, although Plaintiffs declined to amend the Amended Complaint in January of 2025, following the August 2025 Decision, Plaintiffs amended the Amended Complaint by filing the SAC on September 25, 2025.  The SAC is the operative pleading discussed in this Memorandum and Order.

[13]  Plaintiffs contend without support that their new claims of fraud and fraud by omission claims are "not new causes of action" but "legal variants of th[e] same fraud-based conduct" as their claim for fraudulent inducement.  (Pls.' Opp'n 15.)

claim for fraud under New York law, a plaintiff must allege (1) *a material misrepresentation or omission of fact*; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 189–90 (2d Cir. 2023) (emphasis added) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015)); *see Somnia, Inc. v. Change Healthcare Tech. Enabled Servs., LLC*, No. 19-CV-8983, 2021 WL 639529, at *5 (S.D.N.Y. Feb. 16, 2021) ("There are two species of claims for fraud in New York: '[f]raud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment . . . .'" (alterations in original) (quoting *Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 466 n.3 (S.D.N.Y. 2017))); *see also Vinci Brands LLC v. Coach Servs., Inc.*, No. 23-CV-5138, 2024 WL 4370841, at *4 n.2 (S.D.N.Y. Oct. 2, 2024) ("Fraud claims based on a theory of fraudulent inducement require the same elements [as fraud]." (citing *Wild Bunch, SA v. Vendian Ent., LLC*, No. 17-CV-1383, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018))); *Learning Experience Sys., LLC v. Collins*, No. 20-CV-2504, 2023 WL 5835034, at *21 (E.D.N.Y. Sep. 8, 2023) ("Under New York law, the elements of fraudulent inducement are similar to those of common law fraud." (citing *Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018))).

Plaintiffs' claim for fraudulent inducement requires misrepresentation, *see Rowe V*, 2024 WL 4315128, at *4 (Under New York law, the elements for fraudulent inducement are "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." (quoting *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012))), and Plaintiffs' claim for fraud by omission requires an omission or concealment. *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 90–91 (2d Cir. 2005) ("[F]raudulent concealment[, or fraud

22

by omission,] requires proof of: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." (citing *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 152 (2d Cir. 1993))).  Despite this distinction between misrepresentation and omission of fact, many courts generally consider fraudulent inducement and fraud by omission to be similar causes of action and often address them together.  *See e.g.*, *Henderson v. Golden Corral Franchising Sys., Inc.*, 663 F. Supp. 3d 313, 332 (S.D.N.Y. 2023) ("The elements of claims for fraudulent inducement and fraudulent omission are nearly identical under New York law."); *see also Weida Freight Sys., Inc. v. Jetson Elec. Bikes LLC*, --- F. Supp. 3d. ---, 2026 WL 1041940, at *3 (E.D.N.Y. Apr. 17, 2026) ("Under New York state law, the elements of both fraud and fraud in the inducement permit an omission to serve as a basis for such claim[.]").

All three of Plaintiffs' claims involve the same underlying facts of their communications with Aetna prior to the Patient's surgery and Aetna's alleged representation, or omission, involving reimbursement at 90th percentile reasonable and customary.  (*See* SAC fraud ¶¶ 76, 82; fraud by omission ¶¶ 98, 101; fraudulent inducement ¶¶ 110–12.)  However, Plaintiffs' fraud and fraud by omission claims also allege Aetna omitted critical information about granting an in-network exception.  (*See id.* fraud ¶ 83 ("Aetna failed to disclose that by covering the services as [in-network] it would not be reimbursing [Plaintiffs] the out of network reimbursement amount."), and fraud by omission ¶ 94 ("Aetna failed to disclose key facts about how it calculates out-of-network payments and how it would calculate reimbursement for an out of network provider (OON) when a network exception is granted.").  Plaintiffs' allegations regarding a network exception are an extension of the misrepresentation of reimbursement from Plaintiffs' first call with Aetna on December 21, 2020, where Plaintiffs allege Aetna promised reimbursement at 90th percentile reasonable and customary.  Accordingly, even though Plaintiffs exceeded their leave in filing fraud and fraud by omission claims, the Court finds it is not

23

prejudicial to consider the two additional claims because of the significant overlap in elements. *See Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.'" (alteration in original) (quoting *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).

In addition, Aetna does not argue that Plaintiffs' additional claims are prejudicial — only that Plaintiffs "improperly added two new claims . . . without seeking leave to do so, [and] [t]his procedural defect alone warrants dismissal," (*see* Def.'s Mem. 7). *See Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 455 (S.D.N.Y. 2016) (determining the defendants failed to carry their burden in proving the amendment would unduly prejudice them as the "new claim" substantially overlapped with, and related to, the plaintiff's existing claims); *see also Khan v. K1 Inv. Mgmt. LLC*, No. 24-CV-7860, 2025 WL 1808725, at *6 (E.D.N.Y. July 1, 2025) (permitting the defendant to amend its counterclaims because, *inter alia*, the plaintiff did not contend that the counterclaims would be prejudicial).

Regardless, Plaintiffs' new claims are futile. *See Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006) (finding leave to amend can be denied "when amendment would be futile"). As discussed *infra*, the amendments are futile because ERISA preempts these claims. *See Rowe XX*, 2025 WL 2644190, at *3 (denying leave to amend because "any additional or alternative pleading of non-ERISA claims would be preempted"); *Rowe XVI*, 2025 WL 1940325, at *3, 11 (denying motion to amend for futility due to preemption and failure to state a claim as a matter of state law); *Rowe VII*, 2025 WL 692051, at *2 (denying motion to amend for futility).

24

### c.    Documents relied on by Aetna

Aetna submitted as exhibits to its Motion to Dismiss certified transcripts of the December 21, 2020 and February 25, 2021[14] calls, the Plan Document, and two EOBs.  (*See* Def.'s Mem. 5–7.)  First, Aetna argues the December 21, 2021 call transcript is "plainly integral" because the SAC "relies upon the 'terms and effect' of the phone call[s]" and the Court already considered this transcript in the August 2025 Decision.  (*Id.* at 6 (citations omitted).)

Second, Aetna argues the EOBs are "integral because the crux of Plaintiffs' claim is [comparing] how much Aetna paid on the claim under the two EOBs" to the "amount Aetna's customer service representative purportedly promised to pay on the phone."  (*Id.*)  In addition, Aetna also contends that the SAC "expressly references the EOBs."  (*Id.*; Def.'s Not. of Suppl. Authority 2 (citing SAC 14).)  Aetna further argues in its supplemental brief that a *Rowe* companion case properly considered EOBs at the motion to dismiss stage.  (Def.'s Not. of Suppl. Authority 2 (citing *Rowe XXIV*, 2026 WL 388609, at *1).)

Third, Aetna argues (1) that the Court can consider the Plan Document because the SAC "presupposes the existence of a relationship between [the claims administrator] and [the Patient] through a health insurance plan."  (Def.'s Mem. 6 (citations omitted); *see* Def.'s Reply 8–9.)  Aetna also contends (2) that the Court declined to consider the Plan Document in the August 2025 Decision "only because it was inadequately linked to the [P]atient" which Aetna states it rectified through the EOBs.  (Def.'s Mem. 6–7 (citing August 2025 Decision 17–20).)  Moreover, Aetna argues (3) that Plaintiffs do not dispute the EOBs supply the "missing link" connecting the Patient to the Plan Document, and therefore Plaintiffs "implicitly concede that the

---

[14]  Aetna attached the February 25, 2021 call transcript to its Motion to Dismiss but does not discuss or present arguments based on its contents in its motion papers.

door this Court identified as open is now shut." (Def.'s Reply 7–8.) Aetna further argues (4) that the Plan Document is "integral" because the SAC alleges that Aetna "maintain[ed] exclusive control over the [financial] terms and reimbursement methodologies." (*Id.* at 8–9 (citations omitted).) Aetna argues (5) that the Plan Document's supporting declaration, the Petrozelli Declaration, is proper because "her personal knowledge as a senior paralegal of Aetna[] lays a proper foundation," and Plaintiffs do not support their challenge of Petrozelli's credentials with any evidence and do not challenge the other exhibits attached to the Petrozelli Declaration. (*Id.* at 9–10 (citations omitted).)

Plaintiffs "object to the admission of the purported [Plan Document] on the grounds of lack of foundation and hearsay."[15] (Pls.' Opp'n 16.) First, Plaintiffs argue that the Petrozelli Declaration is inadmissible because it fails to meet the foundational requirements of Rules 803(6) and 902(11) of the Federal Rules of Evidence. (*Id.*) Plaintiffs contend that in the Declaration, "Petrozelli does not identify the [Plan Document] with specificity, does not state that it was made at or near the time by someone with knowledge, [ ] does not establish that it was kept as part of a regularly conducted business activity or that it was Aetna's regular practice to maintain such documents[,] [ ] fails to state that they are a custodian or otherwise qualified witness[,] [and] there is no certification under Rule 902(11) [of the Federal Rules of Evidence] for self-authentication." (*Id.*)

Second, Plaintiffs argue that they do not "'implicitly' rely on [the P]lan[16] terms simply because [the SAC] references cost-sharing elements like coinsurance or deductibles." (*Id.* at 19.)

---

[15] Plaintiffs do not object to the Court's reliance on the call transcripts or the EOBs. (*See generally* Pls.' Opp'n.)

[16] The Court uses "Plan Document" to refer to the summary plan for the Patient's insurance policy, and "Plan" to refer to the Patient's insurance policy.

Instead, Plaintiffs contend "[t]hose references serve a factual and economic purpose, not a legal one: [t]hey explain why Aetna's reimbursement representation mattered and how it shaped provider and patient decision-making." (*Id.* (citing SAC ¶¶ 23–28).) In support, Plaintiffs argue their claims are based on a "separate, pre-service promise that governed the entire financial structure of the procedure," the SAC "never asks the Court to determine whether any cost-sharing obligation was correctly calculated under the [P]lan," and therefore, "[r]eferencing how coinsurance works in practice is not the same as seeking to enforce plan language." (*Id.*)

Third, Plaintiffs argue that the SAC does not incorporate the Plan Document by reference because "the SAC does not rely on, reference, or attach any ERISA plan." (*Id.* at 21.) Rather, Plaintiffs contend that "Aetna's reimbursement representation was made independently of, and without disclosure of, any [P]lan methodology." (*Id.* (citing SAC ¶¶ 9–15, 47–52).) Plaintiffs argue that they referenced terms such as cost-sharing in the SAC not to litigate Plan rights, but to "illustrate why the reimbursement quote was critical, because it dictates the downstream financial impact for both provider and [the P]atient." (*Id.*) Plaintiffs cite to *McCulloch Orthopaedic Surgical Services, PLLC v. Aetna Inc.* to show that a pre-service reimbursement representation can be actionable "without reference to the underlying benefit plan." (*Id.* at 21–22 (citing 857 F.3d 141, 150 (2d Cir. 2017)).) Further, Plaintiffs argue that "Aetna [cannot] manufacture incorporation by submitting" the Plan Document, and "[f]ederal courts do not apply incorporation-by-reference to accept incomplete or contested ERISA materials that a defendant submits unilaterally, particularly where the complaint does not establish their applicability." (*Id.* at 22–23 (citing *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).) Plaintiffs contend without incorporation, there "is no basis to recast Plaintiffs' claims as seeking [P]lan benefits or requiring [P]lan interpretation." (*Id.* at 23.)

In deciding a Rule 12(b)(6) motion, "the district court is normally required to look only to the allegations on the face of the complaint," but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025) ("Generally, in determining whether a complaint states a claim, the court is required to make the assessment based solely on the allegations in the complaint, without considering extraneous facts and materials[] [but] [a] plaintiff may incorporate allegations in the complaint by reference to another document; and 'where the complaint relies heavily upon its terms and effect,' the 'document is integral to the complaint.'" (first citing *Time Warner, Inc.*, 282 F.3d at 152; and then quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016))). "If, however, there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016); *see also Oberlander v. Coinbase Glob. Inc.*, No. 23-184, 2024 WL 1478773, at *4 (2d Cir. Apr. 5, 2024) (summary order) (emphasizing that "even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document" (alteration in original) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting same); *United States v. Persad*, 607 F. App'x 83, 84 (2d Cir. 2015) ("'A court should not' take judicial notice of a fact 'that is an essential part of a party's case unless the fact is clearly beyond dispute.'" (quoting *Pina v. Henderson*, 752 F.2d 47, 50 (2d Cir. 1985))). "The 'no dispute' requirement has been interpreted strictly: even implicit, conclusory, contradictory, or implausible

28

objections to the authenticity or accuracy of a document render consideration impermissible."

*Lynch v. Roman Cath. Diocese of Brooklyn*, 822 F. Supp. 3d 340, 356 (E.D.N.Y. 2026) (quoting

*Guerriero v. Diocese of Brooklyn*, No. 21-CV-4923, 2024 WL 2826101, at *3 (E.D.N.Y. May

22, 2024)); *Santiago v. City of Rome*, No. 24-CV-704, 2025 WL 553347, at *3 (N.D.N.Y. Feb.

19, 2025) (quoting *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, No.

14-CV-2495, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016)) (same); *Nw. Biotherapeutics,*

*Inc. v. Canaccord Genuity LLC*, No. 22-CV-10185, 2023 WL 9102400, at *8 (S.D.N.Y. Dec. 29,

2023) (quoting *Savides v. United Healthcare Servs., Inc.*, No. 18-CV-4621, 2019 WL 1173008,

at *2 (S.D.N.Y. Mar. 13, 2019)) (same); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221–22

(N.D.N.Y. 2014) (collecting cases).

The Court considers the December 21, 2020 and February 25, 2021 call transcripts, the

EOBs, and the Plan Document.

### 1.    Call transcripts

Both transcripts are integral to the SAC because Plaintiffs reference the calls in the SAC.

(*See, e.g.*, SAC ¶¶ 47, 50.)  Plaintiffs also cite to the transcripts in their opposition to Aetna's

motion.  (*See* Pls.' Opp'n 1, 2, 5–6, 13.)  In addition, Plaintiffs do not object to the Court's

consideration of the transcripts.  *See Nicosia*, 834 F.3d at 231 ("If, however, there is a dispute as

to the relevance, authenticity, or accuracy of the documents relied upon, the district court may

not dismiss the complaint with those materials in mind.").

Therefore, the Court considers the December 21, 2020 transcript and the February 25,

2021 transcript.

### 2.    EOBs

The Court also considers the EOBs because they are integral to the SAC: the EOBs are

explicitly referenced in the Complaint, (SAC "Claims, Payment, and EOBs") and are

incorporated by reference through Plaintiffs reliance on the EOBs' terms and effects, (*id.* ¶¶ 57–60). *See Pearson*, 125 F.4th at 406 ("A plaintiff may incorporate allegations in the complaint by reference to another document; and where the complaint relies heavily upon its terms and effect, the document is integral to the complaint." (citations and internal quotation marks omitted)); *see also Rowe XXIV*, 2026 WL 388609, at *4 n.7 (finding the plaintiffs had incorporated by reference the EOB into the amended complaint through allegations regarding Aetna's correspondence regarding procedural reimbursement at fifty percent of the reasonable and customary rate). Further, Plaintiffs do not challenge the authenticity and accuracy of the EOBs. *See Nicosia*, 834 F.3d at 231.

### 3. Plan Document

In the August 2025 Decision, the Court analyzed consideration of the Plan Document and found that it was "'integral' to the Plaintiffs' pleading, because the allegations 'presuppose[] the existence of a relationship' between the Patient and Aetna," but the Court declined to consider it. (August 2025 Decision 17 (first citing *Strock*, 982 F.3d at 63; and then citing *Park Ave. Podiatric Care, P.L.L.C. v. Cigna Health & Life Ins. Co.*, No. 23-1134, 2024 WL 2813721, at *3 (2d Cir. June 3, 2024) (summary order).) Relying primarily on *Park Avenue*, the Court found the Plan Document integral to the Plaintiffs' pleading because it was the Plan under which Aetna managed the costs of the Patient's medical treatment, (*Id.* at 17–18), and "whether an out-of-network provider like [Plaintiffs were] the recipient of any duty under the [P]lan, [is a] threshold question[] that rel[ies] on the terms of the [P]lan and [is] necessary to resolve in order to advance [Plaintiffs'] challenge to the merits stage." *Park Ave.*, 2024 WL 2813721, at *3 (affirming district court's consideration of insurance plan documents as integral to the complaint "[b]ecause the plan terms and effects were relied upon in [the] complaint, and integral to its adjudication" and finding that the plans were regulated by ERISA). (*See* August 2025 Decision 18 (citing

*Rowe VII*, 2025 WL 692051, at *1 (dismissing Rowe MD and East Coast Plastic Surgery, P.C.'s argument that the court should not consider the plan documents submitted by insurers "because they were not attached to the complaint" as "too ridiculous to warrant serious consideration" because "[t]he plans provide[d] the insurance coverage for the patients and so are integral to the complaint that seeks to recover for surgeries performed on them").)  However, the Court ultimately declined to consider the Plan Document, although a "close call," because "there [was] no permissible basis to conclude that the Patient was covered under the Plan Document, either as a participant or beneficiary." (*Id.* at 17–18.)  Specifically, the Court found that the Plan Document did not "mention the Patient and the only information before the Court linking the Patient to the policy is Aetna's declaration." (*Id.* at 19–20.)

The Court considers the Plan Document now because the Aetna EOBs link the Patient to the Plan, and therefore the Plan Document is integral to the claims and implicitly relied on by Plaintiffs.  First, through the EOBs and the Petrozelli Declaration, Aetna establishes a connection between the Patient and the Plan.  The Petrozelli Declaration states "[i]n 2020–2021, based on Aetna's business records, [the Patient] was enrolled in a health benefits plan sponsored and funded by Intesa Sanpaolo (the 'Plan'), and noted in Aetna's business records as being governed by" ERISA.  (Petrozelli Decl. ¶ 2.)  The Plan Document states that the policy is an employee welfare benefit plan providing health care services under a group policy, Intesa Sanpaolo is the plan sponsor and administrator, and Aetna is the policy underwriter and claims processor.  (Plan Document 3, 7–8, 67–68, 112.)[17]  While the Plan Document does not explicitly mention the Patient, the EOBs connect the Patient to the Plan's named sponsor, Intesa Sanpaolo.  The Plan Document lists a policyholder group number that matches the EOBs, (Plan Document 1, EOBs),

---

[17] The Plan Document is paginated only for a portion of the total exhibit.  The Court refers to the portable document format ("PDF") page numbers of the Plan Document for clarity.

31

the Patient's initials in the EOBs match the initials plead in the SAC, (*see* EOBs; SAC ¶ 4), and the EOBs establish a relationship between the Plan sponsor and the Patient — the Patient is under insurance policy group name, Intesa Sanpaolo, (*see* EOBs).  Further, the amounts billed of $45,615.93 for Dr. Rowe and $45,228.35 for Dr. Schneider listed in the SAC, (SAC ¶ 60), match the amounts billed on the EOBs.  Accordingly, Aetna has rectified what the Court found deficient in the August 2025 Decision by providing EOBs that properly connect the Patient to the Plan.  (*Compare* August 2025 Decision 19–20 ("The Plan Document, however, does not mention the Patient and the only information before the Court linking the Patient to the policy is Aetna's declaration . . . . [T]here are no complaint exhibits that the Court can match to the Plan Document and the Court declines to reconcile any apparent inconsistencies on a motion for judgment on the pleadings.").)

Plaintiffs' objections to the Petrozelli Declaration's admissibility are ineffective.  (*See* Pls.' Opp'n 16.)  The Petrozelli Declaration lays a proper foundation because she attests that the Plan Document is a "business record[] [ ] made and maintained by Aetna in the normal course of its business."  (Petrozelli Decl. ¶ 1.)  *See United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) ("To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].") (alteration in original) (citations and internal quotation marks omitted); *Rowe I*, 705 F. Supp. 3d at 200 ("A declaration from a senior paralegal of defendant indicates the phone call was recorded and maintained in the normal course of Aetna's business.  That is sufficient foundation." (citations and internal quotation marks omitted)).  Plaintiffs have raised similar objections regarding admissibility of plan documents in other *Rowe* cases, which many other courts rejected after finding the plan was integral to the complaint and connected to the patient at issue.  *See Rowe XXVII*, 2026 WL

540767, at *3 (considering the plan document despite plaintiffs' arguments that the "[p]lan is irrelevant and inadmissible" and the claims are "not preempted by ERISA"); *Rowe XX*, 2025 WL 2644190, at *2 ("Contrary to [the p]laintiffs' argument, consideration of the [p]lan, as reflected in the [p]lan [s]ummary, is proper because the [p]lan is referenced in, and is 'integral to' the [a]mended [c]omplaint.'" (citing *Pearson*, 125 F.4th at 406)); *Rowe XVI*, 2025 WL 1940325, at *5 & n.3 (considering the plan documents attached to a Petrozelli Declaration because the plan was integral to the claims — "[the p]laintiffs would not have reached out to Aetna had it not first determined that Aetna was responsible for administering [the patient's] plan"); *Rowe III*, 2024 WL 4252045, at *3 (rejecting the plaintiffs' arguments that their claims were based on the defendants' actions and words and not the patient's plan "[b]ecause the plan's terms and effects were relied upon in [the p]laintiffs' [a]mended [c]omplaint, and integral to its adjudication, the [c]ourt considers the [p]lan [s]ummary as incorporated by reference" (citing *Park Ave.*, 2024 WL 2813721, at *3)); *see also Park Ave.*, 2024 WL 2813721, at *3 (holding the district court did not err in considering the submitted portions of the plan document because "whether [the patient's] plan was an ERISA-regulated plan, and whether an out-of-network provider like [the plaintiffs were] the recipient of any duty under the plan, are threshold questions that rely on the terms of the plan and are necessary to resolve in order to advance [the plaintiffs'] challenge to the merits stage"); *cf. Rowe XXVI*, 2026 WL 783837, at *5 (declining to consider the plan documents because there was no factual basis to conclude the plan governed the patient's claim); *Rowe I*, 705 F. Supp. 3d at 201 (declining to consider the plan on a motion to dismiss because the pleading "contains [only] oblique references to [the patient's] insurance plan").

Second, Plaintiffs incorrectly contend that they do not "'implicitly' rely on [the P]lan terms," (Pls.' Opp'n 19), or incorporate it by reference because they never referenced or attached an ERISA plan in the SAC, and "Aetna's reimbursement representation was made independently

33

of, and without disclosure of, any plan methodology," (*see id.* at 21).  Plaintiffs argue their claims in this case are based on a "separate, pre-service pricing promise," (Pls.' Opp'n 19), but the Court is not persuaded because Plaintiffs conveniently ignore in their pleadings the explicit references to the Plan by Aetna's representative in the December 21, 2020 call transcript.  (*See* Dec. 21, 2020 Tr. 6:15 ("[L]et me quote you the out-of-network benefits for this *[P]lan*" (emphasis added)); *see also id.* 3:18, 3:24, 6:1, 7:9, 7:10 (referencing the Patient's Plan).)  While Plaintiffs do not specifically plead in the SAC that their claims involve "enforcing [P]lan language," that is contradicted by their communications with Aetna which explicitly discuss coverage for the Patient under the Plan.  *See Rowe XXVII*, 2026 WL 540767, at *3 ("Plaintiffs['] attempt to avoid [the court finding the plan is integral to the complaint] by not using the term 'plan,' 'health plan' or 'ERISA' in the operative complaint, unlike their previously dismissed complaints, does not escape this result."); *Rowe XVI*, 2025 WL 1940325, at *5 (dismissing the plaintiffs' argument that their claims are based "entirely on the parties' course of conduct" and "not the ERISA plan" because the "'course of conduct' revolved around what was and what was not covered under [the patient's] ERISA plan"); *see also Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) ("Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the [ ] complaint.'" (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000))).  Further, Plaintiffs' argument that they do not implicitly rely on the Plan terms because they were citing coinsurance information for "a factual and economic purpose," (Pls.' Opp'n 19), is illogical.  Plaintiffs nevertheless allege that Aetna "control[ed] all financial terms that govern how much [the P]atient must pay and how much [Plaintiffs] may expect to receive," (SAC ¶ 23), and that "Aetna affirmatively invoked its in-network benefit framework and thereby assumed the corresponding obligation to pay the rendering provider," (*id.* ¶ 40).  As demonstrated by the December 21, 2021

call transcript and the EOBs, the SAC's discussion of control of financial terms and a benefit framework are references to the Patient's Plan.

Plaintiffs cite to *McCulloch* to argue that a pre-service reimbursement representation can be actionable "without reference to the underlying benefit plan," and as a result, Plaintiffs argue that they do not incorporate the Plan Document by reference. (Pls.' Opp'n 21–22 (citing 857 F.3d at 150).)  In *McCulloch*, the surgeon-plaintiff called Aetna prior to performing surgeries on a patient, who was a member of an Aetna-administered health care plan governed by ERISA, and Aetna stated that the surgeon would be reimbursed at a seventy percent UCR rate.  857 F.3d at 144–45.  The Second Circuit concluded that "any legal duty Aetna has to reimburse [the surgeon] is independent and distinct from its obligations under the patient's plan" because the surgeon's "phone call . . . was not in furtherance of an ERISA plan."  *Id.* at 150.  The Second Circuit reached this conclusion after finding that (1) the surgeon "was not a valid assignee of the plan"; (2) the surgeon "had no preexisting relationship with Aetna"; and (3) the surgeon "was not required by the plan to pre-approve coverage for the surgeries that he performed."  *Id.* at 150–51. None of those three conditions are present in this case.  First, unlike in *McCulloch*, this case does not concern a valid assignment of payment for medical benefits under an insurance plan and an "anti-assignment" provision in the plan, as the parties do not raise these issues.  *See id.* at 144, 147.  Second, the SAC provides that Plaintiffs have a preexisting relationship with Aetna.  (*See* SAC ¶¶ 30–34.)  Third, and most importantly, in the transcript of the December 21, 2020 call between Aetna and Plaintiffs, which Plaintiffs call the "single, concrete event" that this case "turns on," (Pls.' Opp'n 1), the Aetna representative not only references the Plan multiple times, but also states explicitly, billing for the Patient's procedure "requires pre-certification" under the Plan and directs Plaintiffs to contact a "dedicated department . . . for the pre-certification," (*see* Dec. 21 Call Tr. 5:1–4).  Unlike in *McCulloch*, the Court cannot distinguish Plaintiffs' claims as

independent from the Plan obligations.  *See id.* at 151; *see also Rowe XXIV*, 2026 WL 388609, at *7 (finding that the plaintiffs' calls with Aetna prior to performing the surgery were all "different versions of benefit verification (or preauthorization) phone calls, not definite offers or promises to pay" (quoting *Rowe XVI*, 2025 WL 1940325, at *8)).

Accordingly, the Court considers the transcripts of the December 21, 2020 and February 25, 2021 calls, the EOBs, and the Plan Document.

### d.    ERISA governs the Patient's Plan

Aetna argues, first, that the Plan Document establishes "on its face" that ERISA governs the Plan, and therefore the Patient was enrolled in an ERISA-governed employee welfare plan. (Def.'s Reply 10.)  Second, Aetna contends that the Second Circuit has held that an ERISA plan is established if "from the surrounding circumstances a reasonable person can ascertain intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." (*Id.* (quoting *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1209 (2d Cir. 2002)).)  Aetna argues that the Plan Document, a summary document, meets that standard, other courts have relied on summary plan descriptions such as the Second Circuit in *Park Avenue*, 2024 WL 2813721, at *2, and "the plain language of the Plan [D]ocument confirms that the Patient was enrolled in an employee welfare benefit plan governed by ERISA."  (*Id.* at 11–12.)  The Plan Document states it was prepared "according to ERISA" and references employee contributions, identifies the Plan's fiduciaries and Plan administrator, and tasks Aetna as the claims administrator.  (*Id.* at 11 (citing Plan Document).)  Third, Aetna argues Plaintiffs misconstrue the cases they rely on to undermine the sufficiency of the Plan Document in establishing that ERISA governs the Plan.  (*Id.* at 10–11 n.2 (citing Pls.' Opp'n 17–18 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011); *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148 (2d Cir. 1994); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101 (2d Cir. 2008)))).)

36

Plaintiffs argue that Aetna has not met its burden to prove the Plan Document is governed by ERISA because a "vague [Plan Document] coupled with a non-party paralegal affidavit is not enough." (Pls.' Opp'n 16–18.) First, Plaintiffs argue that the Plan Document is only a summary, and not the formal written instrument required by 29 U.S.C. §§ 1102(a)–(b),[18] and this is insufficient to prove the plan is governed by ERISA. (*Id.* at 17, 22 (citing *Amara*, 563 U.S. at 438).) Plaintiffs contend that the Plan Document is insufficient to create an ERISA plan because the Plan points to other "governing documents" and to the Plan administrator to establish necessary facts such as fiduciaries, funding, and more. (*Id.*) Plaintiffs also cite to *Paneccasio v. Unisource Worldwide, Inc.*, to "confirm[] that a[] [Plan Document] does not control when it

---

[18] 29 U.S.C.A. §§ 1102(a)–(b) provides the following requirements to establish an ERISA plan:

> **(a) Named fiduciaries**
> (1) Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.
> (2) For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.
> **(b) Requisite features of plan**
> Every employee benefit plan shall —
> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter,
> (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan (including any procedure described in section 1105(c)(1) of this title),
> (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and
> (4) specify the basis on which payments are made to and from the plan.

defers to other 'official' plan documents." (*Id.* at 18 (citing 532 F.3d 101).)  Further, Plaintiffs

argue the Petrozelli Declaration does not remedy the factual deficiencies of the Plan Document

because Petrozelli is not the Plan sponsor or administrator, and the Declaration only contains a

conclusory statement that the Plan Document is the governing document.  (*Id.* at 17 (citing

*Grimo*, 34 F.3d at 151).)

Second, Plaintiffs argue that Aetna's reliance on the Petrozelli Declaration to establish

that the Patient's Plan was governed by ERISA fails because "[t]he declaration contains only a

conclusory assertion that the [P]lan is 'noted in Aetna's business records as being governed by

[ERISA],' without providing any factual basis to satisfy the statutory criteria under 29 U.S.C. §

1002(1)." (*Id.* at 16–17.)  Plaintiffs contend that the Petrozelli Declaration does not show that

the Plan "was established or maintained by an employer for the purpose of providing employee

benefits, nor does [Petrozelli] attest to the nature of the Plan's funding, administration, or

exemptions." (*Id.* at 17.)  Plaintiffs also argue that the "declaration improperly relies on Aetna's

internal classification of the [P]lan, which is not a substitute for competent evidence." (*Id.*)

ERISA sets forth "a comprehensive system for the federal regulation of private employee

benefit plans," *Feifer*, 306 F.3d at 1209 (emphasis omitted) (quoting *District of Columbia v.*

*Greater Wash. Bd. of Trade*, 506 U.S. 125, 127 (1992)), and "appl[ies] to any employee benefit

plan . . . established or maintained . . . by any employer engaged in commerce" unless it meets an

enumerated exception, 29 U.S.C. § 1003(a); *Browe v. CTC Corp.*, 15 F.4th 175, 194 (2d Cir.

2021) ("ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that

ERISA shall apply to any employee benefit plan, other than listed exceptions." (quoting *Demery*

*v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000))); *Melendez v. New York*

*Foundling, Inc.*, No. 17-CV-6162, 2019 WL 1084776, at *5 (S.D.N.Y. Mar. 7, 2019) ("ERISA

governs employee benefit plans offered and administered 'by any employer engaged in

38

commerce or in any industry or activity affecting commerce.'" (quoting 29 U.S.C. § 1003(a)(1))).  Among the plans excluded from ERISA are (1) governmental plans; (2) church plans; (3) plans "maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws"; (4) plans "maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens"; and (5) unfunded excess benefit plans.  29 U.S.C. § 1003(b); *Gordon Surgical Grp., P.C. v. Empire HealthChoice HMO, Inc.*, 724 F. Supp. 3d 158, 179 n.5 (S.D.N.Y. 2024) ("ERISA governs health plans that are established and/or sponsored by private employers, and does not cover plans established or maintained by governmental entities or churches, nor does it cover plans that are maintained solely to comply with applicable workers compensation, unemployment, or disability laws.  ERISA also does not cover plans maintained outside the United States primarily for the benefit of nonresident aliens or unfunded excess benefit plans.")  An "employee welfare benefit plan" is "any . . . plan, fund, or program . . . established or . . . maintained for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits." *Silverman v. Teamsters Loc. 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 284 (2d Cir. 2014) (alterations in original) (quoting 29 U.S.C. § 1002(1)); *see also Timian v. Johnson & Johnson*, No. 15-CV-6125, 2015 WL 6454766, at *3 (W.D.N.Y. Oct. 26, 2015) ("The definition of 'employee welfare benefit plan' in 29 U.S.C. § 1002(1) 'can be broken down into five elements: (1) a 'plan, fund, or program' (2) established or maintained (3) by an employer . . . (4) for the purpose of providing medical, surgical, [or] hospital care . . . benefits . . . (5) to participants or their beneficiaries.'" (alterations in original) (quoting *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1047 (10th Cir. 1992))).  A plan "need not be a formal written document," but can be established "if from

the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Guilbert v. Gardner*, 480 F.3d 140, 146 (2d Cir. 2007) (quoting *Grimo*, 34 F.3d at 151); *Lovo v. Investis Digit. Inc.*, No. 23-CV-1868, 2023 WL 7004772, at *4 (S.D.N.Y. Oct. 24, 2023) (quoting *id.*).

The Patient's Plan is subject to ERISA by its express terms and does not fall into any of the enumerated list of plan types exempted from ERISA's scope. The Plan Document states the Plan was prepared "according to ERISA," (Plan Document 89), the Plan is an employee welfare benefit plan sponsored and administered by employer Intesa Sanpaolo, (*id.* at 111–12), employees contribute to the Plan, (*id.* at 91, 111), and Aetna acts as the claims administrator, (*see e.g.*, *id.* at 5–7, 15–16, 60–64, 65–76). The Plan Document also discusses how the Patient may enforce their rights under ERISA. (*Id.* at 112–13.) Accordingly, the Plan Document's plain language confirms that the Patient's Plan is ERISA-governed. *See Guilbert*, 480 F.3d at 146 (A "plan, fund, or program under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits," and "[a] plan need not be a formal written document" (citations and internal quotation marks omitted)); *see also Park Ave.*, 2024 WL 2813721, at *2 (upholding district court's consideration of a plan summary to determine ERISA governed the patient's plan); *Rowe XX*, 2025 WL 2644190, at *3 ("[T]he [p]lan [s]ummary makes clear that the [p]lan is governed by ERISA."); *Rowe III*, 2024 WL 4252045, at *4 (finding that the plan summary "establishes on its face that it is indeed an ERISA plan").

Plaintiffs unconvincingly argue against the sufficiency of the Plan Document to establish that the Plan is governed by ERISA. First, Plaintiffs rely on *Amara* to argue that the summary Plan Document cannot create an ERISA Plan, (*see* Pls.' Opp'n 17 (citing *Amara*, 563 U.S. at 438)), but Plaintiffs misunderstand the burden of proof the Second Circuit requires for Aetna to

show that the Plan is governed by ERISA.  *See Guilbert*, 480 F.3d at 145–46 ("In a case involving an alleged employee welfare benefit plan, [the Second Circuit has] held that a plan, fund, or program under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.  A plan need not be a formal written document." (citation and internal quotation marks omitted)).  In *Amara*, the plaintiff was seeking to rely on a plan summary to reform a plan's contradictory terms, and the Supreme Court held that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but [] their statements do not themselves constitute the *terms* of the plan."  *Amara*, 563 U.S. at 438.  The circumstances in this case are different from in *Amara* where there was no debate regarding whether the plan was governed by ERISA.  *See id.*  In this case, Aetna is not using the Plan Document to state that the Plan Document's contents *constitute* the terms of the Plan such that it is independently legally binding, but that the Plan Document "confirms that the Patient was enrolled in an employee welfare benefit plan governed by ERISA."  (*See* Def.'s Reply 11–12.)  Many courts in this Circuit have relied on summary documents such as the Plan Document at the motion to dismiss stage to evaluate whether ERISA governs the plan and how the plan functions.  *See Rowe XX*, 2025 WL 2644190, at *2 ("[T]he [p]lan [s]ummary is properly considered on this motion to dismiss to find that [the p]laintiffs' claims arise out of an ERISA-governed insurance plan."); *Wong v. I.A.T.S.E.*, No. 23-CV-7629, 2024 WL 898866, at *1 n.1 (S.D.N.Y. Mar. 1, 2024) ("Courts routinely consider ERISA plan documents and their summary plan descriptions on motions to dismiss." (quoting *Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, No. 16-CV-5265, 2017 WL 4023350, at *3 (S.D.N.Y. Sep. 11, 2017))).

Plaintiffs' citation to *Paneccasio* to argue the insufficiency of a summary plan to establish an ERISA-governed plan because a "[summary plan document] does not control when

41

it defers to other 'official' plan documents," (Pls.' Opp'n 18 (citing 532 F.3d 101)), is similarly inapposite.  Like in *Amara*, the plaintiff in *Paneccasio* argued that a summary plan document modified the terms of the plan.  *Paneccasio*, 532 F.3d at 107.  The Second Circuit found the argument unpersuasive because of the disclaimer in the summary plan brochure that said "the official legal documents or contracts will govern" in any conflict between the benefit plans and the summary document.  *Id.* at 110.  Whether the plan was governed by ERISA was not an issue in *Paneccasio*, and it does not follow from the Second Circuit's conclusion in that case about when/if a summary document controls plan terms that a summary document like the Plan Document cannot be used to establish a plan is governed by ERISA.  *See id.*

Moreover, to prove that a plan is governed by ERISA, the plan document provided "need not be a formal written document."  *Guilbert*, 480 F.3d at 146 (quoting *Grimo*, 34 F.3d at 151); *see also* 29 U.S.C. § 1003(a) (ERISA covers "*any* employee benefit plan" (emphasis added)).  In fact, "[s]ome essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund, or program — e.g., an insurance company's procedure for processing claims."  *Grimo*, 34 F.3d at 151 (alteration in original) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc)); *see In re AMR Corp.*, 508 B.R. 296, 309 (Bankr. S.D.N.Y. 2014) ("[E]ven though ERISA requires that every welfare plan be established and maintained pursuant to a written instrument, nothing in ERISA defines anything as *the* plan document.  ERISA itself recognizes that various documents are relevant to welfare benefit plans, as evidenced by its requirement to disclose any summary plan descriptions, annual reports, terminal reports, bargaining agreements, trust agreements, and other contracts under which the plan is established or operated." (citations omitted)).  Plaintiffs' citation to *Grimo* is unconvincing.  Plaintiffs cite to *Grimo* to support that a "sparse record fails to establish the existence or structure of an ERISA plan."  (Pls.' Opp'n 17–18.)  However, the plaintiff in *Grimo*

42

tried to establish that her plan was governed by ERISA by simply alleging her employer provided prior contributions to the insurance plan. *Grimo*, 34 F.3d at 152 ("[T]he entire factual record on this question consists of an ambiguous admission by [the plaintiffs'] counsel that [the employer] paid some of the costs of some of its employees' insurance at some time in the past."). *Grimo* is dissimilar because unlike in this case, there was no summary plan document for the Second Circuit to evaluate. *See id.* (*See also* Def.'s Reply 11 n.2.)

Finally, Plaintiffs arguments regarding the Petrozelli Declaration are unpersuasive because Aetna is not relying solely on the Declaration to establish that the Patient's Plan is governed by ERISA. (*See* Pls.' Opp'n 16–17.) An ERISA plan is established "from the surrounding circumstances," *Feifer*, 306 F.3d at 1209 (quoting *Grimo*, 34 F.3d at 151), not one individual document, and Aetna meets its burden of showing the required elements of an ERISA plan via the Plan Document.

Accordingly, the Plan Document establishes ERISA governs the Patient's Plan.

### e. Plaintiffs' claims are preempted by ERISA

#### i. Aetna's arguments

Aetna argues that ERISA fully preempts the SAC. (Def.'s Mem. 14–16; Def.'s Reply 12–14.) First, Aetna argues the SAC "hinges" on the Patient's ERISA Plan because (1) Plaintiffs "admit[] that the reimbursement Plaintiffs seek depends on 'deductible, coinsurance, copayment, and out-of-pocket-maximum' — i.e., the plan terms," and (2) Plaintiffs "concede that Aetna's network exception[] 'invoked its in-network benefit framework,' i.e., the [P]lan terms, and that the duty under which they seek to recover stems from that framework." (Def.'s Mem. 15 (citing SAC ¶¶ 23, 24–29, 40).) Second, Aetna also contends that Plaintiffs place the ERISA-governed Plan "front and center" of the SAC by asserting that, "[w]hen health care providers call the insurer, they do so to obtain essential coverage and reimbursement information, [because]

[p]roviders must understand whether the service is covered, what portion the insurer will reimburse, and what financial burden will fall on the patient." (Def.'s Reply 12 (emphasis omitted) (citing SAC ¶ 5).) Third, Aetna argues that "[n]o matter how Plaintiffs try to rewrite their complaint [or Amended Complaint], it continues to revolve around the benefits verification call to Aetna, administrator for the Patient's ERISA-governed Plan. Such benefits verification calls do not constitute promises to pay Plaintiffs." (*Id.* at 12.) Any attempt to "weaponize such calls against Aetna" would conflict with ERISA because reimbursement ultimately hinges on information beyond that initial benefits call. (*Id.* at 13 (citing *Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, 103 F.4th 597, 604 (9th Cir. 2024)).) Fourth, Aetna argues this case is similar to *Park Avenue*, and the Section 514 express preemption principles applied by the Second Circuit in that case apply here because the SAC similarly invokes a patient's coverage and benefits for reimbursement. (Def.'s Mem. 15–16 (citing 2024 WL 2813721, at *2–3).) Fifth, Aetna also contends other courts in several *Rowe* cases have dismissed Plaintiffs' cases as preempted by ERISA, (*id.* at 16 (citing *Rowe XX*, 2025 WL 2644190, at *3)), and Plaintiffs cannot avoid this conclusion "because they omit the word 'plan,'" (*id.*), or by "pointing to the network exception," (Def.'s Reply 13). Sixth, Aetna argues Plaintiffs cite four inapposite cases that deal with "the wrong kind of ERISA preemption — *complete* preemption under ERISA § 502" as opposed to *express* preemption under ERISA § 514. (*Id.* at 14 (citing Pls.' Opp'n 18–25).)

### ii.    Plaintiffs' arguments

Plaintiffs first argue that the SAC "pleads a classic rate-of-payment, not right-to-payment, dispute"[19] and hinges on the December 21, 2020 representation by Aetna's representative that "formed an independent reimbursement promise wholly outside the written terms of any ERISA plan." (Pls. Opp'n 18.)  Plaintiffs contend that the SAC does not "challenge coverage or seek to enforce any plan-derived right," only "a pre-service misrepresentation about pricing, conduct that would be actionable even if no ERISA plan existed." (*Id.*)  Plaintiffs cite to *Montefiore Medical Center v. Teamsters Local 272* to support that ERISA does not govern "how much a non-contracted provider will be paid." (*Id.* (citing 642 F.3d 321, 325 n.2 (2d Cir. 2011)).)  In addition, because the Court considers the Plan Document, Plaintiffs argue that the Plan Document confirms that this is a "rate-of-payment" dispute because the Plan Document "defines the 'reasonable amount rate' as the 90th percentile value reported in a database prepared by FAIR Health, a third-party pricing index," and this "confirms that reimbursement was to be calculated using a fluctuating external benchmark, not fixed by plan interpretation or internal Aetna methodology." (*Id.* at 23.)

Second, Plaintiffs argue that the network exception, "an express pre-service approval by Aetna," removes "[t]his case [] even further [] from ERISA preemption" "because it displaces

---

[19]  Plaintiffs do not elaborate on the difference between "rate-of-payment" and "right-to-payment" disputes.  (*See* Pls.' Opp'n 18.)  The court in *Neurological Surgery, P.C. v. Aetna Health Inc.* clarified that "'[a]mount of payment' claims concern 'the computation of contract payments or the correct execution of such payments . . . [and] are typically construed as independent' of ERISA." 511 F. Supp. 3d 267, 291 (E.D.N.Y. 2021) (second and third alterations in original) (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 331 (2d Cir. 2011)).  The "'[r]ight to payment' claims 'implicate coverage and benefits established by the terms of the ERISA benefit plan' and are construed as 'claims for benefits that can be brought pursuant to' ERISA." *Id.* (quoting *Montefiore*, 642 F.3d at 331).  Plaintiffs argue this case is a rate-of-payment claim external to the Plan, but as discussed in this Section, the Court finds that Plaintiffs' claims invoke the ERISA-governed Plan, making this a right-to-payment dispute. *See id.*

45

any need to interpret or apply default [P]lan terms regarding coverage, eligibility, or cost-sharing." (*Id.* at 19.)  In support, Plaintiffs contend that "Aetna's discretionary act [of granting a network exception], not the [P]lan language, [] authorized the procedure and triggered reimbursement," making that discretionary exception "independently actionable." (*Id.* at 19–20.)  Moreover, Plaintiffs argue this is what differentiates this case from other *Rowe* cases.  (*Id.* at 20.)  Unlike those cases, in this case "Aetna exercised discretion to bypass standard network rules and then misrepresented how it would calculate payment." (*Id.*)  Plaintiffs cite to *McCulloch* and *Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of New York, Inc.* to support that the distinction between a pre-surgery promise to pay a specific rate is an independent legal duty not preempted by ERISA.  (*Id.* (citing *McCulloch*, 857 F.3d 141), 24–25 (citing *Neuroaxis*, No. 11-CV-8517, 2012 WL 4840807, at \*1 (S.D.N.Y. Oct. 4, 2012)).)

Third, Plaintiffs contend that "[b]ecause Plaintiffs could bring this same fraud claim even if no ERISA plan existed, preemption does not apply." (*Id.* at 22.)  Plaintiffs argue *Aetna Health Inc. v. Davila*[20] shows ERISA does not preempt claims where the alleged duty is "independent of ERISA or the plan terms." (*Id.* (citing 542 U.S. 200, 210 (2004)).)

Fourth, Plaintiffs argue that Aetna's reliance on *Park Avenue* is misplaced because *Park Avenue* "turned on the plaintiff's own pleading that framed the duty as arising from [the insurer's] role as a 'claims administrator for [the patient's] plan.'" (*Id.* at 20 (citing *Park Ave.*, 2024 WL 2813721, at \*2).)  Plaintiffs argue that in this case, the SAC pleads the opposite — that

---

[20] Plaintiffs acknowledge that *Aetna Health Inc. v. Davila* "concerns complete preemption not express preemption" but argues that "*Davila* and its progeny necessarily discuss whether a state law claim is colorable as an ERISA claim, and therefore, the reasoning is instructive and persuasive authority this Court should consider." (Pls.' Opp'n 19 n.1 (citing 542 U.S. 200, 210 (2004)).)

46

the Aetna representative never referenced Plan documents during the December 21, 2020 call. (*Id.* (citing SAC ¶ 15).)

Fifth, Plaintiffs argue that Aetna's payment to Plaintiffs "is wholly inconsistent with its current ERISA-based defense" because "[i]f plan interpretation truly governed this dispute, Aetna's payment would contradict its own position." (*Id.* at 24.) "If Aetna truly believed its pre-service statements carried no meaning and could not be relied upon, there would be no reason to pay anything at all." (*Id.* at 25.)

### iii.   Relevant law

"ERISA was enacted 'to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures.'" *Rutledge v. Pharm. Care Mgt. Ass'n*, 592 U.S. 80, 86 (2020) (quoting *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U.S. 312, 320–21 (2016)). "In line with that intent to create a 'uniform regulatory regime over employee benefit plans' and 'ensure that employee benefit plan regulation would be exclusively a federal concern,'" Congress included Section 514(a), "a sweeping express preemption provision declaring that ERISA 'shall supersede any and all State laws . . . [that] relate to any employee benefit plan.'" *Trs. of N.Y.S. Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 598 (2d Cir. 2024) (alterations in original) (first quoting *Davila*, 542 U.S. at 208; and then quoting 29 U.S.C. § 1144(a))); *see Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) ("Section 514(a) of ERISA provides that the statute 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" (quoting 29 U.S.C. § 1144(a))); *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 106 (2d Cir. 2017) ("ERISA contains a broadly worded preemption clause declaring that the statute 'supersede[s] any and all State laws' that '*relate to* any employee benefit plan.'" (alteration in original) (quoting 29 U.S.C. § 1144(a)); *see also Wurtz v. Rawlings Co.*, 761 F.3d 232, 240 (2d Cir. 2014)

47

("ERISA expressly preempts any state law that 'relate[s] to any employee benefit plan,' but not if that law 'regulates insurance.'" (alteration in original) (quoting 29 U.S.C. §§ 1144(a)–(b))).  A state law "relate[s] to" an ERISA plan if it has a connection with an ERISA plan or has a reference to such a plan.  29 U.S.C. § 1144(a); *Nurses Ass'n Pension Plan*, 102 F.4th at 598 (quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001)).  "[S]tate laws that would tend to control or supersede central ERISA functions . . . have typically been found to be preempted."  *Off. Create Corp. v. Planet Ent., LLC*, 140 F.4th 96, 102 (2d Cir. 2025) (second alteration in original) (quoting *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003)).  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."  *Id.* at 102–03 (quoting *Shaw v. Delta Air Lines*, Inc., 463 U.S. 85, 96–97 (1983)); *Nurses Ass'n Pension Plan*, 102 F.4th at 598 ("A law refers to ERISA if it acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." (quoting *Rutledge*, 592 U.S. at 88)).  "[A] state law has an 'impermissible connection with an ERISA plan' if it 'governs a central matter of plan administration or interferes with nationally uniform plan administration,' or 'provid[es] alternative enforcement mechanisms' to ERISA," *Nurses Ass'n Pension Plan*, 102 F.4th at 598 (second alteration in original) (first quoting *Rutledge*, 592 U.S. at 88; and then quoting *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 (2d Cir. 2014)), or "is a critical element of a state-law cause of action," *Hattem v. Schwarzenegger*, 449 F.3d 423, 432 (2d Cir. 2006) (citation omitted); *see Park Ave.*, 2024 WL 2813721, at *2 ("A state law 'relates to' an ERISA plan . . . when 'the existence of a [ ] plan is a critical factor in establishing liability." (second alteration in original) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139–40 (1990))).

"The touchstone of the preemption analysis is congressional intent, as guided by two presumptions," including "the baseline presumption that ordinarily, 'Congress does not intend to

48

supplant state law'" and that "ERISA typically does preempt state laws that 'control or supersede central ERISA functions' or 'affect the relationships among the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries.'" *Nurses Ass'n Pension Plan*, 102 F.4th at 598–99 (first quoting *Gerosa*, 329 F.3d at 323; and then quoting *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 59 (2d Cir. 2010)); *see Off. Create Corp.*, 140 F.4th at 102 ("In evaluating claims of preemption under ERISA, courts 'begin with the assumption that Congress does not intend to supplant state law, a presumption that is particularly strong for state action in fields of traditional state regulation.'" (quoting *Gerosa*, 329 F.3d at 323)). "[S]tate laws that would tend to control or supersede central ERISA functions" include those "affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits." *Stevenson*, 609 F.3d at 59 (quoting *Gerosa*, 329 F.3d at 323). "[P]reemption is not called for 'if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.'" *Hattem*, 449 F.3d at 429 (emphasis omitted) (quoting *N.Y.S. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995)).

"[T]he pre-emption clause is not limited to 'state laws specifically designed to affect employee benefit plans.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47–48 (1987) (citation omitted). It also includes state common law causes of action "that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" *Paneccasio*, 532 F.3d at 114 (quoting *Davila*, 542 U.S. at 214); *Park Ave.*, 2024 WL 2813721, at *2 ("The Supreme Court has explained that [ERISA Section 514(a)] also preempts state common law claims that seek to rectify 'alleged improper processing of a claim for benefits under' ERISA-regulated plans." (quoting *Pilot Life Ins.*, 481 U.S. at 47–48)); *see also Aesthetic & Reconstructive Breast Ctr., LLC v. United*

49

*HealthCare Grp., Inc.*, 367 F. Supp. 3d 1, 7 (D. Conn. 2019) ("The Second Circuit has also recognized that how § 514 interacts with common law claims is a more nuanced question than a literal reading of the text would imply" and in "elaborat[ing] on the 'connection or reference' standard [ ] cited the Supreme Court's decision in a case about preemption under § 502,[21] [*Davila*, 542 U.S. 200], to note that '[a]s to state common law claims, ERISA preempts those that seek to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" (fourth alteration in original) (citing *Paneccasio*, 532 F.3d at 114)).

### iv.   Discussion

ERISA preempts Plaintiffs' claims because Plaintiffs' allegations of independent legal duties arising from (1) a "rate-of-payment, not right-to-payment, dispute" from Aetna's representations in the December 21, 2020 call, and (2) a "discretionary" network exception are inseparable from the Patient's ERISA-governed Plan.  First, Plaintiffs' allegations, along with the transcript of the December 21, 2020 call, do not support that Aetna's representative "formed

---

[21]  ERISA provides for complete preemption under Section 502 and express preemption under Section 514. *Da Silva Plastic & Reconstructive Surgery, P.C. v. Aetna Health Inc.*, No. 23-CV-5482, 2025 WL 2773102, at *3 (E.D.N.Y. Sep. 29, 2025) ("ERISA provides for two types of preemption: complete preemption under Section 502; and express preemption under Section 514." (quoting *Trundle & Co. Pension Plan v. Emanuel*, No. 18-CV-7290, 2019 WL 4735380, at *3 (S.D.N.Y. Sep. 27, 2019))), *appeal withdrawn*, No. 25-2772, 2025 WL 4673549 (2d Cir. Dec. 11, 2025).  Complete preemption under Section 502 is jurisdictional. *See id.* Under the complete preemption doctrine, a plaintiff's "state cause of action [may be recast] as a federal claim for relief, making [its] removal [by the defendant] proper on the basis of federal question jurisdiction." *Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009) (alterations in original) (citation omitted).  Express preemption under Section 514 "is one of the 'three familiar forms' of ordinary defensive preemption (along with conflict and field preemption) . . . . As an ordinary defensive preemption claim, express preemption cannot support federal jurisdiction because it would not appear on the face of a well-pleaded complaint." *Wurtz v. Rawlings Co.*, 761 F.3d 232, 238 (2d Cir. 2014) (citations omitted).  The parties are disputing express preemption under ERISA Section 514. (*See, e.g.*, Def.'s Mem. 1, 15–16; Def.'s Reply 14; Pls.' Opp'n 16, 19 n.1, 24.)

an independent reimbursement promise wholly outside the written terms of any ERISA plan." (*See* Pls. Opp'n 18.)  As the Court stated in its August 2025 Decision, the allegation that Aetna offered to reimburse the Patient's procedure at 90th percent reasonable and customary is not supported by the December 21, 2020 call transcript because Aetna's representative stated twice that he was quoting the Patient's Plan and that pre-certification was required.  (August 2025 Decision 28.)  "Even drawing all reasonable inferences in Plaintiffs' favor, nothing in the call's transcript can be construed as an offer to reimburse Plaintiffs at a specific amount."  (*Id.*) Plaintiffs' omission of "Plan" and "ERISA" in the SAC cannot magically transform the Court's previous findings regarding the same communication into an independent legal duty "outside the written terms of any ERISA plan," (Pls.' Opp'n 18).  *Rowe XXVII*, 2026 WL 540767, at *3 ("Plaintiffs['] attempt to avoid [ERISA-preemption] by not using the term 'plan,' 'health plan' or 'ERISA' in the operative complaint, unlike their previously dismissed complaints, does not escape [the Court's consideration of the plan documents or preemption].").  Plaintiffs cannot escape ERISA preemption because the transcript makes clear that the ERISA-governed Plan was integral to the December 21, 2020 communication between the parties, and as stated by Plaintiffs, "[t]he case turns on a single concrete event" — the December 21, 2020 call.  (*See* Pls.' Opp'n 1.)  This is not a "tenuous, remote, or peripheral connection with [the] covered plan[s]," *Hattem*, 449 F.3d at 429 (quoting *N.Y.S. Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. at 661), such that preemption does not apply.  Rather, Plaintiffs' claims seek to "rectify a wrongful denial of benefits promised under [an] ERISA-regulated plan[]," *Paneccasio*, 532 F.3d at 114 (quoting *Davila*, 542 U.S. at 214).

Plaintiffs allege that consideration of the Plan Document confirms that this is a "rate of payment dispute" via reliance on an external benchmark, FAIR Health, as stated in the Plan Document, (*see* Pls.' Opp'n 23), but it is unclear how this makes Aetna's duty to pay

independent from the terms of the ERISA-governed Plan when Plaintiffs themselves are relying on the Plan Document's representation to argue about reimbursement rates. *See Park Ave.*, 2024 WL 2813721, at *3 ("[W]hether an out-of-network provider like [plaintiffs'] was the recipient of any duty under the plan, [is a] threshold question[] that rel[ies] on the terms of the plan."); *Rowe XX*, 2025 WL 2644190, at *3 ("'[A]ny legal duty' Aetna 'has to reimburse [the plaintiffs] arises from its obligations under the patient's ERISA plan, and not from some separate agreement or promise,' and thus '[the plaintiffs'] claims are expressly preempted by ERISA § 514(a).'" (quoting *id.* at *2)). Plaintiffs incorrectly rely on *Montefiore* to support that ERISA does not preempt claims about reimbursement amounts, (*see* Pls.' Opp'n 18 (citing 642 F.3d at 325 n.2)), because Plaintiffs do not successfully plead an independent legal duty to pursue an "amount of payment" claim outside of the ERISA-governed Plan. Rather, their claims involve reimbursement pursuant to the benefits provided by the Patient's ERISA-governed Plan.[22]

Second, Plaintiffs' attempt to avoid preemption by contending that Aetna's discretionary network exception "displaces any need to interpret or apply default plan terms" fails. (*See* Pls.' Opp'n 19.) As with their allegations involving a 90th percentile of reasonable and customary reimbursement offer based on the December 21, 2020 call, the Court rejected Plaintiffs' allegations in the August 2025 Decision that Aetna's network exception induced them to perform the surgery because "Plaintiffs have not sufficiently alleged that Aetna offered or promised to pay them a specific rate of reimbursement." (August 2025 Decision 46 n.16.) Plaintiffs' revisions to their pleadings in the SAC do not alter the Court's conclusion because Plaintiffs still

---

[22] Plaintiffs' citation to *Montefiore*, (*see* Pls.' Opp'n 18 (citing 642 F.3d at 325 n.2)), is also inapposite because *Montefiore* involved complete preemption under ERISA § 502(a)(1)(B), and the Second Circuit held that the state-law claims of a hospital, as valid assignee of the patients, for payment of medical services the ERISA plan failed to reimburse, were completely preempted by ERISA. *See* 642 F.3d at 326.

52

fail to demonstrate that the network exception provided a specific rate of reimbursement.  In fact, Plaintiffs seemingly admit that with the network exception, "there was no contracted rate [but] the expectation created by Aetna was that it would reimburse the lesser of the 90th percentile of FAIR Health or the [Plaintiffs'] charge."  (SAC ¶ 42.)  Plaintiffs' contention that Aenta's failure to disclose a reimbursement rate lower than 90th percentile reasonable and customary under the network exception further supports that Aetna did not provide a specific rate of reimbursement — Plaintiffs operated under a unilateral expectation, not a material misrepresentation by Aetna.  See Ne. Plastic Surgery PLLC v. BlueCross BlueShield of Ill., No. 24-CV-9148, 2025 WL 1194446, at *2 (S.D.N.Y. Apr. 22, 2025) ("[The in-network exception] at most, suggests that [the insurer] was prepared to pay something for [the patient's] surgeries; that falls substantially short of a 'declaration to do' so.").  Moreover, Plaintiffs do not provide a copy of the letter where Aetna allegedly granted the network exception, or otherwise allege supporting details where Aetna promised any specific reimbursement rate from granting a network exception.  (See SAC ¶ 42.)

Further, the Court does not understand Plaintiffs' argument as to how a network exception would remove Plaintiffs' claims "even further [ ] from ERISA preemption," (Pls.' Opp'n 19), because Plaintiffs allege that "[Plaintiffs] requested a network exception . . . to guarantee payment[, and] [b]y approving the exception, Aetna affirmatively invoked its in-network benefit framework and thereby assumed the corresponding obligation to pay the rendering provider," (SAC ¶ 40 (emphasis added)).  Plaintiffs' right to payment under the network exception comes from the Aetna's benefit framework, i.e., the Patient's Plan.  Without support, Plaintiffs argue the network exception "conferred express authorization for a surgery it could not otherwise provide, overriding the default plan terms that typically apply," (Pls.' Opp'n 2, 6, 13, 14), but many courts have expressly rejected that pre-authorization or any pre-approval

by an insurer constitutes an independently actionable claim that escapes ERISA-preemption. *See Cooperman v. Empire HealthChoice HMO, Inc.*, No. 24-CV-866, 2025 WL 950675, at *16 (S.D.N.Y. Mar. 28, 2025) (rejecting the plaintiffs' argument that preauthorization created an independent legal duty that was not preempted by ERISA); *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 289 (E.D.N.Y. 2021) ("The 'pre-authorization, pre-certification, or other requirements' provided to Aetna before [the p]laintiff rendered 'medically necessary, covered health care services' do not create a legal duty independent of ERISA. Indeed, the source of those 'pre-authorization[s], pre-certification[s], or other requirements' *is* an ERISA plan." (alterations in original) (citations omitted)); *Neurological Surgery, P.C. v. Siemens Corp.*, No. 17-CV-3477, 2017 WL 6397737, at *5 (E.D.N.Y. Dec. 12, 2017) (finding state law claims preempted where the plaintiffs were "unable to point to any written or oral contract" between the parties and preauthorization did not create an independent contractual duty); *see also Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y.*, 64 F. Supp. 3d 459, 466 (E.D.N.Y. 2014) ("[The p]laintiff argues that [the insurer] already determined the medical necessity of its services to [the patient] by pre-approving them, but any pre-approval further demonstrates how [the] plaintiff's claims implicate coverage and benefits." (citations and internal quotation marks omitted)); *Star Multi Care Servs., Inc. v. Empire Blue Cross Blue Shield*, 6 F. Supp. 3d 275, 287 (E.D.N.Y. 2014) ("Here, accepting the allegations in [the] plaintiff's complaint as true, and in a light most favorable to [the] plaintiff, the complaint still does not allege facts to support an independent contractual obligation, but instead states that [the insurer] 'provided authorization' for [the] plaintiff's services. An 'authorization' plainly implicates coverage and benefits determinations . . . ." (internal citations omitted)). If anything,

54

the network exception brings Plaintiffs' claims further *into* the ambit of ERISA preemption because the Plan provides Plaintiffs' the right to reimbursement.[23]

Accordingly, because Plaintiffs' state common law causes of action "seek to rectify a wrongful denial of benefits promised under [an] ERISA-regulated plan[], and do not attempt to remedy any violation of a legal duty independent of ERISA," *Paneccasio*, 532 F.3d at 114 (citation and internal quotation marks omitted), ERISA preempts Plaintiffs' claims. *See Rowe XXVII*, 2026 WL 540767, at *3 (finding ERISA preempted all of plaintiffs' state-law claims including fraudulent inducement); *Rowe XX*, 2025 WL 2644190, at *3 (same); *Rowe XVI*, 2025 WL 1940325, at *6 (same); *Rowe VII*, 2025 WL 692051, at *1 (same); *Rowe III*, 2024 WL 4252045, at *4 (same); *see also Park Ave.*, 2024 WL 2813721, at *2 (finding ERISA preemption for all state law claims).

---

[23] Plaintiffs unpersuasively cite to *McCulloch Orthopaedic Surgical Services, PLLC v. Aetna Inc.* and *Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of New York, Inc.* to argue that a pre-surgery promise to pay a specific rate is an independent legal duty not preempted by ERISA because Plaintiffs fail to allege an actionable pre-surgery promise to pay, only a unilateral expectation and claims tethered to the Patient's Plan. (Pls.' Opp'n 20 (citing *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141 (2d Cir. 2017)), 24–25 (citing *Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of N.Y., Inc.*, No. 11-CV-8517, 2012 WL 4840807, at *1 (S.D.N.Y. Oct. 4, 2012)).) Furthermore, those cases involve express ERISA preemption under section 502(a)(1)(B), which is not at issue in this case. *See McCulloch*, 857 F.3d at 145–46; *Neuroaxis*, 2012 WL 4840807, at *1.

Similarly, Plaintiffs bring additional unsuccessful arguments against ERISA preemption including: (1) "[b]ecause Plaintiffs could bring this same fraud claim even if no ERISA plan existed, preemption does not apply," (Pls.' Opp'n 22); (2) Aetna's reliance on *Park Avenue* is misplaced because the plaintiffs in *Park Avenue* pled claims involving the patient's plan while Plaintiffs here do not, (*id.* at 20 (citing *Park Ave. Podiatric Care, P.L.L.C. v. Cigna Health & Life Ins. Co.*, No. 23-1134, 2024 WL 2813721, at *2 (2d Cir. June 3, 2024) (summary order)); and (3) Aetna's payment to Plaintiffs "is wholly inconsistent with its current ERISA-based defense" because "[i]f plan interpretation truly governed this dispute, Aetna's payment would contradict its own position," (*id.* at 24). Each of these arguments incorrectly presupposes an independent legal duty from either the December 21, 2020 call or the network exception, which the Court dispenses with in this Section. The Court, therefore, finds these arguments meritless and declines to address them further.

55

### III.   Conclusion

For the foregoing reasons, the Court grants Aetna's motion to dismiss and dismisses with prejudice Plaintiffs' claims of fraud, fraud by omission, and fraudulent inducement as set forth in the SAC.

Dated:  June 26, 2026
          Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge